## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
**Bid Protest**

|  |  |
|---|---|
| CLASSIC AIR CHARTER, INC., | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| THE UNITED STATES, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

**Final Redacted Version**

Case No. <u>25-286 C</u>

### COMPLAINT

Plaintiff, Classic Air Charter, Inc. ("CAC"), alleges as follows for its Complaint against the Defendant, the United States of America, acting by and through the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE" or the "Agency").

### Nature of this Action

1.      This Complaint arises out of a procurement with a history so protracted and convoluted that its length and complexity are rivaled only by Odysseus' arduous ten-year journey home to Ithaca depicted in Homer's epic, *The Odyssey*.[1]

2.      Preceding this Complaint are three award decisions, four rounds of evaluations by the Agency, and five rounds of bid protest litigation—which have included protests by CAC, by the most recent presumptive awardee, CSI Aviation, Inc. ("CSI"), and by a prior awardee, Chapman Freeborn Airchartering, Inc. ("Chapman Freeborn").

---

[1] *See* HOMER, THE ODYSSEY (Robert Fitzgerald trans., Macmillan 1961) (800 BCE).

3.      Yet, even with so many opportunities, the Agency has still failed to conduct a sound evaluation free of material defects, or to make a rational and reasoned award decision.

4.      Request for Quotations No. 70CDCR23Q00000004 (the "RFQ") sought quotations for the establishment of a single-award, multi-billion-dollar Blanket Purchase Agreement ("BPA") for Daily Schedule Large Aircraft ("DSLA") and Special High-Risk Charter ("SHRC") Flight Services in support of ICE Air Operations—the primary air transportation division of the Agency charged with facilitating the transfer and removal of detained aliens in support of DHS initiatives.[2]

5.      Following initial evaluations, the Agency issued an award, valued at approximately $2.8 billion, to Chapman Freeborn—a foreign-owned company with Russian ties and an otherwise unsavory past—in May 2023.  This award was protested at the Government Accountability Office ("GAO") by both CAC and CSI, and resulted in voluntary corrective action by the Agency.  The Agency subsequently terminated the contract award, and disqualified Chapman Freeborn from further consideration.

6.      At the conclusion of a corrective action reevaluation process, an award was issued to CSI in March 2024, with a total value of $3.6 billion.

7.      CAC successfully protested the award to CSI, which, in relevant part, was based upon prejudicially flawed evaluations of CSI's quotation under Factor 2—Aircraft Availability and Commitment and Factor 4—Past Performance, and a defective best-value tradeoff determination.

---

[2] *See* https://www.ice.gov/factsheets/ice-air-operations (last visited February 13, 2025).

8.      The Agency promised to take further corrective action to reevaluate those portions of CSI's quotation, but did not terminate CSI's award—presumably because CSI would not have been eligible to continue on in the competition or receive a new award due to the expiration date of the General Services Administration ("GSA") Multiple Award Schedule ("MAS") contract under which CSI submitted its quotation.

9.      However, rather than "re-evaluate CSI's Factor 2—Aircraft Availability and Commitment and Factor 4—Past Performance proposals," **Exhibit 1** at 1, as the Agency represented to the GAO it would do to obtain dismissal of CAC's prior protest, the Agency solicited revised quotation submissions in a letter dated June 10, 2024 (the "June 10 Letter") to allow CSI to cure the defects in its quotation.

10.     CAC protested the Agency's corrective action bait-and-switch at the GAO, prompting the Agency to quickly rescind the June 10 Letter.  Yet, several months later, the Agency once again abandoned its promised corrective action and, on October 23, 2024, issued a letter (the "October 23 Letter") seeking revised quotation submissions.

11.     The October 23 Letter was nearly identical to the rescinded June 10 Letter.  In it, the Agency stated that it had "performed a post-corrective action review and evaluation of *[CAC's] quote,*" and was now conducting discussions.  **Exhibit 16** at 1 (emphasis added).  In response, CAC renewed its protest at the Agency, challenging the Agency's blatant departure from the corrective action promised to the GAO, among other errors.[3]  In response to CAC's

---

[3] In its Agency-level protest, CAC requested independent review of its claims at a level above the Contracting Officer by an official without prior involvement in the procurement, pursuant to FAR 33.103(d)(4).  **Exhibit 26** at 4.  It is CAC's understanding, however, that the official who conducted this level-above review—Shawn O'Donnell—has been actively involved in the subject procurement since its inception.  **Exhibit 27** at 7.

protest, the Agency issued a paltry, cursory decision which summarily disposed of CAC's argument with little substantive analysis or legal justification.

12.     Instead, after purportedly conducting another corrective action reevaluation drawn out over three months, the Agency confirmed its prior award to CSI, ***at a price premium of more than a <u>half billion dollars</u>*** as compared to CAC's highly-rated quotation.

13.     The Agency's latest evaluation and award decision are no more rational, reasonable, or lawful than those that preceded it.

14.     Indeed, the Agency erred in evaluating CAC's and CSI's quotations, completely disregarded the price evaluation factor, conducted a defective best-value tradeoff determination, breached its implied duty to fairly and honestly consider CAC's quotation, and arrived at a prejudicially arbitrary and unlawful award decision.

15.     CAC, by this Complaint, respectfully seeks, *inter alia*: (a) a declaration from the Court that the Agency's corrective action reevaluation of quotations, and confirmation of CSI as the contract awardee, was prejudicially arbitrary, capricious, an abuse of discretion, and otherwise unlawful; (b) a permanent injunction[4] barring the Agency from proceeding with performance of the unlawfully issued contract award to CSI; (c) an order directing the Agency to terminate CSI's contract award, conduct a rational reevaluation of offerors' quotations in accordance with the terms of the RFQ and applicable law, and render a new award decision; and

---

[4] CAC understands that the Government will be executing an additional six-month bridge contract with CSI, with a period of performance from March 1, 2025 to August 31, 2025, and that performance of the contract award to CSI which is the subject of this protest will be voluntarily stayed during this bid protest litigation.  CAC respectfully reserves the right to move for a temporary restraining order or preliminary injunctive relief in the event that the voluntary stay of performance is lifted prior to resolution of CAC's protest.

(d) the payment of CAC's bid preparation and proposal costs, the precise amount of which will be determined via a separate proceeding if the Agency and CAC are unable to resolve the matter informally.

## Parties

16.     Plaintiff is a corporation organized and incorporated under the laws of the State of Delaware.

17.     Defendant is the United States, acting by and through the U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement.

## Jurisdiction and Standing

18.     The Court has jurisdiction over this action because the case involves CAC's objection to "a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of a statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

19.     CAC has standing to bring this suit because it is an actual offeror whose direct economic interests have been, and continue to be, adversely and prejudicially affected by the Agency's improper conduct described in this Complaint. *See, e.g.*, *G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 396 (2022) ("[A] plaintiff must prove two elements to establish that it has standing: 1) that it is an actual or prospective bidder/offeror, and 2) that it possesses a direct economic interest in the award of the contract.").

20.     CAC timely submitted a quotation in response to the RFQ, has continued to submit quotation revisions in response to each of the Agency's amendments to the RFQ, each round of discussions, and each round of voluntary corrective action undertaken by the Agency,

and has continuously pursued an award under the RFQ.  Thus, it cannot be disputed that CAC is an actual offeror under the subject RFQ, and that the first element of standing is satisfied.

21.     To demonstrate a direct economic interest in the procurement sufficient to support standing, a plaintiff generally must make an adequate showing of prejudice.  *Yang Enterprises, Inc. v. United States*, 156 Fed. Cl. 435, 445 (2021).  "A protester's showing of prejudice differs depending upon the nature of the protest."  *Square One Armoring Serv., Inc. v. United States*, 123 Fed. Cl. 309, 320 (2015).  Generally, in the context of a post-award protest, "a protester demonstrates the requisite prejudice by showing that it would have had a 'substantial chance' of receiving the contract award but for the alleged errors in the procurement process."  *Id*.  For purposes of the standing analysis, "the Court must accept the well-pled allegations of agency error to be true."  *USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 450 (2010).

22.     CAC has standing to challenge the Agency's corrective action reevaluation of quotations and reissuance of a contract award to CSI.

23.     CAC is a highly qualified and highly capable incumbent offeror.  CAC received ▓▓▓▓▓▓▓▓▓ scores under nearly every non-price evaluation factor, and received outstanding marks in every category.  Additionally, CAC submitted a fair and reasonable price quotation under Factor 5, with a quoted price of ▓▓▓▓▓▓▓ and a total evaluated price (inclusive of all options) of $3,066,667,176.19.

24.     But for the Agency's prejudicially arbitrary and unlawful conduct as detailed herein, CAC would have received an even more favorable evaluation under Factor 4—Past Performance, and thus would have achieved ▓▓▓▓▓▓▓ evaluation score under ***every*** non-price factor.  Further, had the Agency rationally evaluated CSI's quotation, properly considered price as an evaluation factor, and rationally conducted its best-value analysis,

selection of CAC as the contract awardee would have been a foregone conclusion.  Considering

CAC's qualifications and capabilities, outstanding evaluation scores, and price advantage of

***more than $██ million*** as compared to CSI—and considering that CAC and CSI are now the

only two companies left in the competition—there is a more than substantial likelihood that CAC

would have received the contract award following a rational and reasonable evaluation and

source selection determination in accordance with the terms of the RFQ.

      25.     Taking CAC's allegations as true, then, CAC has demonstrated that it would have

more than a substantial chance of receiving the contract award, but for the Agency's arbitrary and

unlawful actions.

      26.     As such, CAC has standing to challenge the Agency's corrective action

reevaluation of quotations and reissuance of a contract award to CSI.

**Factual Background**

**A.  <u>Relevant Terms of the RFQ.</u>**

      27.     The Agency initially issued RFQ No. 70CDCR23Q00000004 on January 23,

2023, seeking to award a single, multi-billion-dollar BPA for Daily Schedule Large Aircraft and

Special High-Risk Charter Flight Services in support of ICE Air Operations.  *See* <u>**Exhibit 2**</u>.  The

RFQ was issued in accordance with FAR Subpart 8.4 under GSA MAS 481211B and/or

481211O.  *Id*. at 2.

      28.     The RFQ contemplated the issuance of a hybrid BPA—including fixed-price with

Time and Materials CLINs—with a 12-month base period (inclusive of a 30-day transition

period) and four, 12-month option periods.  *Id*. at 3.

29.     The Agency's evaluation was to take place through a "two-phase, advisory down-select process," whereby the Agency would invite up to four contractors to participate in Phase 2 following a Phase 1 evaluation.  *Id*. at 3-4.

30.     As part of the Phase 1 quotation, offerors were required to submit a Cover Letter, Accounting System Documentation, Letter(s) of Commitment, FAA Air Operating Certificate(s), Airworthiness Certificates, Operations Specifications Documentation, a GSA Certification, a Corporate Experience Questionnaire, a List of Available Aircraft, Required Clauses and Provisions, and, if applicable, Teaming Agreement documentation.  *Id*. at 4-5.  As part of the Phase 2 quotation, offerors were also to participate in an Oral Presentation and submit a Betterment Promise, Pricing Spreadsheet, and Pricing Narrative.  *Id*. at 5; *see also* **Exhibit 3**.

31.     The RFQ specified the following factors and subfactors for use by the Agency in evaluating quotations:

- Phase 1:
    - Factor 1—Corporate Experience
    - Factor 2—Aircraft Availability and Commitment
- Phase 2:
    - Factor 3—Technical Capability
        - Subfactor 1—Subcontractor Management
        - Subfactor 2—Transition
        - Subfactor 3—Aviation Management
        - Subfactor 4—Betterment Promise
        - Subfactor 5—On the Spot Questions
    - Factor 4—Past Performance
    - Factor 5—Price.

**Exhibit 2** at 14.

32.     An acceptability review was also to be conducted as part of the Phase 1 evaluation.  *Id*. at 13-14.  As part of the Phase 1 acceptability review and verification, the Agency

was to evaluate each offeror's GSA Certification which, in turn, required consideration of the offeror's eligibility under the following criterion:

> In order to be eligible to compete, the total period of performance under the contractor's GSA FSS contract must be in full force and effect for at least 60 months beyond the award date of the BPA via the exercise of available, unexercised options.

*Id*. at 7.

33.    The RFQ further specified that "[q]uotes that do not pass the acceptability review will not be evaluated for the remaining phases/parts or factors." *Id*. at 10.

34.    In assessing quotations under Factor 1, the Agency was required to "evaluate whether the contractor will successfully perform the work (which includes, if applicable the extent of its teaming partner's involvement), based on its corporate experience." *Id*. at 14.

35.    The Agency would "evaluate the contractors' experience providing the same or similar services to the requirements listed in the SOW" by assessing "recent (active within the last three years) and relevant projects (similar in scope and complexity)." *Id*. "Projects that are more similar in scope to the proposed work, in scope and complexity, may be seen as more relevant than efforts that are less similar in these areas." *Id*.

36.    The RFQ provided data from the predecessor contract—including total missions, flight hours, and average flight hours per mission—over a look-back period through July 1, 2018, to serve as guidance for the size, scope, and complexity of the subject requirement.

37.    Each offeror was to be assigned a confidence rating under Factor 1—Corporate Experience using the following adjectival scale:

| **High Confidence** | The Government has **high confidence** that the contractor's experience will aid in successfully performing under the contract. |
|---|---|

| Some Confidence | The Government has **some confidence** that the contractor's experience will aid in successfully performing under the contract. |
|---|---|
| Low Confidence | The Government has **low confidence** that the contractor's experience will aid in successfully performing under the contract. |

*Id*. at 14-15.

38.     For Factor 2, the Agency was to "evaluate the contractor's aircraft availability (as demonstrated by letters of commitment from air partners) as it aligns to the requirements of the SOW." *Id*. at 15.

39.     An adjectival confidence rating for Factor 2—Aircraft Availability and Commitment would be assigned to each offeror following the Agency's evaluation, pursuant to the following rating scale:

| High Confidence | The Government has **high confidence** that the contractor has sufficient aircraft commitments available to support the Government's requirement. |
|---|---|
| Some Confidence | The Government has **some confidence** that the contractor has sufficient aircraft commitments available to support the Government's requirement. |
| Low Confidence | The Government has **low confidence** that the contractor has sufficient aircraft commitments available to support the Government's requirement. |

*Id*.

40.     An offeror's Technical Capability was to be evaluated under Factor 3 on the basis of the offeror's Oral Presentation and written Betterment Promise. *Id*.

41.     For Subfactor 1—Subcontractor Management, the Agency would consider "the soundness of the contractor's approach to successfully managing subcontractors" by evaluating whether the offeror's proposed "approach would (1) be realistically achievable, (2) meet the requirements of the SOW, if successfully executed, and (3) pose any excessive risks to the Government." *Id*.

42.    For Subfactor 2—Transition, the Agency was to evaluate whether the offeror's proposed approach to transitioning services "would (1) be realistically achievable, (2) meet the requirements of the SOW, if successfully executed, and (3) pose any excessive risks to the Government." *Id*. The Agency was to conduct a similar analysis under Subfactor 3—Aviation Management, considering whether the offeror's "approach to successfully managing aircraft (to include maintenance and safety)" would be achievable, meet SOW requirements, or pose risk to the Agency. *Id*. at 15-16.

43.    "[T]he soundness of the contractor's betterment promise" would be evaluated under Subfactor 4—Betterment Promise, by a consideration of "whether the promise would (1) be realistically achievable, (2) exceed the requirements of the SOW, if successfully executed, in a way that is beneficial to the Government[, and] (3) pose any excessive risks to the Government." *Id*. at 16.

44.    Finally, an offeror's responses to on-the-spot questions posed during its Oral Presentation would be evaluated under Subfactor 5 for (1) an indication of understanding of the presented scenario; (2) a sound plan or approach; (3) the offeror's fluency on industry-specific concepts and language; and (4) excessive performance and/or compliance risks. *Id*.

45.    A single overall confidence rating would be assigned to each offeror under Factor 3, using the following scale:

| High Confidence | The Government has **high confidence** that the contractor understands the requirement, proposes a sound approach and will be successful in performing the requirement with **little or no** government intervention. |
|---|---|
| Some Confidence | The Government has **some confidence** that the contractor understands the requirement, proposes a sound approach and will be successful in performing the requirement with **some** government intervention. |
| Low Confidence | The Government has **low confidence** that the contractor understands the requirement, proposes a sound approach and will be successful in performing the requirement **even with** government intervention. |

*Id.*

46.      In its Factor 4—Past Performance evaluation, the Agency would "evaluate the quality of services provided by the contractor (and teaming partners) to the agency and other organizations as a prime contractor and/or subcontractor," using as references the same projects submitted by offerors under Factor 1—Corporate Experience.  *Id.*

47.      In evaluating past performance, the Agency was to "consider the recency and relevance of the information obtained, source of information, and information about the quality of services provided."  *Id.* at 17.  "In addition to the CPARS assessments (interim and final) and reference checks on project[s] submitted during Phase 1, the Government reserve[d] the right to use other information in its assessment."  *Id.*  Importantly, the RFQ limited the scope of "recent" past performance to that which was performed within three years prior to the solicitation closing date.  *Id.*

48.      Each offeror would be assigned one of the below confidence ratings for its past performance under Factor 4:

| High Confidence | Based on the contractor's recent (NLT 3 years from solicitation closing date) and relevant (similar in scope and complexity to this effort), and performance record, the Government has a high expectation that the contractor will successfully perform. |
|---|---|
| Some Confidence | Based on the contractor's recent (NLT 3 years from solicitation closing date) and relevant (similar scope and complexity to this effort), and performance record, the Government has a reasonable expectation that the contractor will successfully perform. |
| Low Confidence | Based on the contractor's recent (NLT 3 years from solicitation closing date) and relevant (similar in scope and complexity to this effort), and performance record, the Government has a low expectation that the contractor will successfully perform. |
| Neutral Confidence * | The contractor does not have recent (NLT 3 years from solicitation closing date) and relevant (similar in scope and complexity to this effort), or any performance record; or the contractor's performance record is so sparse, a meaningful confidence rating cannot be reasonably assigned. |

*Id*.

49.     Price was to be evaluated under Factor 5 based on a review of each offeror's Basis of Estimate ("BOE") provided in the pricing spreadsheet as well as the submitted pricing narrative.  *Id*.  Quotations would be evaluated "by adding the total price for all options to the total price for the basic requirement."  *Id*. at 18.

50.     Price would not be rated adjectivally.  *Id*.  Rather, "[p]rices for the base and option periods, including the 6-month option available under FAR 52.217-8, will be evaluated to determine fair and reasonableness."  *Id*.  "The Government will also evaluate in accordance with FAR 8.405-3(b)(2)(vi)."  *Id*.  The Agency further reserved the right to conduct a price realism analysis.

51.     The RFQ specified the relative importance of the evaluation factors and subfactors, as follows:

> Factors 1 and 2 are equally important and are more important than factors 3, 4, and 5.  Factors 3-5 are listed in descending order of importance.  The individual factors will be rated holistically, and will comprise one confidence level rating for each factor, except price.  The non-price factors are significantly more important than factor 5, price.
>
> Subfactors will not be rated separately.  Subfactors will be treated equally within each factor.

*Id*.

52.     The RFQ also set forth the following basis for award:

> An award will be made to the responsible contractor whose quote, conforming to the solicitation, is determined to be the best overall value to the Government, considering the tradeoff between non-price and price factors.
>
> The Government may be willing to pay a price premium for quote features that reduce the risk of unsuccessful contract performance, provide increased technical capability or greater benefits to the Government.  The Government may also award

to other than the highest technically rated quote, if it determines that a price premium is not warranted.  As quotes approach equality (does not mean "equal" because all quotes are different), price may become a determining factor.

*Id*. at 18-19.

B.  **Prior Evaluations, Protests, and Corrective Action.**

53.    CAC timely submitted its Phase 1 quotation on or about January 27, 2023.  CAC also timely submitted its Phase 2 quotation on or about March 20, 2023.  On or about March 28, 2023, CAC provided an oral presentation to the Agency and submitted amended Phase 2 documentation in accordance with Amendment 2 to the RFQ.

54.    On May 11, 2023, following the Agency's initial evaluation, the Agency notified CAC that it had not been selected for award, and that a contract had been issued to Chapman Freeborn at a value of approximately $2.8 billion.  **Exhibit 4** at 1.

55.    Both CAC and CSI filed protests with the GAO, challenging the Agency's award to Chapman Freeborn.  *See Classic Air Charter, Inc.*, B-421683.1; *CSI Aviation, Inc.*, B-421683.2.  Among other things, CAC's protest challenged the Agency's unreasonable evaluation of quotations, failure to conduct a proper price reasonableness analysis, and failure to reasonably determine whether Chapman Freeborn was a responsible offeror.

56.    In June 2023, the Agency undertook voluntary corrective action in response to CAC's and CSI's protests.  The Agency subsequently terminated Chapman Freeborn's contract award in August 2023 and, following a reevaluation of the acceptability of quotation submissions under the RFQ, excluded Chapman Freeborn from the competition.  *See Chapman Freeborn Airchartering, Inc.*, B-421683.3, Nov. 30, 2023, 2024 CPD ¶ 197 at 4.

57.    On or about October 17, 2023, the Agency issued Amendment Three to the RFQ, which made administrative changes and provided additional instructions for offerors, and opened discussions with CAC.  *See* **Exhibit 5**; **Exhibit 6**.

58.    On October 26, 2023, CAC filed another GAO protest, challenging the terms of Amendment Three and the discussions conducted by the Agency.  *See Classic Air Charter, Inc.*, B-421683.4, Jan. 19, 2024, 2024 WL 663179.

59.    On October 27, 2023, the Agency issued Amendment Four to the RFQ, with the intent of clarifying Amendment Three and the Agency's discussions.  *See* **Exhibit 7**.  Among other things, Amendment Four clarified that "[t]he evaluation factors from the January 23, 2023 RFQ have not changed and remain applicable to this procurement."  *Id*. at 1 ("Amendment 3 did not add or change any evaluation criteria.  Amendment 3 included submission instructions and clarifications.").

60.    CAC timely submitted a revised quotation in accordance with Amendment Three, Amendment Four, and the Agency's discussions.

61.    The Agency issued additional discussions to CAC on January 5, 2024 and February 7, 2024.  *See* **Exhibit 8**; **Exhibit 9**.  Each time, CAC responded with timely submissions providing the requested information and clarifications to the Agency.

62.    On March 8, 2024, CAC received from the Agency a Notification of Unsuccessful Offeror & Brief Explanation of Award, which explained that "[CAC] ha[d] not been selected for award under the subject RFQ" and identified CSI as the awardee.  **Exhibit 10** at 1.

63.    CSI's quoted price, inclusive of options but exclusive of FAR 52.217-8, was $3,219,266,171.80.  *Id*.  The amount of CSI's award, inclusive of the base and all options, was $3.6 billion.  **Exhibit 11** at 1.  CSI's contract award had a period of performance extending from

March 8, 2024 to March 7, 2029.  *Id*.  This period of performance was to conclude just days before the expiration of the last option period of the GSA Schedule under which CSI submitted its quotation.  *Compare id*. (showing an award date of March 8, 2024 and the end of the period of performance of CSI's award as March 7, 2029) *with* **Exhibit 12** (showing an expiration date of the last option period of CSI's GSA Schedule of March 9, 2029); *see also* **Exhibit 2** at 7 ("In order to be eligible to compete, the total period of performance under the contractor's GSA FSS must be in full force and effect for at least 60 months beyond the award date of the BPA via the exercise of available, unexercised options. … Prime Contractors, only, must have 60 months (beyond award) remaining on their GSA Schedule."); **Exhibit 13**, Question No. 9 ("If the contractor is on their last 5 year option period they will be ineligible to compete.  This is a FAR requirement and cannot be changed.") (quoting FAR 8.405-3).

64.    The Agency provided the following summary of CAC's evaluations scores under each factor:

**Phase I**

| Factor 1: Corporate Experience | Factor 2: Aircraft Availability and Commitment |
|---|---|
| ████████████████████ | ████████████████████ |

**Phase II**

| Factor 3: Technical Capability | Factor 4: Past Performance | Factor 5: Quoted Price | Factor 5: Total Evaluated Price (Includes 52.217-8) |
|---|---|---|---|
| ████ | ████ | ████ | ████ |

**Exhibit 10** at 2.

65.     The Agency also provided the following brief explanation of the basis for its

decision to issue an award to CSI:

> Based upon the Government's evaluation of all quotes received and based upon the
> relative importance of the factors as established in the RFQ, the Government
> conducted a tradeoff between non-price and price factors and has determined that
> CSI Aviation Inc. provides the best value to the Government.

*Id*.

66.     On March 18, 2024, CAC filed a protest with the GAO, challenging numerous

aspects of the Agency's evaluation, including the Agency's evaluation of CSI's quotation under

Factor 2—Aircraft Availability and Commitment, and Factor 4—Past Performance.  *See Classic*

*Air Charter, Inc.*, B-421683.5, B-421683.6.  CAC supplemented its protest to raise additional

allegations after reviewing the Agency Report.

67.     On May 24, 2024, the GAO held outcome prediction Alternative Dispute

Resolution ("ADR") and advised the parties that, if a decision on the merits were to be reached,

the GAO would likely sustain CAC's protest allegations challenging the Agency's evaluation of

CSI's quotation under Factors 2 and 4.  The GAO also indicated that it would be likely to

determine that the Agency's best-value determination was flawed, and that CAC was prejudiced

by the Agency's material evaluation errors.

68.     On May 29, 2024, the Agency filed (yet another) a Notice of Corrective Action.

*See* **Exhibit 1**.  In that Notice of Corrective Action, the Agency represented to the GAO and to

CAC that it would take the following corrective actions:

> In accordance with the recommendations from the outcome prediction Alternative
> Dispute Resolution, the Agency will *re-evaluate CSI's Factor 2—Aircraft*
> *Availability and Commitment and Factor 4—Past Performance proposals*.

Consequently, the Agency intends to issue a new Source Selection Decision with a new best value tradeoff.

*Id*. (emphasis added).

69.    The Agency was clear and specific in representing to the GAO, and to CAC, the corrective action it planned to undertake in response to the GAO's determinations at outcome prediction ADR.  *Id*.  The Agency did not notify the GAO or CAC of any intent to, or otherwise reserve the right to, expand the scope of its corrective action beyond what was represented in its Notice of Corrective Action.  *Id*.

70.    In reliance on the Agency's representations, the GAO dismissed CAC's protest as academic on May 31, 2024.[5]

71.    Less than two weeks later, however, the Agency reversed course.

72.    On June 10, 2024, to kick off its purported "corrective" action reevaluation, the Agency requested revised quotation submissions from offerors.  *See* **Exhibit 14**.

73.    CAC filed yet another GAO protest on June 13, 2024, challenging the Agency's implementation of corrective action as reflected in the June 10 Letter.  *See Classic Air Charter, Inc.*, B-421683.8.  Generally, CAC contended that the Agency unreasonably and unlawfully abandoned the corrective action it represented to the GAO that it would undertake—and upon which the GAO specifically relied in dismissing CAC's prior protest—in favor of a radically different corrective action which allowed for broad quotation revisions and a broad reevaluation

---

[5] Following dismissal of its GAO protest as academic, CAC initiated an entitlement action, docketed as B-421683.7, in which it memorialized the agreement between the Agency and CAC that CAC was entitled to recover its attorneys' fees and costs related to its successful protest.  *See Classic Air Charter, Inc.*, B-421683.7—ENT.

of quotations, and which gave CSI another opportunity to cure the material defects in its quote which were previously ignored by the Agency.

74.     In response to CAC's protest, the Agency promptly rescinded the June 10 Letter. **Exhibit 15**.  Because the Agency rescinded the June 10 Letter, the GAO subsequently dismissed CAC's protest as academic.

75.     After a four-month lapse in procurement activity, the Agency issued a letter to CAC on October 23, 2024, in which the Agency indicated that it had "performed a post-corrective action review and evaluation of [CAC's] quote" and was "establish[ing] a competitive range and conduct[ing] discussions."  **Exhibit 16** at 1.

76.     The only practical difference between the rescinded June 10 Letter and the October 23 Letter was a four-month delay, which allowed the Agency cover to request updated aircraft commitments from both offerors under Factor 2 to replace the expiring commitments contained in prior quotation submissions.  Thus, the Agency sidestepped its obligation to *reevaluate* CSI's materially deficient quotation, as submitted prior to the March 2024 award, under Factors 2 and 4—despite its unequivocal commitment to the GAO to do so in exchange for dismissal of CAC's meritorious protest.

77.     Contrary to its promised corrective action, the Agency's October 23 Letter instead solicited completely new submissions from CSI *and CAC* under Factors 1, 2, and 5.  This expansion not only deviated from the promised corrective action and disregarded any time-sensitive implementation concerns, but also subjected CAC to re-review in areas where it had already received ███████████ adjectival ratings and proposed ███████ price.  The errors highlighted by the GAO which prompted the Agency to undertake corrective action were limited

to errors in the evaluation of CSI's quotation, and the solicitation of revised quotations was neither necessary nor appropriate in light of the errors found or corrective action promised.

78.    CAC timely submitted its final revised quotation on October 30, 2024 in accordance with the Agency's instructions in the October 23 Letter.  **Exhibits 17-25**.

79.    CAC also filed an Agency-level protest on November 1, 2024, in which CAC explained that (1) the Agency engaged in an effective bait-and-switch whereby it deviated dramatically from the represented corrective action and sought, instead, to allow CSI the opportunity to shore up the weak aspects of its quotation; and (2) CSI was no longer eligible, under the terms of the RFQ and the FAR, to compete for a contract award because it lacked the necessary period of performance remaining on its GSA Schedule to span the potential period of performance of a contract awarded under the RFQ.  **Exhibit 26** at 2-3.

80.    On December 5, 2024, the Agency issued a perfunctory denial of CAC's Agency-level protest.  *See* **Exhibit 27**.  In that response, the Agency claimed that it did not deviate from the corrective action promised to the GAO, and that CSI remained an eligible offeror:

> CAC misunderstands the relevance of CSI's GSA Schedule expiring on March 9, 2029.  If the current award stands as awarded, March 8, 2024, 60 months beyond the award date would be March 7, 2029, which is two days prior to the expiration of CSI's GSA Schedule.  Furthermore, the period of performance on BPA #70CDCR24A00000001 with CSI is March 8, 2024 through March 7, 2029.  The Government has no intention of extending the period of performance ***once*** the stop work order is lifted.

*Id*. at 6 (emphasis added).

### C.  **The Agency's January 31, 2025 Award Decision.**

81.    On January 31, 2025, the Agency issued another Notification of Unsuccessful Offeror and Brief Explanation of Award, informing CAC that it had not been selected for award and reaffirming the award issued to CSI.  **Exhibit 28** at 1.

82.     The Agency confirmed that CSI's quoted price was $3,219,226,171.80, exclusive of FAR 52.217-8. *Id*. CSI's awarded price, inclusive of all options and reflective of CSI's total evaluated price, remained $3.6 billion. *See* **Exhibit 11**.

83.     The Agency provided the following details of its evaluation of CAC's quotation:

**Phase I**



**Phase II**

| Factor 3: Technical Capability | Factor 4: Past Performance | Factor 5: Quoted Price | Factor 5: Total Evaluated Price (Includes 52.217-8) |
|---|---|---|---|
|  |  |  |  |

**Exhibit 28** at 2.

84.     The Agency also offered the following explanation of its award decision:

Based upon the Government's evaluation of all quotes received and based upon the relative importance of the factors as established in the RFQ, the Government conducted a tradeoff between non-price and price factors and has determined that CSI Aviation Inc. provides the best value to the Government.

*Id*.

85.     This timely Complaint follows.

**Count I**

**The Agency's Corrective Action Reevaluation of CAC's Quotation under Factor 4—Past Performance was Arbitrary, Capricious, and Otherwise Not in Accordance with Law.**

86.     CAC incorporates by reference the above-numbered paragraphs as if fully stated herein.

87.     For purposes of the evaluation under Factor 4—Past Performance, the Agency was to evaluate each offeror's prior performance of the projects submitted for purposes of the Factor 1—Corporate Experience evaluation.  *See* **Exhibit 2** at 12 ("The contractor shall identify the projects under Phase 1, Part 2 (Corporate Experience) that were evaluated using CPARS as well as any references that can be contacted to confirm past performance.").

88.     The RFQ set forth the following criteria to be used by the Agency in evaluating offerors under Factor 4—Past Performance:

> The Government will evaluate the quality of services provided by the contractor (and teaming partners) to the agency and other organizations as a prime contractor and/or subcontractor.  The past performance evaluation assesses the contractors' performance under previously awarded contracts.  The past performance evaluation is an assessment of the Government's level of confidence in the contractor's ability to successfully perform the solicitation requirements.

> The Government will assess its confidence that the contractor will successfully perform the work based on its past performance.  In addition to the CPARS assessments (interim and final) and reference checks on project[s] submitted during Phase 1, the Government reserves the right to use other information in its assessment.  The Government will consider the recency and relevance of the information obtained, source of the information, and information about the quality of services provided.

> A less than positive CPARS assessment (interim or final) or a less than positive reference check may result in lowered confidence by the Government.  The Government will assign one overall rating for the past performance factor.

> Past performance shall be evaluated for each contractor using the following levels of confidence ratings:



| High Confidence | Based on the contractor's recent (NLT 3 years from solicitation closing date) and relevant (similar in scope and complexity to this effort), and performance record, the Government has a high expectation that the contractor will successfully perform. |
|---|---|
| Some Confidence | Based on the contractor's recent (NLT 3 years from solicitation closing date) and relevant (similar scope and complexity to this effort), and performance record, the Government has a reasonable expectation that the contractor will successfully perform. |
| Low Confidence | Based on the contractor's recent (NLT 3 years from solicitation closing date) and relevant (similar in scope and complexity to this effort), and performance record, the Government has a low expectation that the contractor will successfully perform. |
| Neutral Confidence * | The contractor does not have recent (NLT 3 years from solicitation closing date) and relevant (similar in scope and complexity to this effort), or any performance record; or the contractor's performance record is so sparse, a meaningful confidence rating cannot be reasonably assigned. |

*Id.* at 16-17.

89.    CAC's quotation included ████ examples of recent and relevant projects to be considered for the Factor 1—Corporate Experience, and Factor 4—Past Performance evaluations. **Exhibit 20** at 5-8.  As its ████████, CAC submitted ████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████ *Id.* at 5-6.  As its ████████, CAC submitted █████████████████████████ ████████████████████████████████████████████████ █████████████████████ *Id.* at 6-8.

90.    Considering that CAC's submitted projects ████████████████████ ██████████████████████████████████████████ it is beyond dispute that CAC's past performance examples were recent and extraordinarily relevant.

91.    This is confirmed not only in CAC's quotation submissions, *see generally id.*, but also by the Agency's assessment of a ████████████ rating to CAC under Factor 1— Corporate Experience, wherein the Agency evaluated these same projects for recency, relevancy, and success in performance.  *See* **Exhibit 2** at 14 ("The Government will evaluate the ████████████████████████ ████████████████████████████████████████████████

contractors' experience providing [the] same or similar services to the requirements listed in the SOW.  The Government will evaluate recent (active within the last three years) and relevant projects (similar in scope and complexity) for [the] same or similar services.  Projects that are more similar to the proposed work, in scope and complexity, may be seen as more relevant than efforts that are less similar in these areas."); *id*. (explaining that a "High Confidence" rating would be assigned where "[t]he Government has **high confidence** that the contractor's experience will aid in successfully performing under the contract.") (emphasis in original).

92.    To evaluate the quality of each offeror's past performance projects, and to form its confidence rating, the Agency was to evaluate each offeror's CPARS ratings.  *Id*. at 17.  The use of CPARS for the Factor 4 evaluation was appropriate, because "CPARS is the official source for past performance information."  FAR 42.1501(b).

93.    As defined in the FAR, CPARS ratings of "Satisfactory," "Very Good," and "Exceptional" are positive ratings, used to describe performance meeting or exceeding contractual requirements.  *See* FAR 42.1503, Table 42-1; *see also id*. ("A fundamental principle of assigning ratings is that contractors will not be evaluated with a rating lower than Satisfactory solely for not performing beyond the requirements of the contract/order.").

94.    CAC's CPARS for the ████████ projects submitted with its quotation and evaluated under Factor 4—Past Performance were entirely positive:

| Period | |
|---|---|
| Quality | |
| Schedule | |
| Cost Control | |
| Management | |

---

[6] CAC's rating for ████████ in its CPARS ████████ ████ is not accurately reflected in the CPARS system.  While the rating reflected in the ████████████████



*See* **Exhibits 29-31**.

95.     Thus, as shown above, CAC met or exceeded requirements for each rating period for its submitted past performance projects.  *See* FAR 42.1503, Table 42-1 (defining CPARS ratings).

96.     Inexplicably, however, the Agency only found [REDACTED] in CAC's ability to successfully perform essentially the same work scope and requirements, again, under the RFQ.[7]  **Exhibit 28**.

97.     CAC's CPARS reflect ***no*** rational or plausible basis for a determination by the Agency that it had any less than "a high expectation that the contractor will successfully perform."  **Exhibit 2** at 17.

98.     CAC's CPARS prove that CAC successfully performed [REDACTED] [REDACTED]

---

CPARS system [REDACTED] [REDACTED] **Exhibit 31**.

[7] Considering that CAC's [REDACTED]

████████████████████ There existed no "less than positive CPARs assessment," or other "less than positive" past performance rating, which could justify "lowered confidence by the Government" in CAC's ability to successfully perform.  *Id*.

99.     Indeed, the Agency is well familiar with, and has obtained the benefit of, CAC's ████████████████████████████ called for under the RFQ.

100.    The Agency's finding of only ████████████ rather than ██████ ████████ that CAC will successfully perform under the RFQ thus cuts against the weight of contemporaneously documented evidence from "the official source for past performance information," FAR 42.1501(b) regarding CAC's performance capabilities.

101.    The Agency's decision to downgrade CAC's past performance score under Factor 4 to ████████████ defies rationality and reason, and it reflects a prejudicially arbitrary and capricious evaluation in which the Agency ignored clear evidence undermining its evaluation findings and failed to score CAC in accordance with the RFQ criteria.  *See, e.g.*, *Mortgage Contracting Servs., LLC v. United States*, 153 Fed. Cl. 89, 129 (2021) ("[C]ourts will reject an agency's determinations if they are unreasonable."); *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) ("[A] reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citations omitted); *BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 684 (2012) ("Examples of arbitrary and capricious agency action include when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'") (quoting *Ala. Aircraft*

*Indus., Inc.—Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original)); *see also, e.g., Philips Healthcare Informatics*, B-405382.2, May 14, 2012, 2012 CPD ¶ 220 at 8 ("[W]e conclude that the agency's evaluation of past performance was unreasonable, inconsistent with the RFP, and insufficiently documented. Accordingly, we sustain the protest on this basis."); *General Revenue Corp., et al.*, B-414220.2, *et al.*, Mar. 27, 2017, 2017 CPD ¶ 106 at 11 ("[A]n agency's past performance evaluation is unreasonable where the agency fails to give meaningful consideration to available relevant past performance information."); *id.* at 13 ("[T]he record does not support the reasonableness of the agency's evaluation of TGSL's past performance. The TEC found TGSL's three past performance references to be highly relevant, and the agency noted positive indicators of performance on TGSL's highly relevant contracts; nonetheless, the agency assigned TGSL a satisfactory rating overall.").

102.    Had the Agency properly evaluated CAC's past performance under Factor 4 in a manner consistent with the stated criteria and contemporaneous records, it would have undoubtedly assigned CAC a rating of ████████ and fully acknowledged the overt and unequivocal merits of CAC's past performance.

103.    In turn, the Agency would have recognized that CAC's past performance, as evaluated both adjectivally and on the basis of clear substantive merit, was no worse than equal to CSI's past performance under Factor 4.[8]

---

[8] Considering that CAC received ████████ ratings under Factors 1-3, and that CSI was the higher-priced offeror, CSI presumably received a rating of ████████ under Factor 4, such that CSI was perceived by the Agency to be the higher-rated offeror. To the extent that CSI was the higher-priced, but not the higher-rated, offeror, a determination that CSI was the best-value offeror would have been impossible, and this would be yet another basis upon which to grant judgment in CAC's favor. *See, e.g., Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 349-50 (2009) ("No amount of agency reasoning could justify selecting a higher-priced proposal, where a lower-priced and technically equal proposal is available. … [A]n agency

104.    Thus, considering that CAC also received ▮▮▮▮▮▮▮ evaluation scores under all other non-price factors, and considering that CAC's evaluated price was ***more than*** **$▮▮ *million* lower** than CSI's, a rational evaluation of CAC's quotation under Factor 4 would have led to the inevitable conclusion that as the lower-price, and no worse than technically equal, offeror, CAC presented the best value to the Agency and was to be selected for award. *See, e.g.*, *Carahsoft Tech. Corp.*, 86 Fed. Cl. at 349-50 ("No amount of agency reasoning could justify selecting a higher-priced proposal, where a lower-priced and technically equal proposal is available. … [A]n agency decision to select a technically equal, higher-priced proposal would itself be arbitrary and capricious.").

105.    Accordingly, the Agency conducted a prejudicially arbitrary and irrational evaluation of CAC's quotation under Factor 4—Past Performance, and the Court should grant judgment in CAC's favor.

### Count II

### The Agency Arbitrarily and Unlawfully Disregarded Price as an Evaluation Factor, and Failed to Rationally Evaluate the Reasonableness of CSI's Quoted Price.

106.    CAC incorporates by reference the above-numbered paragraphs as if fully stated herein.

107.    Per the RFQ, offerors' quoted prices were to be evaluated to determine whether such prices were fair and reasonable.  **Exhibit 2** at 18.  The RFQ also explained that, in the context of the overall evaluation, "price may become a determining factor" as "quotes approach equality" under the non-price factors.  *Id*. at 19.

_____

decision to select a technically equal, higher-priced proposal would itself be arbitrary and capricious.").

108.    The Agency's selection of CSI's quotation for award—at a price premium of ***more than a <u>half billion dollars</u>*** over CAC's quotation—makes clear that the Agency ignored the evaluation criteria of its own RFQ and relegated price to a nominal or non-existent consideration. CAC's lower-priced quote, at worst, offered equivalent merit and value to CSI's quote under the non-price factors.  Given the virtual parity of non-price merit between the offerors, the RFQ demanded that price become a determining factor.

109.    The Competition in Contracting Act of 1984 ("CICA") mandates that price shall be included "as an evaluation factor that must be considered in the evaluation of proposals."  41 U.S.C. § 3306(c)(1)(B).  "The legislative history of CICA indicates that [the requirement to include price as an evaluation factor was] designed not only to allow the Federal government to obtain the 'best products,' but to do so at the 'best prices'—to avoid paying $436 for an ordinary claw hammer … where it can be bought for $7.'"  *Serco, Inc. v. United States*, 81 Fed. Cl. 463, 491 (2008) (quoting H.R. Rep. 98-1157, at 18 (1984)).

110.    "[P]rice can neither be a nominal evaluation factor nor relegated to the role of being a mere consideration in determining whether a proposal is eligible for award."  *Id*.  "[F]or price to be a significant factor, there must be ramifications if a price substantially exceeds the norms."  *Id*. at 492.  "[A]n evaluation that fails to give price its due consideration is inconsistent with CICA and cannot serve as a reasonable basis for an award."  *Id*. at 491.

111.    CAC received ██████████████ evaluation ratings under virtually every non-price factor,[9] confirming that its quotation was, at worst, at least equal in underlying substantive merit to CSI's under the non-price factors.  **<u>Exhibit 28</u>** at 2.

---

[9] The only factor under which CAC received ████████████████████ rating was Factor 4—Past Performance, which was also the least important of the non-price evaluation factors.

112.    Despite the no more than marginal difference between quotations under the non-price factors, the Agency ***completely disregarded*** the enormous price differential between CAC's and CSI's quotations, directly contradicting its own RFQ scoring methodology, which elevated the weight of price when non-price scores were nearly equal.

113.    CSI's total evaluated price, as reflected by the value of its contract award, was $3.6 billion.  **Exhibit 11** at 1.  By contrast, CAC's total evaluated price was $██████████ — a reduction of ***more than $██  million*** from CSI's price.  **Exhibit 28** at 2.

114.    The Agency paid no mind to this truly exorbitant price difference, opting to award to CSI as the purported best-value offeror. The Agency produced virtually no explanation for why the expenditure of ***more than a <u>half billion dollars</u> of additional taxpayer funds*** was justified or necessary based on a comparison of non-price quotations and a tradeoff of price and non-price merits.  The only explanation the Agency offered was a recycling of its anemic refrain from the preceding defective award: "the Government conducted a tradeoff between non-price and price factors and has determined that CSI Aviation, Inc. provides the best value to the Government."  *Id*.

115.    The Agency's conclusion was neither rational, nor reasonable, nor within the bounds of agency discretion, nor consistent with the RFQ evaluation scheme.

116.    Rather than elevating the importance of the price factor in accordance with the RFQ criteria, based on the essential equality of CAC's and CSI's quotations under the non-price

---

**Exhibit 28** at 2; **Exhibit 2** at 18.  However, as described *supra* in Count I, the Agency conducted a prejudicially irrational evaluation of CAC's quotation under Factor 4.  Had the Agency conducted a rational evaluation in accordance with the RFQ criteria, CAC would have received ███████████ evaluation rating under Factor 4 as well.

factors, *see* **Exhibit 2** at 19, the Agency virtually eliminated the price factor from consideration and simply ignored the astonishingly steep price premium accompanying CSI's quotation in selecting CSI, rather than CAC, as the best-value offeror to receive the contract award.

117.    The Agency's relegation of price to an effectively non-existent consideration violated the stated criteria in the RFQ, the FAR, and CICA.  *See, e.g.*, *Serco, Inc.*, 81 Fed. Cl. at 491 ("[P]rice can neither be a nominal evaluation factor nor relegated to the role of being a mere consideration in determining whether a proposal is eligible for award.  These are not minor distinctions—an evaluation that fails to give price its due consideration is inconsistent with CICA and cannot serve as a reasonable basis for an award.") (internal citations omitted); *id*. at 493 ("[W]hile defendant may have had a good recipe for considering price, it failed to follow through—and 'the proof of the pudding is the eating.' … [O]ne searches in vain for evidence that the agency not only performed calculations that involved price, but actually acted upon those results. … Accordingly, the court concludes that GSA gave price neither the weight it was entitled under the Solicitation nor that which it must be afforded under CICA and the FAR.") (citations omitted); *Cognosante, LLC*, B-417111, Feb. 21, 2019, 2019 CPD ¶ 93 at 5 (where the agency "did not compare offerors' prices to one another or make any findings about why [awardee's] highest price should be viewed as reasonable, we find that the agency failed to determine whether offerors' prices were fair and reasonable); *U.S. Info. Techs. Corp.*, B-404357, Feb. 2, 2011, 2011 CPD ¶ 74 (sustaining a protest where the record contained no documentation or evidence reflecting that the agency conducted a proper price reasonableness analysis as required by FAR Subpart 8.4).

118.    The Agency did not stop there, however, and instead "compounded this mistake by failing to conduct a proper price reasonableness analysis."  *Id*.

119.    The RFQ unequivocally required an evaluation of the fairness and reasonableness of each offeror's quoted price.  **Exhibit 2** at 18.  "In general, a price reasonableness analysis has the goal of preventing the government from paying too much for contract work."  *EMTA Isaat, A.S. v. United States*, 123 Fed. Cl. 330, 338 n.9 (2015); *see also Mortgage Contracting Servs.*, 153 Fed. Cl. at 134 ("[A] price reasonableness analysis considers whether an offeror's price is too high.").

120.    Notably, FAR 8.404(d) provides that agencies generally are not ***required*** to make separate determinations of fair and reasonable pricing in establishing a BPA because, ordinarily, "GSA has already determined the prices of supplies and fixed-price services, and rates for services offered at hourly rates, under schedule contracts to be fair and reasonable."  FAR 8.404(d).  Here, however, the Agency has opted to obligate itself to conduct a new price reasonableness analysis in the terms of this RFQ, which states: "Prices for the base and option periods, including the 6-month option available under FAR 52.217-8, ***will be evaluated to determine fair and reasonableness*.**"  **Exhibit 2** at 18 (emphasis added).  The plain language of the RFQ further demonstrates that the promised price reasonableness evaluation will be ***in addition to*** the Agency's evaluation obligations under FAR 8.405-3(b)(2)(vi).  *See id*. ("The Government will ***also*** evaluate in accordance with FAR 8.405-3(b)(2)(vi).") (emphasis added).  Where the Agency has obligated itself, in the plain terms of the RFQ, to conduct a new price reasonableness analysis, it must do so—and the analysis must be rational and reasoned, and in accordance with applicable law and regulation.

121.    By its selection of CSI as the awardee, however, the Agency made clear that it failed to conduct ***any*** analysis of reasonableness of CSI's quoted price, let alone an analysis which was rational, meaningful, and comported with applicable law and regulation.

122.    CSI's price was absurdly high, exceeding the competition by upwards of a half billion dollars.  *Compare* **Exhibit 11** at 1 (showing CSI's awarded price of $3.6 billion) *with* **Exhibit 4** (showing an awarded price of approximately $2.8 billion to Chapman Freeborn) *and* **Exhibit 28** at 2 (showing CAC's quoted price of approximately $█ billion and total evaluated price, inclusive of all options, of just over █ billion).

123.    Indeed, CSI's price is even unreasonably high based on a comparison to CSI's own performance of the bridge contract for this same requirement.

124.    CSI was previously awarded a bridge contract, commencing April 1, 2024, to perform the services being procured under the RFQ during bid protest litigation and the Agency's ongoing corrective action reevaluations.  *See* **Exhibit 32**.  Performance of this bridge contract currently extends through February 28, 2025, and the bridge contract has an awarded value of $358,704,293.87.  **Exhibit 33** at 1.  Most recently, CSI was awarded a one-month extension of performance, and corresponding funds in the amount of $29,000,672.72.  *Id*.

125.    So, over the bridge contract's eleven-month period of performance, CSI has performed the same scope of services as required by the RFQ, at an average monthly price of $32,609,481.26, and a most recent month's price of just over $29 million.

126.    By contrast, CSI's quoted price of $3,219,226,171.80, averaged over the 60-month period of performance provided in the RFQ, equates to an average monthly price of $53,653,769.53.  *See* **Exhibit 28** at 1.

127.    One must wonder, then, how the Agency could ***not*** have found CSI's quoted price to be unreasonably high, where its quoted price appeared to exceed its current price of performance of the same requirement by ***more than $21 million per month***, when viewed as an average monthly cost.  *Compare id*. *with* **Exhibit 33** at 1.  Where CSI is purportedly providing

the same services under the bridge contract as are to be provided under the RFQ, *see* **Exhibit 32**
at 1-3, an increase in quoted pricing of ***more than $21 million per month*** raises serious red flags
about the reasonableness of CSI's quoted price, to say the least.

128.    This increase in price is particularly curious because it is typically the ***bridge***
contract, ***not*** the ***long-term*** award, which is more expensive for the government due to the short-
term period of performance, the lack of competition for sole-source bridge contracts, the sudden
and unexpected nature of the requirement, and the lack of economies of scale that comes with
performance of a bridge contract. *See, e.g.*, *Newimar, S.A. v. United States*, 163 Fed. Cl. 240,
255 (2022) (explaining that the non-competitive, sole-source bridge contracts "were $100,000 to
$120,000 more expensive per month than [] proposed pricing under the awarded contract" and
resulted in roughly $2.5 million in additional costs over the period of the bridge contract).

129.    Simply put, the Agency has failed to explain how it determined CSI's price to be
reasonable, particularly considering the sizeable discrepancy between CSI's price and the prices
of its competitors, and between CSI's price under the RFQ and CSI's own pricing for the same
services under an ongoing bridge contract. *See, e.g.*, *Fluor Intercontinental, Inc. v. United
States*, 147 Fed. Cl. 309, 336 (2020) (finding error in an agency's price analysis where "no
discernable, meaningful analysis exists to demonstrate how, despite the wide range in proposed
prices, [the] awardee's price was fair and reasonable").

130.    While "an agency may conclude that an awardee's price is reasonable if it is
***consistent*** with the prices received from various competitors," there is no basis for the same
conclusion "if that price is ***inconsistent*** with those of competitors." *Serco, Inc.*, 81 Fed. Cl. at
494 (emphasis in original).  "After all, it is not competition for competition's sake, but the

favorable comparison of a given offeror's price to those of the other contestants, that provides the necessary assurance that a given price is 'fair and reasonable.'" *Id*. (citations omitted).

131.    Absent a rational, contemporaneously documented explanation as to how and why the Agency found CSI's inordinately high price to be reasonable, and failing to establish such reasonableness via a comparison to competitors' prices or to CSI's own pricing for ongoing performance of the same work, the Agency's prejudicially arbitrary and irrational evaluation, and the award decision resulting therefrom, cannot stand.

132.    Indeed, payment of an unreasonably high price—in this case, a price premium of ***more than $██ million for a quotation of essentially equal non-price merit***—is precisely the scenario sought to be ***avoided*** by the conduct of a rational price reasonableness analysis.  *See, e.g.*, *Mortgage Contracting Servs.*, 153 Fed. Cl. at 134; *Serco, Inc.*, 81 Fed. Cl. at 494.

133.    The Agency's arbitrary and irrational evaluation (or lack thereof) under Factor 5—Price was undeniably prejudicial to CAC.  CAC offered the Agency a non-price quotation of no worse than equal merit to that offered by CSI, and did so at a price which was ***more than a half billion dollars*** below the price offered by CSI.  Had the Agency not unlawfully relegated price to a nominal or non-existent consideration, had the Agency not arbitrarily ignored the massive disparity between CAC's and CSI's prices, and had the Agency rationally evaluated the reasonableness of CSI's inordinately high price, the Agency would have recognized that only CAC presented a fair and reasonable price, and that award to CAC as the best-value offeror—by a large margin—was a foregone conclusion in this two-offeror competition.  *See, e.g.*, *Carahsoft Tech. Corp.*, 86 Fed. Cl. at 349-50 ("No amount of agency reasoning could justify selecting a higher-priced proposal, where a lower-priced and technically equal proposal is available. … [A]n

agency decision to select a technically equal, higher-priced proposal would itself be arbitrary and capricious.").

134.    Because the Agency acted arbitrarily, irrationally, and in contravention of applicable law and regulation—and because the Agency's flawed evaluation caused direct prejudice to CAC, the only other remaining offeror—the Court should grant judgment in CAC's favor.

**Count III**

**<u>The Agency's Best-Value Tradeoff was Arbitrary, Irrational, and Otherwise Not in Accordance with Law.</u>**

135.    CAC incorporates by reference the above-numbered paragraphs as if fully stated herein.

136.    The RFQ provided that "[a]n award will be made to the responsible contractor whose quote, conforming to the solicitation, is determined to be the best overall value to the Government, considering the tradeoff between non-price and price factors."  **Exhibit 2** at 18.  To that end, the RFQ stated that "[t]he Government may also award to other than the highest technically rated quote, if it determines that a price premium is not warranted."  *Id*. at 18-19.

137.    For purposes of the best-value tradeoff analysis, the relative importance of evaluation factors was defined as follows:

> Factors 1 and 2 are equally important and are more important than factors 3, 4, and 5.  Factors 3-5 are listed in descending order of importance.  The individual factors will be rated holistically and will comprise one confidence level rating for each factor, except price.  The non-price factors 1-4 are significantly more important than factor 5, price.

*Id*. at 18.

138.    However, the RFQ also explained that "[a]s quotes approach equality (does not mean 'equal' because all quotes are different), price may become a determining factor." *Id*. at 19.

139.    The only explanation offered by the Agency of the best-value tradeoff "analysis" conducted as part of its latest corrective action reevaluation was as follows:

> Based upon the Government's evaluation of all quotes received and based upon the relative importance of the factors as established in the RFQ, the Government conducted a tradeoff between non-price and price factors and has determined that CSI Aviation Inc. provides the best value to the Government.

**Exhibit 28** at 2.

140.    The Agency's best-value tradeoff determination was clearly arbitrary, irrational, abusive of agency discretion, and otherwise unlawful.

141.    As detailed *supra* in Count I, the Agency conducted an arbitrary and irrational evaluation of CAC's quotation under Factor 4—Past Performance, substantially underrating CAC's directly relevant past performance and failing to recognize the full extent of merit arising from CAC's past performance experience.  But for the Agency's prejudicially defective evaluation, CAC would have received ████████ evaluation score of ████ ████ under Factor 4—Past Performance, based on the underlying substantive merit of its quotation.

142.    And, as described *supra* in Count II, the Agency unlawfully relegated price to a non-existent consideration, and otherwise failed to evaluate the reasonableness of CSI's quotation as required under the Factor 5 of the RFQ.  But for the Agency's prejudicially arbitrary and unlawful evaluation, the Agency would have determined CSI's price to be unreasonably high and unawardable, and would have recognized that the expenditure of more than $██ *million* in

37

additional taxpayer dollars for a solution which offered no greater non-price merit was unjustifiable under these circumstances.

143.    The Agency's underlying evaluations of CAC's and CSI's quotations were arbitrary, unlawful, and abusive of agency discretion, and have tainted the Agency's best-value tradeoff determination and source selection decision.  *See, e.g.*, *BayFirst Sols., LLC*, 102 Fed. Cl. at 695 ("Because the ratings that provided the basis for the Agency's tradeoff analysis and best value award were fundamentally flawed and arbitrary, the best value award itself was arbitrary and capricious.").

144.    On this basis alone, the Agency's award to CSI cannot stand.

145.    However, even setting aside the fundamentally arbitrary and unlawful nature of the Agency's underlying factor-by-factor evaluations, the Agency's best-value tradeoff determination—and selection of CSI as the awardee at a price premium of ***more than a half billion dollars***—still reflects a clear abuse of Agency discretion and provides an independent basis upon which this Court should grant judgment in CAC's favor.

146.    Specifically, notwithstanding the evaluation errors described *supra* in Counts I and II, CAC's and CSI's quotations were still essentially equal in merit under the non-price evaluation factors, with, at most, a slight difference in adjectival rating between CAC's and CSI's quotations under the least important non-price evaluation factor.  *See* **Exhibit 2** at 18; **Exhibit 28** at 2.

147.    Indeed, CAC received ████████████ evaluation marks, and ratings of ████ ████████ for Factor 1—Corporate Experience, Factor 2—Aircraft Availability and Commitment, and Factor 3—Technical Capability, as well as an adjectival rating of ████ under Factor 4—Past Performance.  **Exhibit 28** at 2.  To have been perceived to be ████████████████████████████████████████████████████████████████

the best-value offeror, notwithstanding its price premium of more than $██ million over CAC,

CSI must have received ratings of ████████████ under Factors 1-4.  To the extent that CSI

*did not* receive such ratings, this is yet another independent basis upon which the Court must

find the Agency's source selection decision to be facially arbitrary and unlawful and grant

judgment in CAC's favor.  *See, e.g., Carahsoft Tech. Corp.*, 86 Fed. Cl. at 349-50 ("No amount

of agency reasoning could justify selecting a higher-priced proposal, where a lower-priced and

technically equal proposal is available. … [A]n agency decision to select a technically equal,

higher-priced proposal would itself be arbitrary and capricious.").

148.    In any event, even assuming, *arguendo*, that the Agency awarded CSI a slightly

higher adjectival rating under Factor 4—Past Performance, such a minor difference in adjectival

rating under the least important non-price factor is plainly insufficient to rationally justify

payment of a price premium ***in excess of a <u>half billion dollars</u>*** of taxpayer money.

149.    To repeat, as quotations approached equality under the non-price evaluation

factors, ***the importance of the price factor was to be elevated***, in accordance with the terms of

the RFQ.  **<u>Exhibit 2</u>** at 19.

150.    Relatedly, "[l]ogic suggests that as that magnitude [of the price differential

between two offers] increases, the relative benefits yielded by the higher-priced offer must also

increase."  *Serco, Inc.*, 81 Fed. Cl. at 497.

151.    Considering that the RFQ required the Agency to give elevated importance to the

price factor under these circumstances—and considering the extent of relative benefits that

would be necessary to plausibly overcome a price differential of ***more than $██ million***—there

is ***no way*** that the Agency could have rationally and reasonably concluded that CSI presented a

better value to the Agency than CAC.

152.    Rather, the Agency's determination reflects an arbitrary tradeoff analysis in which the Agency improperly diminished the importance of price and placed unjustifiable emphasis on what were at most miniscule differences in merit under the least important non-price evaluation factor.

153.    This is especially true where, as here, the Agency offers nothing more than a cursory conclusion that it "conducted a tradeoff between non-price and price factors and [] determined that CSI Aviation Inc. provides the best value." **Exhibit 28** at 2; *see also, e.g.*, *Serco, Inc.*, 81 Fed. Cl. at 497 ("Conclusory statements, devoid of any substantive content … threaten[] to turn the tradeoff process into an empty exercise.  Indeed, … generalized statements that fail to reveal the agency's tradeoff calculus deprive this court of any basis upon which to review the award decisions."); *Distributed Sols., Inc. v. United States*, 106 Fed. Cl. 1, 24 (2012) ("Even though a lower threshold applies for a FAR Part 8 tradeoff analysis, the Court will analyze the CO's tradeoff decision to determine whether it is reasonable and within the agency's discretion."); *Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 49 (2010) ("Even when a solicitation emphasizes technical merit, an agency 'may properly select a lower-priced, lower-technically-rated proposal if it decides that the cost premium involved in selecting a higher-rated, higher-priced proposal is not justified, given the acceptable level of technical competence available at the lower price.'  The Court's main task is to ensure that the CO articulated a 'rational connection between the facts found and the choice made.'") (citations omitted); *Reli Grp., Inc. v. United States*, --- Fed. Cl. ---, 2025 WL 326403, at *7 (2025) (noting that FAR Subpart 8.4 imposes documentation requirements, "including a rationale for an agency's tradeoff in making its award decision.").

154.    For the reasons described herein, the Agency's best-value determination defies rationality, reason, and the terms of the RFQ.

155.    Accordingly, the Court should grant judgment in favor of CAC.

### Count IV

### The Agency Breached its Implied Duty to Fairly and Honestly Consider CAC's Quotation.

156.    CAC incorporates by reference the above-numbered paragraphs as if fully stated herein.

157.    The Agency breached its implied duty to fairly and honestly consider CAC's quotation by repeatedly refusing to rationally evaluate CAC's quotation, refusing to effectuate the corrective action reevaluation promised to the GAO to obtain dismissal of CAC's prior protests, delaying and drawing out the corrective action process to contrive a basis for allowing CSI to cure the fatal flaws in its Factor 2—Aircraft Availability and Commitment submission related to the March 2024 award, refusing to account for the difference of more than $██ *million* in offerors' quoted prices, and refusing to consider CAC's equally meritorious but *significantly* lower priced quotation in a non-arbitrary fashion.

158.    When soliciting quotations, the Agency impliedly promises to give fair and honest consideration to all offers received.  *See, e.g.*, *CACI, Inc.—Federal v. United States*, 719 F.2d 1567, 1573 (Fed. Cir. 1983) ("[B]y the solicitation for bids, the Government impliedly promised that it would give honest and fair consideration to all bids received…."); *Safeguard Base Ops., LLC v. United States*, 989 F.3d 1342 (Fed. Cir. 2021) (finding jurisdiction over implied-in-fact contract claims in the procurement context under § 1491(b)(1)); *Tender Years Learning Corp. v. United States*, 128 Fed. Cl. 265, 271 (2016) ("When a bidder submits a bid in a competitive

solicitation such as the one at issue in this case, an implied-in-fact contract arises between the bidder and the Government to fairly and honestly consider the bid.").

159.    "The ultimate standard for determining whether an unsuccessful bidder is entitled to relief on the ground that the government breached the implied-in-fact contract to consider all bids fairly and honestly is whether the government's conduct was arbitrary and capricious." *J.C.N. Constr., Inc. v. United States*, 107 Fed. Cl. 503, 517 (2012); *see also Medline Indus., Inc. v. United States*, 155 Fed. Cl. 522, 541 (2021) ("The United States breaches this implied contract [to evaluate proposals fairly and honestly] if the Court finds that the United States' 'consideration of offers is … arbitrary and capricious toward the bidder-claimant.'") (quoting *Cent. Arkansas Maint., Inc. v. United States*, 68 F.3d 1338, 1341 (Fed. Cir. 1995)).  "[T]he Court may award 'bid preparation and proposal costs' should it find the United States in breach." *Medline Indus., Inc.*, 155 Fed. Cl. at 541.

160.    A claim asserting breach of the implied duty to fairly and honestly consider quotations is not a claim that the agency acted in bad faith.  *See, e.g.*, *Innovative Test Asset Sols., LLC v. United States*, 125 Fed. Cl. 201, 216 (2016) (explaining that a claim of breach of the implied duty to fairly and honestly consider a quotation "is separate and distinct from a claim that the government acted in bad faith."); *Kogan v. United States*, 112 Fed. Cl. 253, 265 (2013) ("[P]roof of bad faith is not required to show a breach of the implied duty of good faith and fair dealing.") (internal quotations & citations omitted).

161.    "To recover under the implied covenant for bids to be fairly and honestly considered, a plaintiff has to establish arbitrary and capricious action by the government." *Castle-Rose, Inc. v. United States*, 99 Fed. Cl. 517, 531 (2011).  In determining whether an agency breached the implied duty by acting arbitrarily and capriciously, the Court may consider

several factors, such as whether a reasonable basis for the agency's decision existed or whether there existed a proven violation of statute or regulation. *See, e.g.*, *J.C.N. Constr., Inc.*, 107 Fed. Cl. at 517 (citations omitted). The Court may also "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Medline Indus., Inc.*, 155 Fed. Cl. at 541 (citations omitted).

162. By soliciting quotations under the RFQ, the Agency was bound to give fair and honest consideration to CAC's quotation.

163. As established in this Complaint, and in CAC's numerous prior protests of this procurement, the Agency has not fairly or honestly considered CAC's quotation submitted in response to the RFQ. Rather, the Agency's actions in conducting the subject procurement are prejudicially arbitrary and capricious, constitute a clear and prejudicial abuse of agency discretion, and are otherwise violative of applicable law and regulation.

164. The Agency has failed to rationally evaluate CAC's quotation, has failed to rationally effectuate the corrective action promised in exchange for dismissal of CAC's prior protests, and has completely failed to rationally consider price in its selection of the contract awardee under the RFQ. There can be no rational basis for the Agency's decision to award the best-value contract in question to CSI, where CAC's quotation presented an approach under the non-price factors which was no worse than equal to that presented by CSI and where CAC's price was ***more than a <u>half billion dollars</u> lower*** than CSI's price.

165. Rather than conducting a fair and honest evaluation of CAC's quotation, it is now clear that the Agency has strung CAC along—through countless rounds of error-filled evaluations, protest litigations, and promises of meaningful corrective action—in a pattern of behavior reflective the Agency's intent to reaffirm the award to CSI notwithstanding CSI's price

premium of more than $██ million, and notwithstanding CAC's outstanding and significantly lower-priced solution.[10]

166.    Accordingly, the Agency has breached the implied-in-fact contract to consider CAC's quotation fairly and honestly, and CAC is entitled to relief on this basis, including but not limited to recovery of its bid preparation and proposal costs, the amount of which should be determined by a separate proceeding if the Agency and CAC are unable to reach an informal resolution. *See, e.g.*, *Medline Indus., Inc.*, 155 Fed. Cl. at 533.

167.    The Court should, therefore, grant judgment in favor of CAC and award CAC its bid preparation and proposal costs, in an amount to be determined separately.

## Count V

### The Agency's Arbitrary, Capricious, and Otherwise Unlawful Actions Caused Undeniable Prejudice to CAC.

168.    CAC incorporates by reference the above-numbered paragraphs as if fully stated herein.

169.    CAC suffered undeniable prejudice as a result of the Agency's arbitrary, capricious, and otherwise unlawful acts described herein because, but for such improper conduct, CAC would have had more than a substantial chance of receiving one of the contract awards.

170.    "A protester's showing of prejudice differs depending upon the nature of the protest." *Square One Armoring Serv., Inc.*, 123 Fed. Cl. at 320.  Generally, in the context of a

---

[10] The Agency has not even attempted to disguise its intent of reaffirming its award to CSI without meaningfully considering whether CAC's quotation presents a better value. *See, e.g.*, **Exhibit 27** at 6 ("[T]he period of performance on BPA #70CDCR24A00000001 with CSI is March 8, 2024, through March 7, 2029.  The Government has no intention of extending the period of performance ***once*** the stop work order is lifted.") (emphasis added).

post-award protest, "a protester demonstrates the requisite prejudice by showing that it would have had a 'substantial chance' of receiving the contract award but for the alleged errors in the procurement process." *Id*.

171.    To satisfy the "substantial chance" standard, the plaintiff must "show that 'had the alleged errors been cured, … its chances of securing the contract [would have] increased.'" *Blue Water Thinking, LLC v. United States*, 159 Fed. Cl. 65, 75 (2022) (quoting *Precision Asset Management Corp. v. United States*, 125 Fed. Cl. 228, 233 (2016)).

172.    CAC suffered undeniable prejudice as a result of the Agency's actions described herein.

173.    CAC is a highly qualified and highly capable incumbent offeror.  CAC received ▮▮▮▮▮▮▮ scores under nearly every non-price evaluation factor, and received outstanding marks in every category.  Additionally, CAC submitted a fair and reasonable price quotation under Factor 5, with a quoted price of ▮▮▮▮▮▮▮ and a total evaluated price (inclusive of all options) of ▮▮▮▮▮▮▮.  **Exhibit 28** at 2.  So, CAC had impossible-to-beat evaluation scores under virtually every non-price evaluation factor, and its total evaluated price was ***more than $▮▮ million*** less than CSI's total evaluated price of $3.6 billion, as reflected in the amount of the contract award issued.  **Exhibit 11** at 1.  Not to mention, CAC is the only other offeror still in the running for the contract award.

174.    As described *supra* in Count I, the Agency conducted an arbitrary and irrational evaluation of CAC's quotation under Factor 4—Past Performance.  Had the Agency conducted a rational and reasoned evaluation of CAC's past performance under Factor 4, in accordance with the RFQ, the Agency would have recognized the full extent of underlying merit in CAC's quotation, and would have awarded CAC a score of "High Confidence."  As such, CAC's

positioning relative to CSI—on the basis of adjectival rating, and on the basis of underlying substantive merit—would have improved for purposes of both the Factor 4—Past Performance evaluation and the best-value tradeoff analysis, and selection of CAC as the awardee would have been a foregone conclusion considering CAC's price advantage of more than a half billion dollars.

175.    Further, and as detailed *supra* in Count II, the Agency completely disregarded price as an evaluation factor, and failed to conduct a rational evaluation of the reasonableness of CSI's quoted price.  Had the Agency rationally and reasonably evaluated CSI's quoted price, it would have found CSI's quoted price to be unreasonably high.  And, had the Agency given due consideration to offerors' quoted prices—and, critically, the difference of upwards of $██ million between CAC's reasonable price and CSI's unreasonably high price—there is a substantial likelihood that the Agency would have selected CAC—an equally or more qualified and capable offeror than CSI, with a substantially lower quoted price—to receive the contract award.

176.    Moreover, as described *supra* in Count III, the Agency conducted a materially defective best-value tradeoff analysis.  Considering CAC's and CSI's comparative evaluation scores and relative merits, and that CAC's quotation was no worse than equal to CSI's quotation in terms of non-price merit, there was no rational or plausible basis for finding that CSI's quotation warranted award notwithstanding its price premium of more than a half billion dollars.  Had the Agency rationally evaluated quotations, and conducted a reasoned best-value tradeoff analysis, the Agency almost certainly would have selected CAC's technically equivalent, but significantly lower priced, quotation.

177.     Finally, as detailed *supra* in Count IV, the Agency breached its implied duty to fairly and honestly consider CAC's quotation.  Had the Agency fairly and honestly considered CAC's quotation, and appropriately recognized both the substantial merit in CAC's quotation under the non-price factors and the significant price advantage of CAC's quotation—which was more than $█ *million less* than the price quoted by the awardee—CAC, the only other offeror still in the running, would have had a more than substantial likelihood of being selected for award as the best-value offeror.

178.     Thus, it is beyond dispute that, but for the improper Agency actions described herein, CAC—a highly capable and highly qualified incumbent offeror, with a price advantage of more than a half billion dollars over CSI—would have had a more than substantial likelihood of receiving an award under the RFQ as the best-value offeror.  *See, e.g.*, *BayFirst Sols, LLC*, 102 Fed. Cl. at 695 ("If a proper evaluation of proposals had occurred, and the errors pointed out … had been avoided, the technical factor ratings could easily have been much closer than those erroneously produced by the TEP and endorsed by the SSA.  There is a substantial chance that the SSA's tradeoff analysis would then have indicated that BayFirst's proposal, not VSI's higher-priced proposal, provided the best value to the government.  The court is satisfied that BayFirst had a substantial chance of award, and was prejudiced by the procurement errors.").

179.     In sum, CAC has suffered undeniable prejudice as a result of the Agency's arbitrary, irrational, and otherwise unlawful acts, and the Court should grant judgment in its favor.

**Count VI**

**CAC is Entitled to Permanent Injunctive Relief.**

180.     CAC incorporates by reference the above-numbered paragraphs as if fully stated herein.

181.     CAC respectfully requests that the Court issue a permanent injunction barring the Agency from proceeding with performance of the contract awarded to CSI because, as described herein, that contract award arose from a prejudicially arbitrary and unlawful evaluation of quotations and source selection decision.

182.     To obtain injunctive relief, a protester must generally demonstrate (1) success on the merits; (2) irreparable harm if the injunction is not granted; (3) that the balance of hardships weighs in the protester's favor; and (4) that an injunction is in the public interest. *Superior Optical Labs, Inc. v. United States*, 152 Fed. Cl. 319, 323 (2021) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)).

183.     Based on the foregoing, CAC has established, with near certainty, that it is likely to succeed (again) on the merits.  The Agency conducted an irrational evaluation of CAC's quotation under Factor 4—Past Performance.  Further, the Agency arbitrarily disregarded price as an evaluation factor, and failed to conduct a rational and reasonable analysis of the reasonableness of CSI's quoted price.  Moreover, the Agency conducted a prejudicially defective best-value tradeoff analysis, as a result of which it erroneously selected CSI for award, at an obscene price premium of ***more than a half billion dollars***, over CAC—a highly qualified and highly capable incumbent offeror, who received the highest possible evaluation scores under nearly every non-price factor and whose price was more than ███ ***million less*** than the price

quoted by CSI.  Finally, the Agency clearly breached its implied duty to fairly and honestly consider CAC's quotation.  In short, the Agency's actions lacked a rational basis.

184.     If the Court does not grant a permanent injunction, CAC will suffer irreparable harm because, *inter alia*, "[t]he loss of potential work and profits from a government contract constitutes irreparable harm."  *Springfield Parcel C, LLC v. United States*, 124 Fed. Cl. 163, 195 (2015) ("Competitive detriment to plaintiffs stemming from a denial of a fair opportunity to participate in a lawful procurement process 'also engenders irreparable harm.'") (citations omitted).  Irreparable harm to CAC is not, however, limited to the loss of opportunity to perform, and profit from, this multi-billion-dollar contract opportunity.  CAC will also be deprived of the opportunity to earn valuable experience and past performance that, in turn, can be used to obtain future contract awards.  *See* Decl. of D. Carson at ¶¶ 4-6.

185.     The balance of hardships also weighs in favor of a grant of permanent injunctive relief to CAC.  The Government does not suffer harm if it is barred from proceeding with an arbitrarily and unlawfully issued contract award as a result of the issuance of injunctive relief.  Nor will a grant of injunctive relief unduly delay this procurement, which has already been prolonged by repeated evaluation errors by the Agency, numerous Agency-caused protests, and multiple rounds of voluntary corrective action undertaken by the Agency.  *See, e.g.*, *Fed. Acquisition Servs. Team, LLC v. United States*, 124 Fed. Cl. 690, 708 (2016); *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 716 (2006) (finding that no exceptional case exists in which delay alone would warrant a denial of injunctive relief, "particularly as it appears that some of the problems encountered here are, at least in part, of defendant's own making.").  To the extent necessary services must still be performed, the Agency can continue to obtain such

services through short-term bridge contracts, as it has now done for several years as it has struggled, time and time again, to conduct a fair and rational evaluation and selection decision.

186.    To the extent that the Agency claims some economic harm from the need to conduct yet another reevaluation, this harm is insufficient to tip the balance of hardships out of CAC's favor. *See, e.g.*, *Springfield Parcel C, LLC*, 124 Fed. Cl. at 195 ("Although the government may suffer economic harms, the 'burden of reprocurement costs occurs whenever an improper award of a contract is set aside,' and that alone does not affect the balance of harms here.") (citations omitted).

187.    While CSI may claim to suffer harm from the loss of its contract award upon the issuance of an injunction and following a fair and rational evaluation of quotations, CSI had no rightful expectation of a contract award in the first instance, and only received such an award as the result of a defective evaluation process and award decision. Thus, any claim of harm by CSI does not outweigh the harm to CAC. *Id.* ("The court finds that the balance of harms favors entry of an injunction. Harm to [the awardee] does not alter this balance, because the process by which [the awardee] received the contract was itself flawed."). Not to mention, CSI has received, and continues to receive, windfalls from performance of the bridge contract work which undercut any claim of harm from CSI. Notwithstanding that CAC has successfully demonstrated, more than once, that CSI's selection as the awardee was the result of clear Agency error, CSI has received the benefit of hundreds of millions of dollars in bridge contract work, and has thus already obtained significant windfalls—both financial, and in the form of past performance—which more than counteract the loss of an award under the RFQ to which CSI was never entitled.

188.    Finally, a grant of permanent injunctive relief unquestionably serves the public interest.  "[T]he public has an interest in the fair and lawful procurement of goods and services by the government."  *Superior Optical Labs, Inc.*, 152 Fed. Cl. at 326.  "[T]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion."  *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 496 (2013).  Thus, "[t]he public interest is, without doubt, served by ensuring that government officials follow applicable procurement statutes and regulations."  *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 551 (2010) (citations omitted).

189.    Accordingly, the public interest is best served by a grant of permanent injunctive relief to prevent the Agency from proceeding with an arbitrarily and unlawfully issued contract award which resulted from an irrational and unreasonable evaluation of quotations.  This is particularly true where, as here, the Agency's defective evaluation led to an erroneous award to an offeror at an unnecessary price premium of ***more than a half billion dollars <u>of taxpayer money</u>***.  *See, e.g.*, *Cardinal Maint. Serv. v. United States*, 63 Fed. Cl. 98, 111 (2004) ("An injunction in this case will also promote the integrity of the procurement process by holding the government accountable for its actions.  Finally, an injunction in this case may result in lowering the cost to the taxpayers of the work.  As a result, an injunction would serve the public interest.").

190.    For these reasons, the Court should grant a permanent injunction barring the Agency from proceeding with performance of the unlawfully and arbitrarily issued contract award to CSI.

## Request for Relief

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and grant Plaintiff the following relief:

A.      A declaration from the Court that the Agency's corrective action reevaluation of quotations, and reselection of CSI as the contract awardee, was prejudicially arbitrary, capricious, an abuse of discretion, and otherwise unlawful;

B.      A permanent injunction barring the Agency from proceeding with performance of the unlawfully issued contract award to CSI;

C.      An order directing the Agency to terminate CSI's contract award, conduct a rational reevaluation of offerors' quotations in accordance with the terms of the RFQ and applicable law, and render a new award decision;

D.      The payment of CAC's bid preparation and proposal costs, the precise amount of which will be determined via a separate proceeding if the Agency and CAC are unable to resolve the matter informally;

E.      The payment of attorneys' fees pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504; and

F.      Such other relief as the Court may deem just and proper.

February 18, 2025

Respectfully submitted,

/s/Aron C. Beezley
Aron C. Beezley
Bradley Arant Boult Cummings LLP
1615 L Street, N.W.
Suite 1350
Washington, D.C. 20036
Email: abeezley@bradley.com
Tel.: (202) 719-8254
*Attorney of Record for Classic Air Charter, Inc.*

*Of Counsel:*

Nathaniel J. Greeson
Gabrielle A. Sprio
Bradley Arant Boult Cummings LLP