# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
**Bid Protest**

(Electronically Filed on March 27, 2025)

|  |  |
|---|---|
| CLASSIC AIR CHARTER, INC., | ) |
| Plaintiff, | ) |
| v. | ) Case No. 25-286C |
| THE UNITED STATES, | ) Judge Richard A. Hertling |
| Defendant, | ) |
| and | ) |
| CSI AVIATION, INC. | ) |
| Defendant-Intervenor. | ) |

**Final Redacted Version**

## AMENDED COMPLAINT

Plaintiff, Classic Air Charter, Inc. ("CAC"), alleges as follows for its Amended Complaint against the Defendant, the United States of America, acting by and through the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE" or the "Agency").

### Nature of this Action

1.      This Amended Complaint arises out of a procurement with a protracted history of arbitrary, irrational, and unlawful Agency actions which have resulted in three faulty award decisions, four rounds of arbitrary and irrational evaluations, and five rounds of meritorious bid protest litigation.  Yet, even with so many opportunities, the Agency's latest corrective action reevaluation and award decision remain riddled with prejudicial defects.

2.      Request for Quotations No. 70CDCR23Q00000004 (the "RFQ") sought
quotations for the establishment of a single-award, multi-billion-dollar Blanket Purchase
Agreement ("BPA") for Daily Schedule Large Aircraft ("DSLA") and Special High-Risk Charter
("SHRC") Flight Services in support of ICE Air Operations—the primary air transportation
division of the Agency charged with facilitating the transfer and removal of detained aliens in
support of DHS initiatives.

3.      CSI Aviation, Inc. ("CSI") first received a $3.6 billion contract award under the
RFQ in March 2024, following a series of evaluations and reevaluations by the Agency.

4.      In a prior protest at the Government Accountability Office ("GAO"), CAC
successfully challenged the award to CSI, which, in relevant part, was based upon prejudicially
flawed evaluations of CSI's quotation under Factor 2—Aircraft Availability and Commitment
and Factor 4—Past Performance, and a defective best-value tradeoff determination.

5.      In exchange for dismissal of CAC's successful protest, the Agency promised to
take further corrective action to reevaluate those portions of CSI's quotation, but did not
terminate CSI's award—presumably because CSI would not have been eligible to continue on in
the competition or receive a new award due to the expiration date of the General Services
Administration ("GSA") Multiple Award Schedule ("MAS") contract under which CSI submitted
its quotation.

6.      However, the Administrative Record ("AR") produced in this case makes clear
that while the Agency determined that a reevaluation of CSI's quotation was necessary, *see* Tab
91, the Agency ***never actually reevaluated CSI's quotation as promised***.  Rather, under the guise
of conducting discussions, the Agency resolicited a new quotation from CSI.

7.     On January 31, 2025, at the end of its drawn-out corrective action process, the Agency once again selected CSI as the awardee of this high-profile procurement, at a ***half-billion-dollar*** price premium.  The Agency's latest evaluation and award decision are no more rational, reasoned, or lawful than those that preceded it.

8.     Indeed, the Agency failed to conduct an Acceptability Review of CSI's quotation in accordance with the RFQ criteria, and thus failed to recognize that CSI's quotation was ineligible for award under the terms of the RFQ and the FAR because CSI's GSA MAS contract is set to expire less than 60 months after the award date of the BPA.

9.     The Agency also conducted a facially defective evaluation of CSI's quotation under Factor 1—Corporate Experience, whereby, among other things, the Agency credited CSI with corporate experience of its teaming partners—including ███████████████ ███—notwithstanding that (1) CSI failed to submit teaming agreements post-dating Round 4 Discussions with either entity; and (2) the RFQ criteria and Round 4 Discussions letter expressly precluded the consideration of a teaming partner's experience absent an updated teaming agreement.

10.     The Agency also failed to rationally evaluate price in accordance with the RFQ criteria.  CSI's price submission failed to include all required information—a fact which the Agency raised during discussions, which CSI repeatedly failed to correct, and which the Agency blatantly ignored in its final evaluation and award decision.

11.     The Agency also conducted a completely arbitrary, irrational, and unlawful evaluation of CAC's and CSI's quotations under Factor 4—Past Performance.  The Agency (1) ignored ████████ ratings and ████████████████████ in CSI's CPARS and reference checks; (2) credited CSI with past performance which was not relevant to the subject

requirement and for which the Agency had no CPARS, reference checks, or other information to evaluate; (3) made plainly irrational findings with respect to CAC's past performance which were belied by the weight of contemporaneous evidence; and (4) assessed CAC's past performance against a completely different—and substantially more punitive—standard than that against which CSI's past performance was assessed.

12.     The Agency also engaged in misleading and non-meaningful discussions with CAC.  Specifically, the Agency misled and misinformed CAC by claiming to have found a technical deficiency in CAC's quotation—which did not exist—after a purported reevaluation of quotations during corrective action—which was never conducted—and directed CAC to remedy this non-existent issue while failing to inform CAC of material changes in the information previously shared by the Agency with respect to the Agency's understandings, intentions, and assumptions for this procurement and expressly relied upon by CAC in preparing its revised quotation.

13.     Finally, the Agency breached its implied duty to fairly and honestly consider CAC's quotation.

14.     The litany of Agency errors described herein resulted in a defective best-value tradeoff determination and a prejudicially arbitrary and unlawful award decision.

15.     CAC, by this Amended Complaint, respectfully seeks, *inter alia*: (a) a declaration from the Court that the Agency's corrective action reevaluation of quotations, and reselection of CSI as the contract awardee, was prejudicially arbitrary, capricious, an abuse of discretion, and otherwise unlawful; (b) a permanent injunction[1] barring the Agency from proceeding with

---

[1] CAC understands that the Government has executed an additional bridge contract with CSI, and that performance of the contract award to CSI which is the subject of this protest will be voluntarily stayed during this bid protest litigation.  CAC respectfully reserves the right to move

performance of the arbitrarily and unlawfully issued contract award to CSI; (c) an order directing

the Agency to terminate CSI's contract award, conduct a rational reevaluation of offerors'

quotations in accordance with the terms of the RFQ, and render a new award decision; and (d)

the payment of CAC's bid preparation and proposal costs, the precise amount of which will be

determined via a separate proceeding if the Agency and CAC are unable to resolve the matter

informally.

## Parties

16.     Plaintiff is a corporation organized and incorporated under the laws of the State of

Delaware.

17.     Defendant is the United States, acting by and through the U.S. Department of

Homeland Security, U.S. Immigration and Customs Enforcement.

## Jurisdiction and Standing

18.     The Court has jurisdiction over this action because the case involves CAC's

objection to "a solicitation by a Federal agency for bids or proposals for a proposed contract or to

a proposed award or the award of a contract or any alleged violation of a statute or regulation in

connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).

19.     CAC has standing to bring this suit because it is an actual offeror whose direct

economic interests have been, and continue to be, adversely and prejudicially affected by the

Agency's improper conduct described in this Complaint.  *See, e.g.*, *G4S Secure Integration LLC

v. United States*, 161 Fed. Cl. 387, 396 (2022) ("[A] plaintiff must prove two elements to

---

for a temporary restraining order or preliminary injunctive relief in the event that the voluntary
stay of performance is lifted prior to resolution of CAC's protest.

establish that it has standing: 1) that it is an actual or prospective bidder/offeror, and 2) that it possesses a direct economic interest in the award of the contract.").

20.　　CAC timely submitted a quotation in response to the RFQ, has continued to submit quotation revisions in response to each of the Agency's amendments to the RFQ, each round of discussions, and each round of voluntary corrective action undertaken by the Agency, and has continuously pursued an award under the RFQ.  Thus, it cannot be disputed that CAC is an actual offeror under the subject RFQ, and that the first element of standing is satisfied.

21.　　To demonstrate a direct economic interest in the procurement sufficient to support standing, a plaintiff generally must make an adequate showing of prejudice.  *Yang Enterprises, Inc. v. United States*, 156 Fed. Cl. 435, 445 (2021).  "A protester's showing of prejudice differs depending upon the nature of the protest."  *Square One Armoring Serv., Inc. v. United States*, 123 Fed. Cl. 309, 320 (2015).  Generally, in the context of a post-award protest, "a protester demonstrates the requisite prejudice by showing that it would have had a 'substantial chance' of receiving the contract award but for the alleged errors in the procurement process."  *Id*.  For purposes of the standing analysis, "the Court must accept the well-pled allegations of agency error to be true."  *USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 450 (2010).

22.　　CAC has standing to challenge the Agency's corrective action reevaluation of quotations and reissuance of a contract award to CSI.

23.　　CAC is a highly qualified and highly capable incumbent offeror.  CAC received ███████████████ scores under nearly every non-price evaluation factor, and received ████████ marks in every category.  Additionally, CAC submitted a fair and reasonable price quotation under Factor 5, with a quoted price of █████████████ and a total evaluated price (inclusive of all options) of ████████████.

24.     But for the Agency's prejudicially arbitrary and unlawful conduct as detailed herein, CAC would have received an even more favorable evaluation under Factor 4—Past Performance, and thus would have achieved ██████████ evaluation score under every non-price factor.  Further, had the Agency rationally evaluated CSI's quotation, the Agency would have determined that CSI's quotation was ineligible for award and, in any event, inferior to CAC's quotation in terms of evaluation ratings and substantive merits under the non-price evaluation factors.  Had the Agency rationally conducted its underlying evaluations and best-value tradeoff determination, selection of CAC—the lower-priced offeror with a superior non-price quotation—would have been a foregone conclusion.  Considering CAC's qualifications and capabilities, outstanding evaluation scores, and half-billion-dollar price advantage as compared to CSI—and considering that CAC and CSI are now the only two companies left in the competition—there is a more than substantial likelihood that CAC would have received the contract award following a rational and reasonable evaluation and source selection determination in accordance with the terms of the RFQ.

25.     Taking CAC's allegations as true, then, CAC has demonstrated that it would have more than a substantial chance of receiving the contract award, but for the Agency's arbitrary and unlawful actions.

26.     As such, CAC has standing to challenge the Agency's corrective action reevaluation of quotations and reissuance of a contract award to CSI.

**Factual Background**

A.  **Relevant Terms of the RFQ.**

27.     The Agency initially issued RFQ No. 70CDCR23Q00000004 on January 23, 2023, seeking to award a single, multi-billion-dollar BPA for Daily Schedule Large Aircraft and

Special High-Risk Charter Flight Services in support of ICE Air Operations.  *See* Tab 17.  The RFQ was issued in accordance with FAR Subpart 8.4 under GSA MAS 481211B and/or 481211O.  Tab 17, AR 409.

28.     The RFQ contemplated the issuance of a hybrid BPA—including fixed-price with Time and Materials CLINs—with a 12-month base period (inclusive of a 30-day transition period) and four, 12-month option periods.  Tab 17, AR 410.

29.     The Agency's evaluation was to take place through a "two-phase, advisory down-select process," whereby the Agency would invite up to four contractors to participate in Phase 2 following a Phase 1 evaluation.  Tab 17, AR 410-11.

30.     As part of the Phase 1 quotation, offerors were required to submit a Cover Letter, Accounting System Documentation, Letter(s) of Commitment, FAA Air Operating Certificate(s), Airworthiness Certificates, Operations Specifications Documentation, a GSA Certification, a Corporate Experience Questionnaire, a List of Available Aircraft, Required Clauses and Provisions, and, if applicable, Teaming Agreement documentation.  Tab 17, AR 411-12.

31.     As part of the Phase 2 quotation, offerors were also to participate in an Oral Presentation and submit a Betterment Promise, Pricing Spreadsheet, and Pricing Narrative.  Tab 17, AR 412; *see also* Tab 24.

32.     The RFQ specified the following factors and subfactors for use by the Agency in evaluating quotations:

- Phase 1:
    o  Factor 1—Corporate Experience
    o  Factor 2—Aircraft Availability and Commitment
- Phase 2:
    o  Factor 3—Technical Capability
        ▪  Subfactor 1—Subcontractor Management
        ▪  Subfactor 2—Transition
        ▪  Subfactor 3—Aviation Management

8

- Subfactor 4—Betterment Promise
- Subfactor 5—On the Spot Questions
- Factor 4—Past Performance
- Factor 5—Price.

Tab 17, AR 421.

33.     An acceptability review was also to be conducted as part of the Phase 1

evaluation.  Tab 17, AR 420-21.  As part of the Phase 1 acceptability review and verification, the

Agency was to evaluate each offeror's GSA Certification which, in turn, required consideration

of the offeror's eligibility under the following criterion:

> In order to be eligible to compete, the total period of performance under the
> contractor's GSA FSS contract must be in full force and effect for at least 60 months
> beyond the award date of the BPA via the exercise of available, unexercised options.

Tab 17, AR 414.

34.     The RFQ further specified that "[q]uotes that do not pass the acceptability review

will not be evaluated for the remaining phases/parts or factors."  Tab 17, AR 417.

35.     In assessing quotations under Factor 1, the Agency was required to "evaluate

whether the contractor will successfully perform the work (which includes, if applicable the

extent of its teaming partner's involvement), based on its corporate experience."  Tab 17, AR

421.

36.     The Agency would "evaluate the contractors' experience providing the same or

similar services to the requirements listed in the SOW" by assessing "recent (active within the

last three years) and relevant projects (similar in scope and complexity)."  *Id*.  "Projects that are

more similar in scope to the proposed work, in scope and complexity, may be seen as more

relevant than efforts that are less similar in these areas."  *Id*.

37.     Each offeror was to be assigned a confidence rating under Factor 1—Corporate

Experience using the following adjectival scale:

| High Confidence | The Government has **high confidence** that the contractor's experience will aid in successfully performing under the contract. |
|---|---|
| Some Confidence | The Government has **some confidence** that the contractor's experience will aid in successfully performing under the contract. |
| Low Confidence | The Government has **low confidence** that the contractor's experience will aid in successfully performing under the contract. |

Tab 17, AR 421-22.

38.     For Factor 2, the Agency was to "evaluate the contractor's aircraft availability (as demonstrated by letters of commitment from air partners) as it aligns to the requirements of the SOW."  Tab 17, AR 422.

39.     An adjectival confidence rating for Factor 2—Aircraft Availability and Commitment would be assigned to each offeror following the Agency's evaluation, pursuant to the following rating scale:

| High Confidence | The Government has **high confidence** that the contractor has sufficient aircraft commitments available to support the Government's requirement. |
|---|---|
| Some Confidence | The Government has **some confidence** that the contractor has sufficient aircraft commitments available to support the Government's requirement. |
| Low Confidence | The Government has **low confidence** that the contractor has sufficient aircraft commitments available to support the Government's requirement. |

*Id.*

40.     An offeror's Technical Capability was to be evaluated under Factor 3 on the basis of the offeror's Oral Presentation and written Betterment Promise.  *Id.*

41.     For Subfactor 1—Subcontractor Management, the Agency would consider "the soundness of the contractor's approach to successfully managing subcontractors" by evaluating whether the offeror's proposed "approach would (1) be realistically achievable, (2) meet the

requirements of the SOW, if successfully executed, and (3) pose any excessive risks to the Government." *Id*.

42.     For Subfactor 2—Transition, the Agency was to evaluate whether the offeror's proposed approach to transitioning services "would (1) be realistically achievable, (2) meet the requirements of the SOW, if successfully executed, and (3) pose any excessive risks to the Government." *Id*.  The Agency was to conduct a similar analysis under Subfactor 3—Aviation Management, considering whether the offeror's "approach to successfully managing aircraft (to include maintenance and safety)" would be achievable, meet SOW requirements, or pose risk to the Agency.  Tab 17, AR 422-23.

43.     "[T]he soundness of the contractor's betterment promise" would be evaluated under Subfactor 4—Betterment Promise, by a consideration of "whether the promise would (1) be realistically achievable, (2) exceed the requirements of the SOW, if successfully executed, in a way that is beneficial to the Government[, and] (3) pose any excessive risks to the Government." Tab 17, AR 423.

44.     Finally, an offeror's responses to on-the-spot questions posed during its Oral Presentation would be evaluated under Subfactor 5 for (1) an indication of understanding of the presented scenario; (2) a sound plan or approach; (3) the offeror's fluency on industry-specific concepts and language; and (4) excessive performance and/or compliance risks.  *Id*.

45.     A single overall confidence rating would be assigned to each offeror under Factor 3, using the following scale:

| High Confidence | The Government has **high confidence** that the contractor understands the requirement, proposes a sound approach and will be successful in performing the requirement with **little or no** government intervention. |
|---|---|
| Some Confidence | The Government has **some confidence** that the contractor understands the requirement, proposes a sound approach and will be successful in performing the requirement with **some** government intervention. |
| Low Confidence | The Government has **low confidence** that the contractor understands the requirement, proposes a sound approach and will be successful in performing the requirement **even with** government intervention. |

*Id.*

46.     In its Factor 4—Past Performance evaluation, the Agency would "evaluate the quality of services provided by the contractor (and teaming partners) to the agency and other organizations as a prime contractor and/or subcontractor," using as references the same projects submitted by offerors under Factor 1—Corporate Experience.  *Id.*

47.     In evaluating past performance, the Agency was to "consider the recency and relevance of the information obtained, source of information, and information about the quality of services provided."  Tab 17, AR 424.  "In addition to the CPARS assessments (interim and final) and reference checks on project[s] submitted during Phase 1, the Government reserve[d] the right to use other information in its assessment."  *Id.*  Importantly, the RFQ limited the scope of "recent" past performance to that which was performed within three years prior to the solicitation closing date.  *Id.*

48.     Each offeror would be assigned one of the below confidence ratings for its past performance under Factor 4:

| High Confidence | Based on the contractor's recent (NLT 3 years from solicitation closing date) and relevant (similar in scope and complexity to this effort), and performance record, the Government has a high expectation that the contractor will successfully perform. |
|---|---|
| Some Confidence | Based on the contractor's recent (NLT 3 years from solicitation closing date) and relevant (similar scope and complexity to this effort), and performance record, the Government has a reasonable expectation that the contractor will successfully perform. |
| Low Confidence | Based on the contractor's recent (NLT 3 years from solicitation closing date) and relevant (similar in scope and complexity to this effort), and performance record, the Government has a low expectation that the contractor will successfully perform. |
| Neutral Confidence * | The contractor does not have recent (NLT 3 years from solicitation closing date) and relevant (similar in scope and complexity to this effort), or any performance record; or the contractor's performance record is so sparse, a meaningful confidence rating cannot be reasonably assigned. |

*Id.*

49.     Price was to be evaluated under Factor 5 based on a review of each offeror's Basis of Estimate ("BOE") provided in the pricing spreadsheet as well as the submitted pricing narrative.  *Id.*  Quotations would be evaluated "by adding the total price for all options to the total price for the basic requirement."  Tab 17, AR 425.

50.     Price would not be rated adjectivally.  *Id.*  Rather, "[p]rices for the base and option periods, including the 6-month option available under FAR 52.217-8, will be evaluated to determine fair and reasonableness."  *Id.*  "The Government will also evaluate in accordance with FAR 8.405-3(b)(2)(vi)."  *Id.*  The Agency further reserved the right to conduct a price realism analysis.

51.     The RFQ specified the relative importance of the evaluation factors and subfactors, as follows:

> Factors 1 and 2 are equally important and are more important than factors 3, 4, and 5.  Factors 3-5 are listed in descending order of importance.  The individual factors will be rated holistically, and will comprise one confidence level rating for each factor, except price.  The non-price factors are significantly more important than factor 5, price.

Subfactors will not be rated separately.  Subfactors will be treated equally within each factor.

*Id*.

52.     The RFQ also set forth the following basis for award:

An award will be made to the responsible contractor whose quote, conforming to the solicitation, is determined to be the best overall value to the Government, considering the tradeoff between non-price and price factors.

The Government may be willing to pay a price premium for quote features that reduce the risk of unsuccessful contract performance, provide increased technical capability or greater benefits to the Government.  The Government may also award to other than the highest technically rated quote, if it determines that a price premium is not warranted.  As quotes approach equality (does not mean "equal" because all quotes are different), price may become a determining factor.

Tab 17, AR 425-26.

## B.  **Prior Evaluations, Protests, and Corrective Action.**

53.     CAC timely submitted its Phase 1 quotation on or about January 27, 2023.  CAC also timely submitted its Phase 2 quotation on or about March 20, 2023.  On or about March 28, 2023, CAC provided an oral presentation to the Agency and submitted amended Phase 2 documentation in accordance with Amendment 2 to the RFQ.

54.     On May 11, 2023, following the Agency's initial evaluation, the Agency notified CAC that it had not been selected for award, and that a contract had been issued to Chapman Freeborn at a value of approximately $2.8 billion.  Tab 39a, AR 1484.

55.     Both CAC and CSI filed protests with the GAO, challenging the Agency's award to Chapman Freeborn.  *See Classic Air Charter, Inc.*, B-421683.1; *CSI Aviation, Inc.*, B-421683.2.  Among other things, CAC's protest challenged the Agency's unreasonable evaluation of quotations, failure to conduct a proper price reasonableness analysis, and failure to reasonably determine whether Chapman Freeborn was a responsible offeror.

56.     In June 2023, the Agency undertook voluntary corrective action in response to CAC's and CSI's protests.  The Agency subsequently terminated Chapman Freeborn's contract award in August 2023 and, following a reevaluation of the acceptability of quotation submissions under the RFQ, excluded Chapman Freeborn from the competition.  *See Chapman Freeborn Airchartering, Inc.*, B-421683.3, Nov. 30, 2023, 2024 CPD ¶ 197 at 4; Tab 40.

57.     On or about October 17, 2023, the Agency issued Amendment Three to the RFQ, which made administrative changes and provided additional instructions for offerors, and opened discussions.  *See* Tabs 41, 42a, 42b.

58.     On October 26, 2023, CAC filed another GAO protest, challenging the terms of Amendment Three and the discussions conducted by the Agency.  *See Classic Air Charter, Inc.*, B-421683.4, Jan. 19, 2024, 2024 WL 663179.

59.     On October 27, 2023, the Agency issued Amendment Four to the RFQ, with the intent of clarifying Amendment Three and the Agency's discussions.  *See* Tab 49.  Among other things, Amendment Four clarified that "[t]he evaluation factors from the January 23, 2023 RFQ have not changed and remain applicable to this procurement."  Tab 49, AR 2734 ("Amendment 3 did not add or change any evaluation criteria.  Amendment 3 included submission instructions and clarifications.").

60.     CAC timely submitted a revised quotation in accordance with Amendment Three, Amendment Four, and the Agency's discussions.

61.     The Agency issued additional discussions on January 5, 2024 and February 7, 2024.  *See* Tabs 55a, 55b, 60a, 60b.  Each time, CAC responded with timely submissions providing the requested information and clarifications to the Agency.

62.     On March 8, 2024, CAC received from the Agency a Notification of Unsuccessful Offeror & Brief Explanation of Award, which explained that "[CAC] ha[d] not been selected for award under the subject RFQ" and identified CSI as the awardee.  Tab 64, AR 3308.

63.     CSI's quoted price, inclusive of options but exclusive of FAR 52.217-8, was $3,219,266,171.80.  *Id*.  The amount of CSI's award, inclusive of the base and all options, was $3.6 billion.  Tab 65, AR 3310.

64.     CSI's contract award had a period of performance extending from March 8, 2024 to March 7, 2029.  *Id*.  This period of performance was to conclude just days before the expiration of the last option period of the GSA Schedule under which CSI submitted its quotation.  *Compare id*. (showing an award date of March 8, 2024 and the end of the period of performance of CSI's award as March 7, 2029) *with* Tab 57.2, AR 3090 (showing an expiration date of the last option period of CSI's GSA Schedule of March 9, 2029); *see also* Tab 17, AR 414 ("In order to be eligible to compete, the total period of performance under the contractor's GSA FSS must be in full force and effect for at least 60 months beyond the award date of the BPA via the exercise of available, unexercised options. … Prime Contractors, only, must have 60 months (beyond award) remaining on their GSA Schedule."); Tab 108, AR 5964 ("If the contractor is on their last 5 year option period they will be ineligible to compete.  This is a FAR requirement and cannot be changed.") (quoting FAR 8.405-3).

65.     The Agency provided the following summary of CAC's evaluations scores under each factor:

**Phase I**

| Factor 1: Corporate Experience | Factor 2: Aircraft Availability and Commitment |
|---|---|
| ███████████████████████ | ███████████████████████ |

**Phase II**

| Factor 3: Technical Capability | Factor 4: Past Performance | Factor 5: Quoted Price | Factor 5: Total Evaluated Price (Includes 52.217-8) |
|---|---|---|---|
| ███████ | ███████ | ███████ | ███████ |

Tab 64, AR 3309.

66.     The Agency also provided the following brief explanation of the basis for its

decision to issue an award to CSI:

> Based upon the Government's evaluation of all quotes received and based upon the relative importance of the factors as established in the RFQ, the Government conducted a tradeoff between non-price and price factors and has determined that CSI Aviation Inc. provides the best value to the Government.

*Id.*

67.     On March 18, 2024, CAC filed a protest with the GAO, challenging numerous

aspects of the Agency's evaluation, including the Agency's evaluation of CSI's quotation under

Factor 2—Aircraft Availability and Commitment, and Factor 4—Past Performance.  *See Classic*

*Air Charter, Inc.*, B-421683.5, B-421683.6.  CAC supplemented its protest to raise additional

allegations after reviewing the Agency Report.

68.     On May 24, 2024, the GAO held outcome prediction Alternative Dispute

Resolution ("ADR") and advised the parties that, if a decision on the merits were to be reached,

the GAO would likely sustain CAC's protest allegations challenging the Agency's evaluation of

CSI's quotation under Factors 2 and 4. The GAO also indicated that it would be likely to

determine that the Agency's best-value determination was flawed, and that CAC was prejudiced

by the Agency's material evaluation errors.

69.     On May 29, 2024, the Agency filed (yet another) a Notice of Corrective Action.

*See* Tab 84a, AR 5187. In that Notice of Corrective Action, the Agency represented to the GAO

and to CAC that it would take the following corrective actions:

> In accordance with the recommendations from the outcome prediction Alternative
> Dispute Resolution, the Agency will **re-evaluate CSI's Factor 2—Aircraft
> Availability and Commitment and Factor 4—Past Performance proposals**.
> Consequently, the Agency intends to issue a new Source Selection Decision with a
> new best value tradeoff.

*Id*. (emphasis added).

70.     The Agency was clear and specific in representing to the GAO, and to CAC, the

corrective action it planned to undertake in response to the GAO's determinations at outcome

prediction ADR. *Id*. The Agency did not notify the GAO or CAC of any intent to, or otherwise

reserve the right to, expand the scope of its corrective action beyond what was represented in its

Notice of Corrective Action. *Id*.

71.     In reliance on the Agency's representations, the GAO dismissed CAC's protest as

academic on May 31, 2024. Tab 79, AR 5148.

72.     Less than two weeks later, however, the Agency reversed course. On June 10,

2024, to kick off its purported corrective action reevaluation, the Agency requested revised

quotation submissions from offerors.

73.     CAC filed yet another GAO protest on June 13, 2024, challenging the Agency's

implementation of corrective action as reflected in the June 10 Letter. *See Classic Air Charter,*

*Inc.*, B-421683.8.  Generally, CAC contended that the Agency unreasonably and unlawfully abandoned the corrective action it represented to the GAO that it would undertake—and upon which the GAO specifically relied in dismissing CAC's prior protest—in favor of a radically different corrective action which allowed for broad quotation revisions and a broad reevaluation of quotations, and which gave CSI another opportunity to cure the material defects in its quote which were previously ignored by the Agency.

74.     In response to CAC's protest, the Agency promptly rescinded the June 10 Letter. Because the Agency rescinded the June 10 Letter, the GAO subsequently dismissed CAC's protest as academic.

75.     In August 2024, the Agency prepared a memorandum to the procurement file which purported to document the Agency's "review [of] the impact of the iAero Group bankruptcy proceedings on CSI Aviation, INC.'s (CSI) proposal evaluation and determin[ation of] what actions, if any, the Agency should take after review."  Tab 91, AR 5323.

76.     The Agency determined that CSI's quotation would "need to be re-evaluated" in a new Acceptability Review and new Factors 1-5 evaluations.  Tab 91, AR 5327-28.  The Agency further noted that "***[o]nce the reevaluation is complete***, the Government will determine what additional actions are needed to move forward with an award including whether to conduct discussions, amend the RFQ, and/or take additional actions."  Tab 91, AR 5328 (emphasis added).

77.     The record does not reflect the completion of such a reevaluation.[2]  Rather, the Agency solicited revised quotations.

_____

[2] CAC asked for copies of the evaluation reports from this reevaluation, and was informed by counsel for the Government that the relevant document was Tab 91.  Tab 91 does not contain a

78.     The Agency issued another discussions letter to CAC on October 23, 2024, in which the Agency indicated that it had "performed a post-corrective action review and evaluation of [CAC's] quote" and was "establish[ing] a competitive range and conduct[ing] discussions." Tab 92a; *see also* Tab 92b.

79.     CAC and CSI submitted final revised quotations on October 30, 2024 in accordance with the Agency's instructions in the October 23 Letter.  *See* Tabs 93-94.

80.     CAC also filed an Agency-level protest on November 1, 2024, in which CAC explained that (1) the Agency engaged in an effective bait-and-switch whereby it deviated dramatically from the represented corrective action and sought, instead, to allow CSI the opportunity to shore up the weak aspects of its quotation; and (2) CSI was no longer eligible, under the terms of the RFQ and the FAR, to compete for a contract award because it lacked the necessary period of performance remaining on its GSA Schedule to span the potential period of performance of a contract awarded under the RFQ.  *See* Tab 108.

81.     On December 5, 2024, the Agency issued a perfunctory denial of CAC's Agency-level protest.  *See* Tab 109.  In that response, the Agency claimed that it did not deviate from the corrective action promised to the GAO, and that CSI remained an eligible offeror:

> CAC misunderstands the relevance of CSI's GSA Schedule expiring on March 9, 2029.  If the current award stands as awarded, March 8, 2024, 60 months beyond the award date would be March 7, 2029, which is two days prior to the expiration of CSI's GSA Schedule.  Furthermore, the period of performance on BPA #70CDCR24A00000001 with CSI is March 8, 2024 through March 7, 2029.  The Government has no intention of extending the period of performance ***once*** the stop work order is lifted.

Tab 109, AR 5972 (emphasis added).

---

reevaluation of CSI's (or CAC's quotation), but rather only reflects the Agency's determination that such a reevaluation needed to be conducted.

C. **The Agency's January 31, 2025 Award Decision.**

82.     After issuing its response to CAC's Agency-level protest, the Agency evaluated CAC's and CSI's revised quotation submissions from October 2024 and prepared new evaluation reports for (1) CAC Factors 1 & 2, *see* Tab 97; (2) CSI Factors 1-3, *see* Tabs 98a, 98b; (3) CAC and CSI Factor 4, *see* Tab 95; and (4) CAC and CSI Factor 5.  *See* Tab 96.

83.     On January 31, 2025, the Agency conducted a best-value tradeoff and new award decision.  *See* Tab 99.  CSI was again selected as the awardee, and the Source Selection Decision Document showed that the base period of performance for the awarded contract commenced on March 8, 2024, prior to the submission of revised quotes in response to Round 4 Discussions, the corrective action reevaluation, and the new award decision.  Tab 99, AR 5602.  The Agency apparently did not issue new contract documents to CSI, but rather issued a modification to CSI's prior contract lifting the stop work order.  *See* Tabs 111, 111a, 111b, 112.

84.     On January 31, 2025, the Agency also issued another Notification of Unsuccessful Offeror and Brief Explanation of Award, informing CAC that it had not been selected for award and reaffirming the award issued to CSI.  Tab 113, AR 6003.

85.     The Agency confirmed that CSI's quoted price was $3,219,226,171.80, exclusive of FAR 52.217-8.  *Id*.  CSI's awarded price, inclusive of all options and reflective of CSI's total evaluated price, remained $3.6 billion.  *See* Tab 112, AR 5998.

86.     The Agency provided the following details of its January 2025 evaluation of CAC's quotation:

**Phase I**

| Factor 1: Corporate Experience | Factor 2: Aircraft Availability and Commitment |
| --- | --- |
|  |  |

**Phase II**

| Factor 3: Technical Capability | Factor 4: Past Performance | Factor 5: Quoted Price | Factor 5: Total Evaluated Price (Includes 52.217-8) |
| --- | --- | --- | --- |
|  |  |  |  |

Tab 113, AR 6004.

87.     CAC timely filed its Complaint on February 18, 2025.  *See* Dkt. 1.  On March 11, 2025, counsel for the Government served the AR on all parties.  On March 14, 2025, in response to additional requests by counsel for CAC, the Agency served on all parties those additional requested documents which existed.

88.     This timely Amended Complaint follows.

**Count I**

**The Agency Irrationally Failed to Conduct an Acceptability Review as Required by the RFQ and Thus Failed to Disqualify CSI as Ineligible Due to its Unawardable Quotation.**

89.     As part of the RFQ evaluation scheme, the Agency was to conduct an Acceptability Review to ensure that offerors submitted complete and compliant quotations.  *See, e.g.*, Tab 17, AR 420 ("[T]he Government will evaluate to ensure the contractor has submitted all requirements for the Acceptability Review.").

90.     The Acceptability Review encompassed consideration of each offeror's accounting system, FAA certification(s), Airworthiness Certificates, FAA operations specifications documentation ("OpSpecs"), and GSA contractor certification/GSA Schedule.  Tab 17, AR 417.

91.     The RFQ was clear that "[q]uotes that do not pass the acceptability review will not be evaluated for the remaining phases/parts or factors."  *Id.*

92.     As part of its June 2023 corrective action—which promised a reevaluation of quotations, a new best-value tradeoff, and a new award decision in response to meritorious protests of the initial award to Chapman Freeborn—the Agency undertook a post-corrective action acceptability review.  Tab 40, AR 1489 ("In accordance with the solicitation, the Government conducted a pre-evaluation acceptability review of the Phase II quoters (interested parties) to ensure the contractors submitted all requirements as outlined in the RFQ.").  Among other things, the Agency evaluated offerors' Letters of Commitment, FAA certifications, Airworthiness Certificates, OpSpecs, GSA Certifications and Schedules, and Teaming Agreements.  Tab 101, AR 5715-21.

93.     As a result of this initial Acceptability Review, "[o]n August 22, 2023, ICE informed three quoters that they had GSA Schedule contract issues which rendered them technically unacceptable under the RFQ and ineligible for award."  Tab 40, AR 1489; *see, e.g.*, Tab 101, AR 5720 (disqualifying an offeror because its "GSA Schedule expires June 2, 2028, which does not allow 60 months from award date.").

94.     Prior to the March 2024 award to CSI, the Agency conducted another Acceptability Review, to evaluate and consider the new submissions made by CAC and CSI during discussions.  *See* Tab 104 (Post-Discussions Acceptability Review).

95.     Following CAC's successful protest in May 2024, the Agency specifically noted the need to conduct another Acceptability Review as part of its corrective action reevaluation. Tab 91, AR 5327 ("Acceptability Review: The RFQ stated 'The contractor shall provide verification of the ability to perform 14 CFR Part 121 or Part 135 flight operations as well as OpSpecs documentation and Airworthiness Certificates for, at a minimum, the 12 DSLA aircraft to include a listing of aircraft, authorized aircraft, aircraft owners, aircraft make and models. …' [T]he iAero documents are no longer of value since iAero ceased normal operations on April 7, 2024. ████████████████████████████████ ICE will need to review the documentation and determine whether the documents meet requirements.").

96.     During Round 4 Discussions conducted in October 2024, CSI submitted new Letters of Commitment, new Airworthiness Certificates, new OpSpecs, and new Teaming Agreements.

97.     Inexplicably, however, the Agency never conducted a new Acceptability Review as part of its corrective action reevaluation predating the January 2025 award[3]—in violation of the RFQ evaluation criteria and the Agency's own determination that such an Acceptability Review was necessary.  *See, e.g.*, Tab 17, AR 417, 420-21; Tab 91, AR 5327; *see also, e.g.*, *DigiFlight, Inc. v. U.S.*, 165 Fed. Cl. 588 (2023) (granting judgment for plaintiff where the agency's analysis of proposals failed to comply with the evaluation criteria in the agency's own RFQ).

---

[3] Counsel for CAC noted that the AR, as initially produced, did not contain documentation of an Acceptability Review conducted as part of the corrective action reevaluation predating the January 2025 award.  Upon inquiry, counsel for the Government confirmed on March 14, 2025 that no documents existed.

98.     The Agency's failure to conduct an Acceptability Review as part of its latest corrective action reevaluation was not only violative of the RFQ criteria, but was clearly arbitrary and irrational.

99.     As previously noted, CSI submitted new documentation during discussions and as part of its final revised quote which was within the scope of the Acceptability Review.

100.    By failing to conduct an Acceptability Review, the Agency never even evaluated these aspects of CSI's final revised quote before it re-awarded the contract to CSI.  And, because the Agency never even bothered to evaluate substantial portions of CSI's final revised quote before making its award decision, the Agency failed to recognize that CSI's quotation was unawardable under the terms of the RFQ and the FAR.

101.    The Acceptability Review required an evaluation of each offeror's GSA Certification and GSA Schedule—which, among other things, set forth the expiration date of the offeror's GSA Schedule.  Tab 17, AR 417, 420-21; Tab 17c, AR 511.

102.    This expiration date was to be validated against the RFQ (and FAR) requirement that "[i]n order to be eligible to compete, the total period of performance under the contractor's GSA FSS contract must be in full force and effect for at least 60 months beyond the award date of the BPA via the exercise of available, unexercised options."  Tab 17, AR 414; *see also* FAR 8.405-3(d)(3) ("Contractors may be awarded BPAs that extend beyond the current term of their GSA Schedule contract, so long as there are option periods in their GSA Schedule contract that, if exercised, will cover the BPA's period of performance."); Tab 108, AR 5964 ("If the contractor is on their last 5 year option period [of their GSA Schedule] they will be ineligible to compete. This is a FAR requirement and cannot be changed.").

103.   As shown in CSI's GSA Certification, the last option period of CSI's GSA Schedule is set to expire on March 9, 2029.  *See, e.g.*, Tab 19-23, AR 840.

104.   Had the Agency conducted an Acceptability Review of CSI's quotation as part of its corrective action reevaluation predating the January 2025 award decision, as required by the RFQ, the Agency would have recognized that CSI lacked the necessary remaining period of performance on its GSA Schedule to be eligible for award under the RFQ or the FAR, and would have had no choice but to disqualify CSI from the competition.[4]

105.   The date of CSI's BPA award was January 31, 2025.  *See, e.g.*, Tab 111, AR 5989 (January 31, 2025 email, stating that the agency "is pleased to notify CSI Aviation, Inc. of the award of" the BPA.").

106.   CSI's GSA Schedule expires on March 9, 2029—a mere 49 months and 9 days beyond the award date of the BPA.

107.   Thus, CSI's GSA Schedule will expire prior to the end of the 60-month period of performance of the BPA, and CSI is ineligible to compete under the terms of the RFQ and the FAR.  Tab 17, AR 414; FAR 8.405-3(d)(3); Tab 41b, AR 1546 (showing a 60-month period of performance, with precise dates "[t]o be added upon award.").

108.   To be sure, the January 2025 award to CSI is a new award following new quotation submissions, new evaluations, and a new source selection decision—and thus has a new "award date" from which the 60-month period beyond the award date must be measured.

---

[4] Indeed, the Agency previously disqualified another offeror in its prior Acceptability Reviews for the same issue.  *See, e.g.*, Tab 101, AR 5720 (disqualifying an offeror because its "GSA Schedule expires June 2, 2028, which does not allow 60 months from award date.").

109. In its December 5, 2024 response to CAC's Agency-level protest,[5] the Agency previously took the position that:

> CAC misunderstands the relevance of CSI's GSA Schedule expiring on March 9, 2029. If the current award stands as awarded, March 8, 2024, 60 months beyond the award date would be March 7, 2029, which is two days prior to the expiration of CSI's GSA Schedule. Furthermore, the period of performance on [the BPA] with CSI is March 8, 2024, through March 7, 2029. The Government has no intention of extending the period of performance once the stop work order is lifted.

Tab 109, AR 5972.

110. It is the Agency, not CAC, who misunderstands the implications of the corrective action undertaken and the expiration of CSI's GSA Schedule.

111. The Agency's prior evaluation and award to CSI were legally unsound. Thus, the Agency solicited—and CSI submitted—substantially revised quotations as part of its corrective action, which included new corporate experience (and, thus, new past performance) submissions, new subcontractors and teaming partners, new aircraft commitments, new OpSpecs documentation, and new technical approaches. *See* Tab 92b; Tab 94. The Agency, in turn, reevaluated CSI's new quotation under every evaluation factor, and arrived at a new award decision. *See* Tabs 95, 96, 98a, 98b, 99.

112. The new quotation submissions, new evaluation, and new award decision superseded and nullified the Agency's prior award to CSI.

---

[5] CAC's present allegation is based on new information presented in the Agency's award decision and in the AR—namely, that the Agency selected CSI for award and failed to conduct an Acceptability Review as required under the RFQ—and is undoubtedly timely. Even so, CAC has preserved its right to challenge CSI's eligibility due to the period of performance of its GSA Schedule by filing an Agency-level protest on November 1, 2024. *See, e.g.*, *Harmonia Holdings Grp., LLC v. U.S.*, 20 F.4th 759, 767 (Fed. Cir. 2021) (holding that a formal, agency-level pre-award protest is sufficient to "remove[] th[e] case from the ambit of *Blue & Gold* and its progeny" and preserve a protester's right to later assert the same objection).

113.    Thus, the Agency could not merely reinstate its prior award—with the prior

period of performance[6]—to CSI, because the quotation upon which that award was based was

substantially different from the revised quotation submitted by CSI and upon which the January

2025 award decision was based.  *See, e.g.*, *Hanford Tank Disposition Alliance, LLC v. U.S.*, 173

Fed. Cl. 269, 312-14 (2024) ("[T]he [agency] took corrective action, opened discussions, and

identified several issues for discussions with both offerors, both offerors were asked to, and

submitted, revised proposals…. At that point, the agency needed to evaluate the protester's

revised proposal and the intervenor's revised proposal and the Source Selection Authority needed

to conduct a best value trade-off analysis on the revised proposals before the agency could accept

an offer and award a contract. … [B]y extension, the original offers to a solicitation, are moot

after an agency takes corrective action….); *id*. at 316 ("[A]fter the [agency] issued the corrective

action and received new proposals, the agency could no longer evaluate the earlier submitted

proposals, make a best value determination or award a contract based on those earlier submitted

proposals submitted before the corrective action."); *id*. at 318 ("The Source Selection Authority's

initial evaluation of proposals and award decision were mooted by the court's earlier decision …

and the subsequent corrective action taken by the agency."); *Centech Grp., Inc. v. U.S.*, 79 Fed.

Cl. 562, 575-77 ("[I]n Plaintiff's view, its original contract award should be reinstated. … The

problem with this argument is that Centech would not in fact be receiving award based upon its

---

[6] The Agency's apparent position—that it made a new award decision on January 31, 2025, based on a new quotation submission from CSI, and that the period of performance of the award resulting therefrom began on March 8, 2024, *see* Tab 99; Tab 109 AR 5972—is facially irrational.  CSI submitted its revised quotation on October 30, 2024.  Tab 94.  The Agency conducted its evaluation of that quotation and made its award decision on January 31, 2025.  Tab 99, AR 5615.  Yet, the Agency purports to have made an award whose period of performance commenced on March 8, 2024.  An agency cannot issue an award with a period of performance predating the existence of the quotation and award decision upon which the award was based.

original proposal. … The original solicitation, evaluation, and award were premised on legal error…. As such, that original award is illegal, void ab initio and a nullity, and cannot be reinstated by the Court."); *Peraton Inc. v. U.S.*, 146 Fed. Cl. 94, 101 (2019) (quoting *HP Enter. Servs., LLC*, B-413382.2, 2016 CPD ¶ 343 at 3 n.3 ("Where an agency takes corrective action in response to a protest under which it reevaluates/reconsiders its prior source selection decision, we view such corrective action as superseding the prior action.")).

114.     The Agency purports to have acted under the authority of FAR 52.233-3 in lifting the stop-work order on CSI's prior (nullified and superseded) award issued in March 2024. Tab 111, AR 5989-90.

115.     This award cannot be reinstated because CSI has replaced the quotation which formed the basis of this award with a substantially different quotation which formed the basis of the Agency's January 2025 award decision, as described above.

116.     Moreover, FAR 52.233-3 does not authorize the Agency to lift the stop-work order and proceed with the prior award under these circumstances.

117.     FAR 52.233-3(a) provides that "[u]pon receipt of the final decision in the protest, the Contracting Officer shall either— (1) Cancel the stop-work order; or (2) Terminate the work covered by the order."

118.     The Agency is not acting in response to a "final decision in the protest," but rather is acting on the basis of a corrective action reevaluation undertaken with respect to completely new quotation submissions. Further, FAR 52.233-3 contemplates an "either/or" scenario, whereby the agency must either cancel the stop-work order (if it receives a favorable final protest decision which sustains the award), or terminate the award (if it receives an unfavorable final protest decision which sustains the protest challenging the award).

119.    FAR 52.233-3 does not contemplate a third alternative whereby an agency may cancel a stop-work order and proceed with a previously-awarded contract following a new evaluation and award decision based on substantially revised quotations.

120.    Thus, while the Agency purports to have relied upon FAR 52.233-3 to cancel the stop-work order and resume with the prior award to CSI under the prior period of performance—likely in an attempt to avoid having to disqualify CSI for the untimely expiration of its GSA Schedule—the cited FAR provision does not give the Agency authority to take such actions.

121.    In sum, the Agency failed to conduct an Acceptability Review as required by the RFQ in its corrective action reevaluation.  Had it conducted such an Acceptability Review, the Agency would have been forced to disqualify CSI from the competition because its GSA Schedule is set to expire less than 60 months from the award date of the BPA—as the Agency had done with other offerors in earlier Acceptability Reviews in prior rounds of evaluations.

122.    No amount of mental gymnastics with respect to the award date or period of performance can save the Agency from this inevitable conclusion.

123.    The RFQ required, as an eligibility criterion, that the offeror's GSA Schedule "be in full force and effect for at least 60 months beyond the award date of the BPA."  Tab 17, AR 414.

124.    The Agency issued an award to CSI—based on new quotations, new evaluations, and a new award decision—with a new award date of January 31. 2025.

125.    CSI's GSA Schedule expires on March 9, 2029—a mere 49 months and 9 days after the January 31, 2025 award date of the BPA.

126.    CSI was, therefore, ineligible under the express terms of the RFQ and the FAR.

127.    The Agency's arbitrary and irrational failure to conduct an Acceptability Review, and failure to disqualify CSI from the competition, was highly prejudicial to CAC.  CAC is a highly qualified, highly experienced prior incumbent offeror who received ███████████ evaluation marks in virtually every category and quoted a fair and reasonable price.

128.    But for the Agency's irrational failure to conduct an Acceptability Review pursuant to the terms of the RFQ and disqualify CSI's ineligible quotation from further consideration, CAC—the only eligible offeror remaining in the competition—almost certainly would have received the contract award.

129.    For this reason, alone, the Court should grant judgment in CAC's favor.

## Count II

## The Agency Arbitrarily and Irrationally Evaluated Quotations under Factor 1—Corporate Experience.

130.    Factor 1—Corporate Experience was one of the most important evaluation factors.  Tab 17, AR 425.  Under Factor 1, the Agency was to "evaluate recent (active within the last three years) and relevant projects (similar in scope and complexity)" to "determine its level of confidence that the contractors' corporate experience will aid in successfully performing the SOW requirements."  Tab 17, AR 421.  "Projects that are more similar to the proposed work, in scope and complexity, may be seen as more relevant than efforts that are less similar in these areas."  *Id.*

131.    The RFQ permitted consideration of a teaming partner's experience ***only*** "if there is a fully executed copy of the teaming agreement that clearly delineates what each company is doing."  Tab 17, AR 418; Tab 92b, AR 5331.

132.    As part of the Round 4 Discussions in October 2024, each offeror was further directed to submit new teaming agreements.  Tab 92b, AR 5331 ("Teaming agreements dated prior to the issuance of this letter will not be accepted by the Government.").

133.    In its final quotation revision, submitted on October 30, 2024 in response to Round 4 Discussions, CSI submitted an updated Corporate Experience Questionnaire in which CSI ███████████████████████████████████████████████████████████ ███████████████████.  Tab 94-18, AR 5472-77, 5482.

134.    However, CSI *did not submit updated teaming agreements* with ███████████ ███████████   *See* Tab 94.

135.    Because CSI did not submit teaming agreements with ███████████████ ██████ dated after October 23, 2024—the date of the Round 4 discussions letter—CSI could not utilize the experience of these teaming partners under the terms of the RFQ.

136.    The RFQ required a fully executed teaming agreement clearly delineating the scope of work to be performed by each company as a prerequisite to utilizing a teaming partner's corporate experience, and the Round 4 Discussions letter further clarified that "[t]eaming agreements dated prior to [October 23, 2024] will not be accepted by the Government."  Tab 17, AR 418; Tab 92b, AR 5331.

137.    CSI's Factor 1 submissions did not comply with these express criteria.

138.    The Agency's evaluation of CSI's quotation under Factor 1 was inarguably arbitrary and irrational because the Agency ███████████████████████████████████ ██████ as part of CSI's Corporate Experience evaluation notwithstanding (1) CSI's failure to

submit updated teaming agreements with either entity; and (2) the express RFQ criteria which precluded such consideration in the absence of a valid teaming agreement.[7]

139.    In particular, CSI was credited with ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████    Tab 98a, AR 5582-83.

140.    Stated differently, absent a valid teaming agreement and in contravention of the RFQ criteria, the Agency irrationally ███████████████████████████████ and ███████████████████████████████████ to CSI under Factor 1 based, in part, on ███████████████████████████████.

141.    These findings—which were irrationally based and assessed in contravention of the RFQ criteria—formed a material part of the Agency's decision to award CSI a ██████ ██████████ rating under Factor 1, as shown in the Agency's explanation for its award of a ████████████████ rating to CSI.  Tab 98a, AR 5586 ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████

142.    CSI was similarly—and wrongfully—credited with ████████████████ ████████████████████████



---

[7] Had the Agency conducted an Acceptability Review as part of the corrective action reevaluation preceding the January 2025 award decision, as was required by the RFQ and as was done in prior rounds of evaluations, the Agency likely would have recognized this issue in CSI's Factor 1 quotation.  *See supra* Count I; Tab 17, AR 417, 420-21; Tab 101, AR 5715-21.

████████████████████████████████████████████████████

143.    Specifically, the Agency found that CSI's ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████  Tab 98a, AR 5583.

144.    The Agency also found, ██████████████████████████████████

████████████████████  Tab 94-18, AR 5482, that ██████████████████

███████████████████████████████████████████████████

███████████████████████████████████  Tab 98a, AR 5585.

145.    These findings also played a material role in the Agency's decision to assess CSI a

██████████████  rating under Factor 1.  Tab 98a, AR 5586 ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████.

146.    The Agency further erred in evaluating the recency and relevancy of CSI's

corporate experience.

147.    Recency was defined in the RFQ as the three-year period preceding the closing

date of the RFQ.  Tab 17, AR 417, 421, 424.[8]

148.    Even with the numerous rounds of corrective action and revised quote

submissions, the Agency made clear that the evaluation criteria remained unchanged from the

initial RFQ.  *See, e.g.*, Tab 49, AR 2734 ("The evaluation factors from the January 23, 2023 RFQ

have not changed and remain applicable to this procurement.  To the extent you have a question

---

[8] The same recent and relevant projects were to be evaluated under Factor 1: Corporate
Experience and Factor 4: Past Performance, and the same recency period applied under both
evaluation factors.  Tab 17, AR 419, 424.

about an evaluation factor, ICE directs you to review the RFQ released on January 23, 2023.");
Tab 92b, AR 5331-32 (referencing the January 23, 2023 RFQ for specific instructions on revised
submittals).

149.    The closing date of the RFQ was January 28, 2023.  Tab 17, AR 408.

150.    Thus, the recency period for Factor 1 (and Factor 4) projects was the three-year
period preceding January 28, 2023.

151.    The AR is devoid of any indication that this three-year recency period has been
adjusted as part of corrective action.  In fact, the Agency declined to provide an updated
Corporate Experience Questionnaire, choosing instead to proceed with revised submissions and a
reevaluation under the same long-standing time periods established in the RFQ and attachments
for all aspects of the Factor 1 evaluation.  *See, e.g.*, Tab 92b, AR 5331 (instructing offerors not to
alter the narrative in the Corporate Experience Questionnaire).

152.    However, CSI submitted—and the Agency evaluated—corporate experience
submissions which ███████████████████████████████████████████████████
███ and were thus not within the RFQ-established period for recency.

153.    For example, CSI submitted as one of its corporate experience projects a ████
█████████████████████████████████████████████████████████████
████  Tab 94-18, AR 5477-78.  The Agency, in turn, made the following clearly erroneous
finding, which materially impacted the confidence rating assessed to CSI under Factor 1: ████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████████████████████  Tab 98a, AR 5584.

154.    The Agency's findings that the subject contract was ██████████████ ██████████████████████████████████████████ clearly contravened the RFQ because the subject contract did not fall within the established three-year period for recency.

155.    As for relevancy, the Agency was to consider the extent of similarity in scope and complexity between an offeror's submitted projects and the requirement being procured on a sliding scale of sorts, where more similar efforts were viewed as more relevant than less similar efforts. *See, e.g.*, Tab 17, AR 421.

156.    Again, however, the Agency failed to apply this RFQ criterion in its Factor 1 evaluation of CSI's quotation.

157.    For example, the Agency found CSI's ████████████████ ████████████████████████████████████ ████████ Tab 98a, AR 5584. However, the contract in question was ██████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████ Tab 94-18, AR 5478. CSI's ████████████ was hardly similar in scope and complexity to the subject requirement and did not warrant a finding of relevancy under the RFQ criteria.

158.    As another example, the Agency found ████████████████ ████████████████████████████████ ██████████████ Tab 98a, AR 5584. ████████ comprises only a small fraction of this requirement, which is primarily for provision of Daily Schedule Large Aircraft and Special High-

Risk Charter Flight Services.  *See, e.g.*, Tab 41b, AR 1545-46.  Again, the Agency failed to evaluate relevancy in accordance with the RFQ criteria by considering the similarity in scope and complexity of the ████████████████ to the subject requirement.  If it had conducted such a rational evaluation under the RFQ criteria, the subject contract could not have been found to be relevant.

159.    In this way, too, the Agency's Factor 1 evaluation of CSI's quotation contravened the RFQ criteria.

160.    The Agency's arbitrary and irrational evaluation of CSI's quotation under Factor 1 was undeniably prejudicial to CAC.

161.    The Agency irrationally credited CSI with ██████████████████████ ████████████████████  CSI failed to submit compliant teaming agreements, in contravention of the RFQ criteria.  As previously demonstrated, these irrational evaluation findings had a material impact on the Agency's Factor 1 evaluation of CSI.  Tab 98a, AR 5582-86.



162.    Moreover, the best-value tradeoff and source selection decision were materially impacted.  *See, e.g.*, Tab 99, AR 5613 ████████████████████████ ████████████████████████████████  ████████  The Agency irrationally ██████████████████████████ which was unquestionably outside of the recency period established in the RFQ.[9]



---

[9] CAC prepared its revised quotation submission in response to Round 4 Discussions based on the reasonable understanding, stated in its cover letter, that the RFQ-established time period for corporate experience remained unchanged.  *See* Tab 93-1, AR 5334 ██████████████████ ████████████████  Had CAC been aware that the Agency would consider corporate experience outside of the original timeframe, CAC could have submitted additional experience performed by itself and its subcontractors after the closing date of the RFQ.  This could have included, for

163.    And, the Agency similarly assigned undue credit to CSI's quotation under Factor 1 for experience which was arbitrarily found to be relevant when it bore no similarity in scope or complexity to the subject requirement.

164.    But for these arbitrary and irrational findings, the Agency almost certainly would have found CAC's exceptional quotation to be superior in merit to CSI's quotation under Factor 1—the most important evaluation factor—and would not have determined that CSI's quotation warranted a half-billion-dollar price premium.  *See, e.g.*, *BayFirst Sols, LLC*, 102 Fed. Cl. 677, 695 ("If a proper evaluation of proposals had occurred, and the errors pointed out … had been avoided, the technical factor ratings could easily have been much closer than those erroneously produced by the TEP and endorsed by the SSA.  There is a substantial chance that the SSA's tradeoff analysis would then have indicated that BayFirst's proposal, not VSI's higher-priced proposal, provided the best value to the government.  The court is satisfied that BayFirst had a substantial chance of award, and was prejudiced by the procurement errors.").

165.    For these reasons, too, the Court should grant judgment in favor of CAC.

### Count III

### The Agency's Evaluation of Factor 5—Price was Prejudicially Arbitrary and Irrational.

166.    For purposes of the Factor 5—Price evaluation, offerors were to submit both a pricing spreadsheet and a pricing narrative.  Tab 17, AR 419-20.  The pricing narrative was to "explain[] the methodology for the pricing submitted in" the pricing spreadsheet.  Tab 17, AR 420.

---

example, ███████████████████████████████████████████

167.    The RFQ further instructed that offerors "must input their (1) GSA rate, (2) discount percentage, and (3) proposed rates" in the pricing submissions.  *Id.*

168.    This level of detail—including a stated discount percentage—was important because the Terms and Conditions mandated that "[t]he relationship between the current price in the GSA schedule and the price offered in the contractors' quotation shall remain constant, i.e., the discount rate shall remain the same throughout the term of the BPA," even while GSA pricing is adjusted.  Tab 41b, AR 1545.

169.    The RFQ notified offerors that the Agency "will ensure that the quotes contain all the information required by the RFQ."  Tab 17, AR 424.

170.    The Agency was to "evaluate quotes for award purposes by adding the total price for all options to the total price for the basic requirement."  Tab 17, AR 425.  "Prices for the base and option periods … w[ould] be evaluated to determine fair and reasonableness."[10]  *Id.*

171.    The Agency also "reserve[d] the right to perform a price realism analysis."  *Id.*

172.    In evaluating the impact of the iAero bankruptcy as part of its most recent corrective action, the Agency noted that ███████████████████████████████ ███████████████████████████████████  CSI's price will need to be reevaluated."  Tab 91, AR 5328.

173.    The Agency never actually conducted such a reevaluation, but instead proceeded immediately to discussions with CSI and CAC, citing the impacts of the iAero bankruptcy, "the

---

[10] Amendment 3 to the RFQ included a revised copy of the RFQ Terms and Conditions, in which the Agency removed precise dates of performance for the base and option periods and instead tied the dates of performance to contract award.  Tab 41b, AR 1546.  Consistent with the Terms and Conditions, the pricing spreadsheet called for pricing for the base period and option periods 1-4, but did not assign particular dates of performance for each period as such dates would adjust based on the award in accordance with the Terms and Conditions.  Tab 49a.

time lapse[,] and changes to subcontractor availability" as its bases for reopening discussions and soliciting revised quotations.  *See, e.g.*, Tab 92b, AR 5331-32.

174.    As part of these Round 4 Discussions in October 2024, the Agency invited revised pricing submissions under Factor 5.  *Id.*

175.    Although CAC 

CAC submitted an updated price quote as part of its October 30, 2024 submission in which it ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████  Tab 93-1, AR 5335.

176.    CAC's updated pricing was based on an entirely reasonable and rational understanding[11] that (1) the RFQ connected the precise dates of performance for the base and option periods to the contract award, not to a fixed date or period, *see* Tab 41b, AR 1546; Tab 49a; and (2) any award resulting from the Agency's corrective action reevaluation would be made with a FY 2025 start date, considering that revised quotes were submitted in October 2024 and that a contract award date cannot precede the date of submission of the quotations upon which the award is based.

177.    On the other hand, CSI ██████████████████████████████████

██████████████████ — ████████████████████████████████████

---

[11] This understanding was consistent with the history of this procurement, because the Agency previously adjusted the contract period of performance to account for the passage of time between the now-terminated contract award to Chapman Freeborn made in May 2023 and the award made to CSI in March 2024.  *See* Tab 41b, AR 1546; *Compare* Tab 65, AR 3310 (showing CSI's period of performance from 3/8/2024-3/7/2029) *with* Tab 44a-13, AR 1940 (showing Chapman Freeborn's period of performance commencing 5/23/2023).  Notably, the Agency did not reopen discussions with CAC or otherwise correct this basis for CAC's revised pricing.

██████████████████████—in response to Round 4 Discussions in October 2024. *Compare, e.g.*, Tab 51-20 *with* Tab 94-17.

178.    Despite the ██████████████████████ the significant passage of time, and the fiscal year shift in base and option periods to accommodate a new award in FY 2025, ██████████████████████ Tab 96, AR 5572.

179.    The Agency did not critically evaluate the implications of CSI's reliance on outdated pricing which no longer reflected its technical approach. *Id.* But the impacts of elapsed time and a changed technical approach are significant.

180.    For example, CSI's ████████ pricing narrative states that ██████████ ██████████ Tab 61.3, AR 3171. But, because CSI did not ██████████ ██████████████████████ the pricing evaluated by the Agency from ████████ is no longer accurately or appropriately escalated over the base and option periods for a FY 2025 start date.

181.    CSI also claims that it ██████████████████████ *id.*, and ██████████████████████ Tab 61.3, AR 3169, but its ████████ pricing proposal does not—and cannot—██████████████████████ ██████████████████████

182.    Simply put, the Agency did not have adequate or accurate information upon which to evaluate the completeness, fairness, reasonableness, or realism of CSI's price in light of the ██████████████████████

183.    The Agency, itself, even recognized that the ████████████████ CSI's quotation necessitated a reassessment of CSI's quoted price. *See, e.g.*, Tab 91, AR 5328.

184.    Yet, in actually evaluating CSI's revised quotation submission, the Agency completely ignored all of the risk and uncertainty associated with CSI's ███████████████ ████████████████████████████ This, alone, renders the Agency's evaluation arbitrary and irrational—but was far from the only error in the Agency's Factor 5 evaluation.

185.    The Agency also completely ignored clear defects in CSI's quoted pricing which rendered CSI's quoted price non-compliant with the RFQ.

186.    Indeed, CSI's price quote failed to contain all information required by the RFQ— a deficiency which the Agency raised during discussions, which CSI repeatedly failed to correct, and which the Agency simply ignored in its final evaluation and award decision.

187.    Similarly, the Agency found CSI's pricing ████████[12] and notified CSI of this issue—only to ignore this finding in its final evaluation and award decision.

188.    To repeat, the RFQ stated that "Contractors must input their (1) GSA rate, (2) discount percentage, and (3) proposed rates" in their pricing submissions.  Tab 17, AR 420; Tab 96, AR 5570.

189.    CSI repeatedly failed to comply with this RFQ requirement.  Indeed, the AR shows that:

- In its ████████████ evaluation of CSI's revised pricing[13] submitted on ███████████ the Agency noted that CSI's price submittals ████████████████████████████████████ Tab 59, AR 3150.

- In its ██████████████ discussions, the Agency informed CSI that ████████████████████████████████████████████████████

<hr />

[12] CSI's initial price was more than $██ million.  Tab 38, AR 1481-82.  The Agency was ████████████████████████████████████████████████████ *Id.*

[13] In its ██████████████ submission, CSI submitted a quoted price of ███████████ and had a total evaluated price of ████████████.  Tab 59, AR 3150.  CSI has not adjusted its quoted or total evaluated price since that submission.  *See, e.g.*, Tab 113, AR 6003.

Accordingly, ICE asks that CSI ████████████████ Tab 60b, AR 3155.  The Agency also specifically directed CSI to ████████████████ *Id.*

- In its ████████████ evaluation of CSI's revised pricing submitted on ████████ —which remained ████████████ *see* Tab 61.5, AR 3185—the Agency noted, again, that ████████████ Tab 105, AR 5770.  Thus, CSI did not ████████████ and did not ████████████ in accordance with the RFQ requirements.

- Although CSI had the opportunity to do so, *see* Tab 92b, AR 5332, CSI ████████ ████████ through the October 2024 discussions, either.  This led the Agency to find, again, in its ████████████ price evaluation that ████████████ Tab 96, AR 5572.

- In its January 31, 2025 source selection decision, the Agency repeated its finding that ████████████ in CSI's price submissions. Tab 99, AR 5611.

- Yet, despite an unresolved determination that CSI's quoted pricing ████████ and despite an unresolved determination that CSI's quoted pricing ████████ the Agency inexplicably concluded that "CSI's price quote[] ████████ *Id.*

190.    To summarize, then, the Agency ████████████ ████████████ .  *See also, e.g., EMTA Isaat, A.S. v. U.S.*, 123 Fed. Cl. 330, 338 n.9 (2015) ("[A] price reasonableness analysis has the goal of preventing the government from paying too much for contract work."); *Mortgage Contracting Servs. LLC v. U.S.*, 153 Fed. Cl. 89, 134 (2021) ("[A] price reasonableness analysis considers whether an offeror's price is too high.").

191.    The Agency also ████████████ ████████████ *See also, e.g.*, Tab 17, AR 420 ("Contractors must input their (1) GSA rate, (2) discount percentage, and (3) proposed rates.").



192.    Even though CSI was put on notice of these ███████ during discussions, and even though CSI was afforded ample opportunity to ████████████████████████ ████████ in its price quotation, ***CSI chose not to do so***.

193.    Inexplicably, however, the Agency completely ████████████████████ ████████████████████████████████████████████████ ████████████

194.    The Agency does not—and, indeed, cannot—explain why these documented ████████████████████████████ simply disappeared, even though they were never resolved in CSI's revised submissions.

195.    To be clear, CSI's quoted price was ████████████ and CSI never subsequently ██████ its quoted price.  Because this issue was never resolved, CSI's quoted price should have been found unreasonable.[14]

196.    CSI's quotation also ████████████████████████████████ which rendered CSI's quotation ████████████ the RFQ requirement that offerors "must input their (1) GSA rate, (2) discount percentage, and (3) proposed rates" in their pricing

---

[14] FAR 8.404(d) provides that agencies are generally not required to make separate determinations of fair and reasonable pricing in establishing a BPA because, ordinarily, such a determination has already been made by GSA under the schedule contracts.  Here, however, the Agency has opted to obligate itself to conduct a new price reasonableness analysis in the terms of the RFQ, which states that quoted prices "will be evaluated to determine fair and reasonableness" and that this evaluation will be in addition to the Agency's evaluation obligations under 8.405-3(b)(2)(iv). Tab 17, AR 425.  Where the agency has obligated itself, in the plain terms of the RFQ, to conduct a new price reasonableness analysis, it must do so—and the analysis must be rational and reasoned.  The mere existence of more than one quotation is not, however, sufficient to find an offeror's price to be fair and reasonable.  *See, e.g.*, *Serco, Inc. v. U.S.*, 81 Fed. Cl. 463, 494 (2008) ("[I]t is not competition for competition's sake, but the favorable comparison of a given offeror's price to those of the other contestants, that provides the necessary assurance that a given price is 'fair and reasonable.'").

submissions.  Tab 17, AR 420; Tab 96, AR 5570.  This issue was never fixed by CSI, and CSI's quotation thus remained deficient and unawardable.

197.    The Agency's conclusions to the contrary were arbitrary, irrational, and violative of the express requirements of the RFQ.

198.    The Agency's Factor 5 evaluation was not only arbitrary, irrational, and violative of the RFQ, but was highly prejudicial to CAC.

199.    CAC submitted a fair and reasonable price quotation which comported with all RFQ requirements—and which was roughly a half billion dollars lower than CSI's quoted price.

200.    Had the Agency not ███████████████████████████ ████████ in CSI's price quotation, the Agency would have had no choice but to conclude that CSI's quotation was unawardable.  But for this Agency error, issuance of the award to CAC—a highly qualified and highly capable offeror, and the only remaining offeror in the competition— would have been a virtual certainty.

201.    And even if the Agency did not deem CSI's quotation to be unawardable, a rational evaluation of CSI's quotation would have resulted in findings of substantial risk and uncertainty arising from CSI's ████████████████████████████ ███████████████████████ Round 4 Discussions, as well as a finding that CSI's price—if appropriately escalated for a FY 2025 award date—likely would have been even higher than quoted in its outdated price submissions.

202.    But for the Agency's arbitrary and irrational evaluation, the Agency would have recognized that CAC's price was not only hundreds of millions of dollars lower than CSI's, but that it presented significantly greater certainty and lower risk because it was ███████████

███████████████████████████████████████████████████████

███████

203.    Considering these price disparities, and CAC's otherwise stellar evaluation scores, it is substantially likely that the Agency would have selected CAC's highly-rated and lower-priced quotation following a rational and reasoned Factor 5 evaluation and best-value tradeoff.

204.    Accordingly, the Court should grant judgment in favor of CAC

### Count IV

**The Agency Conducted Misleading, Unfair, and Non-Meaningful Discussions with CAC.**

205.    Where, as here, an Agency elects to engage in discussions in a procurement conducted under FAR Subpart 8.4, this Court generally "test[s] discussions undertaken … by the fairness principles enshrined in FAR Part 15." *Centerra Grp., LLC v. U.S.*, 138 Fed. Cl. 407, 414-15 (2018) ("Where, as here, an agency has already conducted two rounds of discussions with offerors remaining in the competition, and allowed proposal revisions after each round, the overwhelming weight of authority is that the agency must conduct any future discussions in conformance with the fairness principles enshrined in FAR Part 15, notwithstanding the fact that the procurement is otherwise governed by FAR Subpart 8.4.  This is true for the simple reason that the relevant provisions of FAR Part 15 provide safeguards against communications with the agency which unfairly favor one offeror over another.").

206.    Whether viewed against the fairness principles comprising the FAR Part 15 framework or the broader standards of fundamental fairness set forth elsewhere in the FAR,[15]

---

[15] *See, e.g.*, FAR 1.108-2(c)(3) ("All contractors and prospective contractors shall be treated fairly and impartially."); *IBM Corp. v. U.S.*, 119 Fed. Cl. 145, 157 (2014) ("[T]his procurement is governed by FAR Part 8, and therefore, it is analyzed under a standard of fundamental fairness.").

███████████████████████████████████████████████████████

discussions must be fair and meaningful, and must not mislead offerors.  *See, e.g.*, *AshBritt, Inc. v. U.S.*, 87 Fed. Cl. 344, 372 (2009) ("[O]nce undertaken, discussions must be equal and must not mislead offerors.").

207.    "Discussions are misleading when a procuring agency issues 'incorrect, confusing or ambiguous' communications that misdirect an offeror attempting to revise its proposal." *Raytheon Co. v. U.S.*, 121 Fed. Cl. 135, 164 (2015) ("A procuring agency also misleads an offeror when the agency 'knows that an offeror's interpretation of the [solicitation] is contrary, in a material way, to its own interpretation and that of a successful offeror' but fails to advise the offeror of that fact."); *see also, e.g.*, *DMS All-Star JV v. U.S.*, 90 Fed. Cl. 653, 670 (2010) ("[D]iscussions become misleading when communications from the government misdirect the protestor as it revises its proposal. … [M]isleading discussions are characterized by communications from the government that are incorrect, confusing or ambiguous."); *East West, Inc. v. U.S.*, 2012 WL 4465228, at *1 (Fed. Cl. 2012) ("The agency had a responsibility to provide accurate, non-misleading information to offerors….  Once corrective action was adopted that involved the submission of revised proposals, the agency had an obligation to correct any misleading communications with offerors.") (internal citation omitted); *Gentex Corp. v. U.S.*, 58 Fed. Cl. 634, 653 (2003) ("[W]here an agency fails to resolve an ambiguity during discussions which should have been reasonably detected and which materially prejudices an offeror, the agency has failed in its obligation to conduct meaningful discussions. … [Agency] discretion is not a license to mislead an offeror when the Government knows that an offeror's interpretation of the RFP is contrary, in a material way, to its own interpretation and that of a successful offeror.") (internal quotations and citations omitted).

208.    Here, the Agency's discussions with CAC were misleading, unfair, and non-meaningful—and the Court should, therefore, grant judgment in CAC's favor.

209.    **First**, the Agency's discussions with CAC were misleading with respect to the Agency's perception of a ███████████████████ solution.

210.    In Round 1 Discussions in October 2023, the Agency informed CAC that its proposed ████████████████████████████████, and that its proposed approach ██████████████████ in CAC's proposed solution.  Tab 42a, AR 1712 ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ *see also* Tab 42b, AR 1717 ██████████████████████████████████

████████████████████████████████

211.    In reliance on the information provided by the Agency during Round 1 Discussions, CAC ████████████████████████████—an approach which CAC ████████████████████████████ ████████████████ based on the Agency's statements in these earlier rounds of discussions. Tab 93-3, AR 5344 ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████



████████████████████████████████████████████████████████

████████████████ *compare with* Tab 94-17, AR 5469-70 ████████████████████

212.    However, after misleading CAC through discussions into changing its proposed approach—and without notice to CAC—the Agency reversed course and penalized CAC for the very approach it induced CAC to adopt through discussions, even going to far as to cite CSI's ████████████████ as a key distinguishing feature warranting payment of a half-billion-dollar price premium.  Tab 99, AR 5613 ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

213.    In other words, the Agency induced CAC to adopt its allegedly preferred ████ ████████████ through discussions which notified CAC that the Agency found ██████████ ████████████████████ to the program.

214.    After CAC adopted the Agency's allegedly preferred ████████████████ (with stated reliance on the Agency's feedback as the reason for this change), the Agency changed tactics, found CAC's ████████████████████████ and justified the payment of a half-billion-dollar price premium to CSI on the basis that the Agency preferred ████████████ ████████

215.    This is a textbook example of prejudicially misleading discussions which render the Agency's evaluation arbitrary and irrational.

████████████████████████████████████████████████████████

216.    Had the Agency not misled CAC in the first instance, or had the Agency conducted meaningful Round 4 Discussions with CAC in which the Agency corrected its prior misdirection after reviewing CAC's revised quote submission and its stated reliance on the Agency's previously provided information, CAC could have ███████████████████ ████████████████████████████████████████████████ ███████████    As the ██████████████ was CAC's initial proposed approach— from which it departed only in reliance upon the Agency's misleading discussions—CAC was more than capable of reinstituting ███████████████ had it not been misdirected to a ████████████████ by the Agency.

217.    The Agency's discussions were also prejudicially misleading because the Agency failed to correct CAC's stated assumption that any award following the October 2024 revised quote submittals and reevaluations would have an FY 2025 award date from which the base and option periods of performance would proceed.[16]

218.    In its October 30, 2024 revised quote submission, CAC offered the following explanation ███████████████ quote:



Tab 93-1, AR 5335.

---

[16] CAC disputes that the Agency had the ability to backdate the January 2025 award by 10 months without changing the period of performance to commence after the source selection decision was made.  However, assuming, *arguendo*, that the Agency could backdate the award in the manner it did, the Agency was required to correct the clearly mistaken understanding upon which CAC relied to prepare its revised price quote.

219.    Had the Agency conducted meaningful discussions in which it informed CAC of its intentions regarding the start date and period of performance for any subsequent award and offered CAC the opportunity to revise its submission, CAC could have ███████████ ███████ the Agency's intention not to shift the award date or period of performance—irrational though they might be.  Rather than conduct meaningful, fair, and non-misleading discussions with CAC, however, the Agency proceeded under Round 4 Discussions which were non-meaningful, misleading, and violative of fundamental fairness.

220.    As part of its latest round of corrective action, the Agency created the memo to file set forth at Tab 91, in which the Agency purported to "review the impact of the iAero Group bankruptcy proceedings on CSI Aviation INC.'s (CSI) proposal evaluation and determine what actions, if any, the Agency should take after review."  Tab 91, AR 5323.

221.    The Agency made no substantive evaluation findings with respect to either offeror's quotation, but rather simply documented that CSI's quotation would "need to be re-evaluated."  Tab 91, AR 5328.

222.    In its Round 4 Discussions letter, issued in October 2024, the Agency claimed to have "performed a post-corrective action review and evaluation of [CAC's] quote in accordance with the RFQ evaluation criteria."  Tab 92a, AR 5329.

223.    However, the record contains absolutely no evidence that the Agency actually conducted the reevaluation of CSI's quotation it deemed necessary.[17]  *See* Tab 91, AR 5328.

---

[17] The Agency failed to actually reevaluate CSI's quotation and, instead, proceeded directly to soliciting revised quotation submissions to allow CSI to simply remove all reference to iAero in its quotation.  In this regard, the Agency completely failed to implement the corrective action promised to CAC and the GAO in exchange for dismissal of CAC's meritorious protest.  *See, e.g.*, Tab 79, AR 5148 (dismissing CAC's protest on the basis that "the agency advises that it intends to reevaluate CSI's quotation under the aircraft availability and commitment and past performance factors, and to perform a new best-value tradeoff analysis.").

224.     The Agency's Round 4 Discussions Letter also claims that this reevaluation of CAC's quotation—which, to be clear, ***never occurred***—revealed that CAC's quote was "technical[ly] deficient [] due to iAero Airways bankruptcy," and directed CAC to address that purported deficiency in its final quote submission.  Tab 92a, AR 5329.

225.     This was a non-existent deficiency, based on a purported reevaluation of CAC's quotation which was never conducted, and was belied by the Agency's prior evaluation record which acknowledged that ███████████████████████████████  *See, e.g.*, Tab 50-3 ████████████████████████████████████████████████ ███████████  Tab 52a, AR 3008; Tab 52b, AR 3031 ████████████████████ ███████

226.     So, to summarize, the Agency's Round 4 Discussions with CAC purported to find a technical deficiency in CAC's quotation following a corrective action reevaluation of CAC's quotation, and directed CAC to remedy that purported technical deficiency.  Tab 92a, AR 5329.  But, the purported corrective action reevaluation was never conducted, and the purported technical deficiency cited in those discussions was a fictitious finding.

227.     All the while, the Agency failed to actually raise other issues in its discussions with CAC—such as the Agency's changed understanding of a ██████████████████ approach, or intentions with respect to the award start date and period of performance—which would have rendered CAC's discussions fair and meaningful and would have given CAC an opportunity to meaningfully revise its quotation without being misled by the Agency.

228.     The Agency's misdirection of CAC's attention to non-issues in its quotation based on evaluations that never took place, while simultaneously failing to correct stated assumptions in CAC's quotation which the Agency apparently perceived to be incorrect, clearly violates the

fundamental fairness principles which govern the conduct of discussions in a FAR Subpart 8.4 procurement.

229.    To be clear, the Agency could—and should—have proceeded with the corrective action reevaluation promised to CAC and the GAO in exchange for dismissal of CAC's meritorious protest, reevaluated the relevant portions of CSI's quotation, and issued an award to CAC as the technically superior, lower-priced offeror who did not elect to proceed with a defunct air carrier as a teaming partner—and the only offeror without serious risk in its quotation.

230.    However, even assuming, *arguendo*, that the Agency's decision to reopen discussions in lieu of performing the promised corrective action reevaluation was not, itself, an arbitrary and irrational act,[18] the Agency's conduct of discussions with CAC was not meaningful or fair, and was misleading.

231.    Had the Agency not misled CAC and otherwise subjected CAC to unfair and non-meaningful discussions, CAC would have been able to adjust its revised quotation to align with the Agency's changed intentions, understandings, and assumptions by, for example, ███████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████ But for these arbitrary and irrational Agency acts, CAC would have had an even more meritorious technical solution and an even lower price, and CAC likely would have received the contract award as the best-value offeror.

232.    Accordingly, the Court should grant judgment in favor of CAC.

---

[18] The record is devoid of any explanation as to why the Agency did not simply reevaluate quotations as promised in its corrective action, or why the Agency felt it necessary or appropriate to give CSI yet another opportunity to correct its error in business strategy and judgment—*i.e.*, its decision to team with a bankrupt air carrier. ████████████████ CSI had ample opportunity to adjust its teaming strategy once it became aware of iAero's bankruptcy but, █████ ████ CSI chose not to do so.

**Count V**

**The Agency Arbitrarily and Irrationally Evaluated Quotations under Factor 4—Past Performance.**

233.    For purposes of the Factor 4: Past Performance evaluation, the Agency was to evaluate CPARS and reference checks provided for the projects submitted as part of the Factor 1: Corporate Experience proposal.  Tab 17, AR 419, 423-24.

234.    Specifically, the Agency was to "assess its confidence that the contractor will successfully perform the work based on its past performance" by "evaluat[ing] the quality of services provided by the contractor (and teaming partners) to the agency and other organizations as a prime contractor and/or subcontractor."  Tab 17, AR 423.

235.    The RFQ warned that "[a] less than positive CPARs assessment (interim or final) or a less than positive reference check may result in lowered confidence by the Government." Tab 17, AR 424; *see also* FAR 42.1503, Table 42-1 (defining "Exceptional," "Very Good," and "Satisfactory" ratings as appropriate for performance which meets and/or exceeds contractual requirements, and "Marginal" and "Unsatisfactory" requirements as appropriate for performance which does not meet some or most contractual requirements.").

236.    The Agency's evaluations of both CAC's and CSI's past performance under Factor 4 were riddled with prejudicial errors.

237.    The Agency failed to evaluate past performance projects in accordance with the stated criteria, completely mischaracterized the contents of both offerors' CPARS and reference checks, credited CSI with past performance ██████████████████████ ███████ blatantly disregarded ███████████████████████████████, created past performance records for CAC in the midst of its evaluation, and subjected CAC to unlawful, disparate treatment.

238.    For all of these reasons, and as described in greater detail below, the Court should grant judgment in CAC's favor

**A.  The Agency Conducted an Arbitrary and Irrational Evaluation of CSI's Past Performance under Factor 4.**

239.    The Agency's most recent past performance evaluation attributed ▇ contracts to CSI—▇▇▇ were performed by CSI, and ▇▇▇▇▇▇▇▇▇▇. Tab 95, AR 5539-67.

240.    The Agency received ▇▇▇▇▇ of those contracts ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇ ▇▇ *Id*. The Agency thus could not evaluate past performance for any of those contracts, and should not have given CSI any credit for these contracts in the Factor 4 evaluation.

241.    This left ▇ contracts for the Agency to evaluate, for which CPARS, reference checks, or both were obtained.

242.    In its evaluation, the Agency made findings of ▇▇▇▇▇ ▇▇▇▇▇▇▇ and found that ▇▇▇▇▇ ▇▇▇▇ Tab 95, AR 5565-66. ▇▇▇ ▇▇▇ were noted in CSI's Factor 4 evaluation. *Id*.

243.    The Agency's Factor 4 evaluation of CSI's quotation was prejudicially arbitrary for several reasons.

244.    ***First***, the Agency completely ignored ▇▇▇▇▇ ▇▇▇▇▇.

245.    Take, for example, ▇▇▇▇▇ ▇▇▇▇▇ Tab 95, AR 5549.  For a 2023

▇▇▇▇▇▇▇▇▇▇▇▇▇▇

performance period, CSI received " ███████ CPARS scores in the areas of ███████████

█████████████████████████████████████████████

████████████████ Tab 95, AR 5551-52.

246.    Inexplicably, the Agency did not assign CSI ███████████████████

████████████ AR 5566, and justified its decision on the basis that ███████████

█████████████████████████ AR 5567.

247.    The Agency's determination was not only irrational—given the ███████████

████████████████████████████████████████████████

████████████████ —but reflects clear disparate treatment as discussed *infra*

in Count V.C.

248.    The Agency made a similar error with respect to ██████████████████

████████████████ Tab 95, AR 5556.  The relevant ████████████

████████████████████████████ AR 5557.  Yet, the

Agency completely ignored this ████████████████████████████

████████████ AR 5566-67.

249.    This, too, was irrational and prejudicially unfair to CAC.  Had the Agency

rationally evaluated the ████████████████████████████████

████████ the Agency would have assessed findings of ███████████████ Factor

4 rating to CSI.  This, in turn, would have substantially increased CAC's chances of receiving a

contract award as an outstanding offeror with a significantly lower proposed price.

250.    ***Second,*** the Agency failed to rationally evaluate the relevancy of CSI's past

performance projects.

251.    The RFQ called for an evaluation of relevancy based on the similarity in scope and complexity between a past performance project and the subject requirement. ███████████ ███████████ should not have been found to be even marginally relevant, because ███████████ ███████████████████████████████████ Tab 95, AR 5539-67.  Such ████████ contracts are not even remotely similar in scope or complexity to the subject multi-billion dollar requirement.  CSI's capability to perform a contract of ███████████████ does not serve as a rational indicator of CSI's capability to perform a significantly larger, significantly more complex, $3.6 billion requirement.

252.    Nor are ███████████████████████ relevant in scope or complexity to the work performed.

253.    ████████████████████████████████████████████ ████████████ Tab 94-18, AR 5478.  It did not ████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████ *Id*.  The Agency's assessment of ███████████████ for such a completely irrelevant past performance project, *see* Tab 95, AR 5565, was neither rational nor reasoned.

254.    ███████████████████████████████████████ ███████████████████████████████████████████ ████████████ Tab 94-18, AR 5479—was similarly irrelevant, and the Agency's finding of ███████████████████ for this contract was similarly arbitrary and irrational.  Tab 95, AR 5565.

255.    ███████████████████████████████████████ ████████████ Tab 94-18, AR 5480.  ███████████ is not relevant as it fails to bear similarity to the

vast majority of the scope and services of the subject RFQ—and does not support a rational finding of ███████████ in CSI's ability to successfully perform repatriation flight services.

256. █████████████████████████████████████████████ ███████████████████████████. Tab 94-18, AR 5481. This is not similar in scope or complexity to the subject five-year requirement for daily services, and thus cannot serve as the basis for ████████████████████ in CSI's ability to perform the subject requirement.

257. And, ████████████████████████████████ █████████████████████████████████████████████ ████████████████████████. Tab 94-18, AR 5483. Such an irrelevant contract could not rationally ████████████████ in CSI's ability to perform the subject requirement.

258. Thus, the Agency's assessment of a ████████████ rating to CSI under Factor 4 was far from rationally based.

259. **Third**, the Agency's irrational evaluation findings carried through to its best-value tradeoff assessment and source selection decision.

260. In justifying the award to CSI notwithstanding an approximately $500 million price premium, the Agency purported to rely on the merit in CSI's past performance, stating that in addition to its ████████████████████████,





Tab 99, AR 5612.

261. This is a blatantly inaccurate assessment of CAC's past performance.

262. CSI did not ████████████████████████████████████████████████████

████████████ *Id*. As previously explained, ██████ of the projects submitted by ███████████████

██████ were irrelevant in scope and complexity to the subject requirement, and ████████ of the

projects ██████████████████████████████████████████████████████████

263. In reality, CSI submitted ██████ relevant past performance projects that the Agency

could evaluate under the RFQ criteria—and █████████████ relevant past performance projects

had █████████████ past performance.

264. To repeat, CSI received a series of █████████ CPARS ratings for █████████ and

the reference check for █████████ reflected ████████████████████████. So, the

Agency's statement that ███████████████████████████████████ *id*. is,

respectfully, categorically false.

265. The Agency's errors in evaluating CSI's Factor 4 quotation were highly prejudicial

to CAC, because these irrational evaluation findings were precisely the bases upon which the

Agency distinguished between CAC's and CSI's quotations to determine that the half-billion-

dollar price premium associated with CSI's quotation was warranted. *See, e.g.*, *id*. But for the

Agency's arbitrary and capricious evaluation, CAC—a highly qualified offeror with exceptional

evaluation marks and a substantially lower price—almost certainly would have received the

contract award instead.

**B.** <u>**The Agency Conducted an Arbitrary and Irrational Evaluation of CAC's Past Performance under Factor 4.**</u>

266.    In its reevaluation of CAC's past performance under Factor 4, the Agency

recognized ███████████ in CAC's quotation because the CPARS covering ███████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████ Tab 95, AR 5537-38 ████████████

████████████████████████████████████████

██████████████████████████████

267.    Stated differently, CPARS—recognized by the FAR as "the official source for past

performance information," FAR 42.1501(b)—reflected ███████ past performance ratings

for CAC for the ████████████.

268.    Notwithstanding the Agency's recognition of such ████ past performance,

CAC was also assessed ████████████ under Factor 4 on the basis of ████████

████████████████████████████████████

████████████ Tab 95, AR 5538.

269.    In particular, the Agency latched onto the following commentary in CAC's

reference check as a basis for ████████████████ to CAC under Factor 4:



Tab 95, AR 5529; *see also* AR 5535 ██████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

270.    On the basis[19] of these narrative discussions—which notably ████████

███████████████████████████████████████████████

███████████████████████—the Agency found reason to █████████████████

███████████████████████████████████████████████

████████████ notwithstanding the █████████████████████████

████████████ Tab 95, AR 5538.

271.    The Agency's evaluation findings, and decision to award CAC ████████████

████████ rating under Factor 4, were arbitrary, irrational, and contrary to the weight of

contemporaneous evidence regarding CAC's past performance.[20]

272.    As the Agency was well aware, ███████████████████████████

███████████████████████████████████████████████

████████████████████████████ *See, e.g.*, Tab 73, AR 5008-09. ████████████

███████████████████████████████████████████

████████████████████████ *Id.* However, in late 2022, the Contracting Officer ████████

---

[19] The Agency's finding of ███████████████████ for CAC under Factor 4 also referenced the ███████████████████████████████ Tab 95, AR 5538. This specific finding was not carried through to either the explanation of CAC's Factor 4 rating or the Source Selection Decision. *Id.*; Tab 99, AR 5609-10. This is likely because, as the result of a claim filed by CAC, the Contracting Officer ████████████████████████████████████████████████

[20] As discussed *infra* in Count V.C, the Agency's evaluation findings also resulted from clear disparate treatment of CAC in its Factor 4 evaluation.

61

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████ *Id.*

273.   The events of ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Indeed, through CAC's ████████████████████████████████

████████████████

274.   The events of ████████████████████████████████

████████████████████████████████████████████████████

████████████   Realistically, ████████████████████████████

████████████████████████████████████

275.   CAC's CPARS and references reflect that CAC successfully performed ███

████████████████████████████████████████████████████

████████████████████████████████

276.   The Agency's reliance on ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████   arbitrary, irrational, and contrary to the weight of CAC's

████████████████   CPARS and past performance references.

277.   The Agency painted an ████████████████████████   of what was clearly

████████████████████████████████████

278.   But then again, the Agency's evaluation of CAC's past performance under Factor

4 was hardly fair, neutral, or objective.  As described *infra* in Count V.C, the Agency disparately

████████████████████████████████████████████████████

evaluated CAC's and CSI's past performance information by ███████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

279.    It also bears note that Agency created past performance information for CAC as part of the evaluation process for this procurement and used that same past performance information to ██████ CAC's Factor 4 rating.

280.    CAC's ████████████████████████████████ notably, the same CPARS report █████████████████████████████ ██████████████████████████ *see* Tab 95, AR 5538—was prepared by ████████████████████████████. Tab 32.3, AR 1292.  CAC ██████████████████████████████████ Tab 32.3, AR 1292-95.

281.    The AR contains a memorandum to the procurement file indicating that evaluators and source selection officials for the subject procurement gathered on September 12, 2023 to ascertain ████████████████████████████████

███████████████████████████████████

███████████████████████████████████

---

[21] ████████████████ fulfillment of the role of ████████████ for this CPARS period appears to have been out of the ordinary course.  In CAC's ██████████████████████████████████████ the Contracting Officer served as the Assessing Official for CPARS.  *See* Tab 32.2.  For this CPARS, prepared during this procurement, ████████████████████████████ ████████████████ Tab 99, AR 5615—served as the ████████████████ instead.

███████████████████████████████████

██████████████████████████████████

████ Tab 35, AR 1354.

282.    It practically goes without saying that, in the midst of an ongoing procurement, Agency evaluators and source selection authorities have no business creating the past performance source materials that they are to review as part of that ongoing evaluation, and then relying on details in those self-created, mid-litigation materials as the basis for justifying a multi-billion-dollar contract award to a company at a half-billion-dollar price premium. *See* Tab 99, AR 5609-14.

283.    The Agency's erroneous evaluation of CAC's quotation under Factor 4 was undeniably prejudicial because, but for these errors, CAC would have been both the lower-priced offeror by a significant measure and superior (or, at worst, equal) to CSI under the non-price factors. In this best-value procurement, and with ████████████ evaluation marks under every evaluation factor and a significantly lower price, CAC would have been virtually certain to receive the contract award but for the arbitrary and capricious evaluation conducted by the Agency.

**C.   The Agency Subjected CAC to Unlawful Disparate Treatment in the Factor 4 Evaluation.**

284.    In addition to the numerous evaluation errors described *supra* in Counts V.A-B, the Agency irrationally subjected CAC to unlawful disparate treatment in the Factor 4 evaluation which led to prejudicially arbitrary evaluation conclusions and tainted the ultimate source selection decision. This disparate treatment is most clearly seen in how the Agency accounted for what it perceived to be ████████████ past performance information for each offeror.

285. As described *supra* in Count V.A, CSI submitted ██████████████████ under which it had received ████████████ CPARS ratings for the ██████████ ██████████████████████████████ Tab 95, AR 5551-52.

286. The Agency did not assess a finding of ██████████████ to CSI, or ████████ ██████████████████████████████ because the Agency found that ████████ ██████████████████████████ Tab 95, AR 5566-67.

287. CSI was also attributed with ██████████████████████████ ██████████████████ in which the ██████████████████████████████ ██████████████████████████ Tab 95, AR 5557.

288. This did not even receive a mention among the Agency's evaluation findings for CSI, and did not serve as a basis for finding ████████████ in CSI under Factor 4 or otherwise ██████████████████ Tab 95, AR 5566-67.

289. By contrast, as discussed *supra* in Section Count V.B, the Agency assessed a finding of ██████████████ to CAC for a ██████████████████████████████ ██████████████████████ Tab 95, AR 5529.

290. CAC's CPARS for the same period contained ██████████████ ██████████████████████████████████ Over the entire ████ ██████████████ of CAC's past performance project, CAC ██████████████ ██████████████████████████████

291. This was recognized in the Agency's evaluation, by the Agency's statements that CAC's CPARS ██████████████████████████ ██████████████████████████ Tab 95, AR 5537-38, and that





*Id.*

292.    The record is devoid of any explanation as to why the Agency took a far more punitive view of perceived ███████████████████████ in CAC's ████████████ ████ than it did of CSI's ██████████████████████████

293.    The Agency offers no explanation as to why CAC's ████████████████ ██████████████████████████████████ and similarly does not explain why it ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████

294.    The Agency engaged in clear disparate treatment in evaluating quotations under Factor 4, and this rendered its evaluation highly arbitrary and capricious.  *See, e.g., BayFirst Sols, LLC v. U.S.*, 102 Fed. Cl. 677, 691 (2012) ("A procuring agency must treat offerors fairly and impartially.  Here, BayFirst's past performance was rated according to a different standard than VSI's past performance.  The court finds that the past performance evaluations of BayFirst and VSI show disparate treatment and were arbitrary and capricious.").

295.    Such disparate treatment continued throughout and materially impacted the Agency's best-value determination and, thus, undeniably prejudiced CAC.

296.    The Agency's best-value tradeoff offered the following discussion of each offeror's past performance under Factor 4:





Tab 99, AR 5612.

297. The inequality and inaccuracy of the Agency's assessment is plainly apparent.

298. As shown by CAC's CPARS, CAC was found to have ▮▮▮▮▮ ratings in ▮▮ CPARS report for its ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Tab 95, AR 5530-35.

299. The real "difference," such as it is, between CAC and CSI is that the Agency ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ This is prejudicially unlawful disparate treatment.

300. Similarly, and as already discussed herein, the Agency did not evaluate perceived ▮▮▮▮▮▮ past performance ratings in CAC's and CSI's quotations evenhandedly, but rather took a significantly more punitive view of CAC's ▮▮▮▮▮▮▮▮▮▮▮ than it did of CSI's ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

301.   To be sure, there is no truth to the statement that ███████████ ███████████████ Tab 99, AR 5612.

302.   Nor is the Agency's claim that CSI's ███████████████ ███████████████████████ and that ███████████ ███████████████████████ factually based or accurate.  *Id.*

303.   To be clear, CSI's CPARS confirm that CSI ███████████ ███████████████ *See, e.g.*, Tab 95, AR 5540 ███████  ; AR 5535 ███████████ ███████

304.   Further, CAC received countless "██████ ratings on its CPARS, with ███████████████ Tab 95, AR 5530-35.

305.   Again, this is clear disparate treatment which led to completely irrational (and factually inaccurate) evaluation determinations.  CAC's past performance ███████ CSI's, but rather simply did not receive evenhanded consideration against the same standards as the Agency gave to CSI.

306.   Had the Agency rationally, equally, and evenhandedly evaluated CSI's and CAC's past performance projects under Factor 4, the Agency would have found CAC's past performance superior, or no worse than equal, to CSI's.  With CAC's otherwise exceptional evaluation marks and significantly lower proposed price, CAC would have had a substantial

likelihood of receiving the award on the best-value basis, but for the Agency errors described herein.

307.    On this basis, too, the Court should grant judgment in CAC's favor.

## Count VI

### The Agency's Best-Value Tradeoff was Arbitrary, Irrational, and Otherwise Not in Accordance with Law.

308.    The RFQ provided that "[a]n award will be made to the responsible contractor whose quote, conforming to the solicitation, is determined to be the best overall value to the Government, considering the tradeoff between non-price and price factors." Tab 17, AR 425. To that end, the RFQ stated that "[t]he Government may also award to other than the highest technically rated quote, if it determines that a price premium is not warranted." *Id*.

309.    For purposes of the best-value tradeoff, the relative importance of evaluation factors was defined as follows:

> Factors 1 and 2 are equally important and are more important than factors 3, 4, and 5. Factors 3-5 are listed in descending order of importance. The individual factors will be rated holistically and will comprise one confidence level rating for each factor, except price. The non-price factors 1-4 are significantly more important than factor 5, price.

*Id*.

310.    However, the RFQ also explained that "[a]s quotes approach equality (does not mean 'equal' because all quotes are different), price may become a determining factor." Tab 17, AR 426.

311.    In its best-value tradeoff determination, the Agency listed ███████ █████████ in CSI's quotation as compared to CAC's quotation as warranting the payment of a half-billion-dollar price premium, including, for example, that:

[REDACTED]

312.     The Agency's best-value tradeoff determination was clearly arbitrary, irrational, abusive of agency discretion, and otherwise unlawful.

313.     As detailed *supra* in Counts I-V, the evaluation findings upon which the Agency relied in its best-value tradeoff determination were, themselves, arbitrary, irrational, and unsupported by the record evidence.  The Agency's arbitrary and irrational underlying evaluations thus tainted the Agency's best-value tradeoff and source selection decision.  *See, e.g.*, *BayFirst Sols., LLC*, 102 Fed. Cl. at 695 ("Because the ratings that provided the basis for the Agency's tradeoff analysis and best value award were fundamentally flawed and arbitrary, the best value award itself was arbitrary and capricious.").

314.     As detailed herein, had the Agency rationally evaluated CAC's and CSI's quotations in accordance with the RFQ, the Agency would have found CAC to be both superior (or, at worst, equal to CSI) under the non-price evaluation factors, and lower-priced under Factor 5.

315.     In this RFQ, which mandated selection of the best-value offeror, the Agency would have had no choice but to select CAC for contract award following a rational evaluation of quotations in accordance with the stated criteria.  *See, e.g.*, *Carahsoft Tech. Corp. v. U.S.*, 86 Fed. Cl. 325, 349-50 (2009) ("No amount of agency reasoning could justify selecting a higher-priced proposal, where a lower-priced and technically equal proposal is available. … [A]n

agency decision to select a technically equal, higher-priced proposal would itself be arbitrary and capricious.").

316.    Moreover, the ███████████████ between CSI's and CAC's quotes, *see* Tab 99, AR 5612-13, even if rationally based, were plainly insufficient to justify an award to a quotation with an unreasonably high price at a half-billion-dollar price premium.

317.    CAC received ███████████ evaluation marks under virtually every factor—and would, in fact, have received ██ marks in all evaluation factors but for the Agency's errors in evaluating CAC's past performance.

318.    ████████████ in offerors' proposed approaches under the non-price factors, such as those cited to by the Agency in its best-value tradeoff determination, are plainly insufficient to rationally justify the payment of a half-billion-dollar price premium—particularly under an RFQ evaluation scheme which mandated that price was to "become a determining factor" as quotes approached equality under the non-price evaluation factors.  Tab 17, AR 425-26; *see also, e.g., Serco, Inc.*, 81 Fed. Cl. at 497 ("Logic suggests that as the magnitude [of the price differential between two offers] increases, the relative benefits yielded by the higher-priced offer must also increase.").

319.    For the reasons described herein, the Agency's best-value tradeoff determination defies rationality, reason, and the terms of the RFQ.  Accordingly, the Court should grant judgment in favor of CAC.

## Count VII

### The Agency Breached its Implied Duty to Fairly and Honestly Consider CAC's Quotation.

320.    The Agency breached its implied duty to fairly and honestly consider CAC's quotation by refusing to rationally evaluate CAC's quotation and refusing to consider CAC's highly meritorious and significantly lower-priced quotation for award in a non-arbitrary fashion.

321.    When soliciting quotations, the Agency impliedly promises to give fair and honest consideration to all offers received.  *See, e.g.*, *CACI, Inc.—Fed. v. U.S.*, 719 F.2d 1567, 1573 (Fed. Cir. 1983) ("[B]y the solicitation for bids, the Government impliedly promised that it would give honest and fair consideration to all bids received…."); *Safeguard Base Ops., LLC v. U.S.*, 989 F.3d 1342 (Fed. Cir. 2021) (finding jurisdiction over implied-in-fact contract claims in the procurement context under § 1491(b)(1)); *Tender Years Learning Corp. v. U.S.*, 128 Fed. Cl. 265, 271 (2016) ("When a bidder submits a bid in a competitive solicitation such as the one at issue in this case, an implied-in-fact contract arises between the bidder and the Government to fairly and honestly consider the bid.").

322.    "The ultimate standard for determining whether an unsuccessful bidder is entitled to relief on the ground that the government breached the implied-in-fact contract to consider all bids fairly and honestly is whether the government's conduct was arbitrary and capricious." *J.C.N. Constr., Inc. v. U.S.*, 107 Fed. Cl. 503, 517 (2012); *see also Medline Indus., Inc. v. U.S.*, 155 Fed. Cl. 522, 541 (2021) ("The United States breaches this implied contract [to evaluate proposals fairly and honestly] if the Court finds that the United States' 'consideration of offers is … arbitrary and capricious toward the bidder-claimant.'") (quoting *Cent. Arkansas Maint., Inc. v. U.S.*, 68 F.3d 1338, 1341 (Fed. Cir. 1995)).  "[T]he Court may award 'bid preparation and proposal costs' should it find the United States in breach." *Medline*, 155 Fed. Cl. at 541.

323. A claim asserting breach of the implied duty to fairly and honestly consider quotations is not a claim that the agency acted in bad faith. *See, e.g.*, *Innovative Test Asset Sols., LLC v. U.S.*, 125 Fed. Cl. 201, 216 (2016) (explaining that a claim of breach of the implied duty to fairly and honestly consider a quotation "is separate and distinct from a claim that the government acted in bad faith."); *Kogan v. U.S.*, 112 Fed. Cl. 253, 265 (2013) ("[P]roof of bad faith is not required to show a breach of the implied duty of good faith and fair dealing.") (internal quotations & citations omitted).

324. "To recover under the implied covenant for bids to be fairly and honestly considered, a plaintiff has to establish arbitrary and capricious action by the government." *Castle-Rose, Inc. v. U.S.*, 99 Fed. Cl. 517, 531 (2011).

325. In determining whether an agency breached the implied duty by acting arbitrarily and capriciously, the Court may consider several factors, such as whether a reasonable basis for the agency's decision existed or whether there existed a proven violation of statute or regulation. *See, e.g.*, *J.C.N. Constr.*, 107 Fed. Cl. at 517 (citations omitted). The Court may also "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Medline*, 155 Fed. Cl. at 541 (citations omitted).

326. By soliciting quotations under the RFQ, the Agency was bound to give fair and honest consideration to CAC's quotation. However, the Agency failed to do so.

327. The Agency's actions in conducting the subject procurement—and, as most relevant here, the Agency's most recent round of corrective action reevaluations culminating in the January 2025 award decision—were prejudicially arbitrary and irrational, and otherwise unlawful.

328.     To begin, the Agency stated in its Agency-level protest decision dated December 5, 2024 that it planned to lift the stop work order on CSI's prior award—indicating that the Agency had already decided as of that date to confirm its prior award to CSI, rather than to terminate CSI's prior award and issue a new award to CAC.  Tab 109, AR 5972 ("The Government has no intention of extending the period of performance [of CSI's BPA] **_once_** the stop work order is lifted.") (emphasis added).

329.     Yet, on that date, the Agency had not yet reevaluated offerors' revised quotation submissions from October 2024.  *See* Tab 95 (Factor 4 evaluation, dated January 6, 2025); Tab 96 (Factor 5 evaluation, dated January 17, 2025); Tab 97 (CAC Factors 1 and 2 evaluation, dated January 25, 2025); Tab 98a (CSI Factors 1 and 2 evaluation, dated December 30, 2024); Tab 98b (CSI Factor 3 evaluation, dated January 6, 2025); Tab 99 (Source Selection Decision, dated January 31, 2025).

330.     This, alone indicates that the Agency never gave fair and honest consideration to CAC's revised quotation submission in its corrective action reevaluation, and never rationally considered whether CAC's outstanding and significantly-lower priced quotation presented the best value to the Agency.

331.     Setting aside the above, the Agency also breached its implied duty to fairly and honestly consider CAC's quotation because, as shown herein, the Agency's evaluation of CAC's quotation was highly arbitrary and irrational.  *See supra* Counts I-VI.

332.     CAC has established arbitrary and capricious action by the Agency in its latest round of corrective action reevaluations, *id.*, and is thus entitled to relief on the ground that the Agency breached its implied duty to fairly and honestly consider quotations.  *See, e.g.*, *JCN Constr.*, 107 Fed. Cl. at 517; *Medline*, 155 Fed. Cl. at 541.

333.     Accordingly, CAC is entitled to relief on this basis, including but not limited to recovery of its bid preparation and proposal costs, the amount of which should be determined by a separate proceeding if the Agency and CAC are unable to reach an informal resolution.  *See, e.g.*, *Medline*, 155 Fed. Cl. at 533.  The Court should, therefore, grant judgment in CAC's favor and award CAC its bid preparation and proposal costs, in an amount to be determined separately

### Count VIII

### The Agency's Arbitrary, Irrational, and Otherwise Unlawful Actions Caused Undeniable Prejudice to CAC.

334.     CAC suffered undeniable prejudice as a result of the Agency's arbitrary, capricious, and otherwise unlawful acts described herein because, but for such improper conduct, CAC would have had a more than substantial chance of receiving the contract award.

335.     "A protester's showing of prejudice differs depending upon the nature of the protest."  *Square One Armoring Serv., Inc. v. U.S.*, 123 Fed. Cl. 309, 320 (2015).  Generally, in the context of a post-award protest, "a protester demonstrates the requisite prejudice by showing that it would have had a 'substantial chance' of receiving the contract award but for the alleged errors in the procurement process."  *Id.*  To satisfy the "substantial chance" standard, the plaintiff must "show that 'had the alleged errors been cured, … its chances of securing the contract [would have] increased.'"  *Blue Water Thinking, LLC v. U.S.*, 159 Fed. Cl. 65, 75 (2022) (quoting *Precision Asset Mgmt. Corp. v. U.S.*, 125 Fed. Cl. 228, 233 (2016)).

336.     CAC is a highly qualified and highly capable offeror who successfully performed the incumbent requirement for five years.

337.     CAC received outstanding evaluation marks under every RFQ criterion, and received ███████████ evaluation ratings under nearly every non-price evaluation factor—including all of the most important non-price evaluation factors.

338.     Additionally, CAC submitted a fair, reasonable, and competitive proposed price which was approximately a half billion dollars lower than the price quoted by CSI.  CAC and CSI are the only two offerors remaining in the competition.

339.     As described *supra* in Counts I-VII, the Agency (1) failed to conduct an Acceptability Review as required by the RFQ, which would have resulted in a finding that CSI was ineligible for award due to the expiration of its GSA Schedule; (2) conducted an arbitrary and irrational evaluation of CSI's quotation under Factor 1: Corporate Experience; (3) conducted an arbitrary evaluation of quotations under Factor 5: Price which failed to comport with the terms of the RFQ; (4) arbitrarily, irrationally, and disparately evaluated CAC's and CSI's quotations under Factor 4: Past Performance; (5) failed to conduct meaningful discussions with CAC; and failed to conduct a rational best-value tradeoff determination.

340.     But for these Agency errors, the Agency would have rationally determined that CSI's quotation was ineligible for award and CAC—the only eligible offeror remaining the competition, and a highly qualified and highly capable offeror in its own right—almost certainly would have received the contract award.

341.     And, even if the Agency did not disqualify CSI from the competition (and it should have), the Agency would have found increased merit in CAC's quotation (and increased CAC's evaluation score) under Factor 4, had it conducted a rational evaluation of CAC's quotation and conducted meaningful, fair, and non-misleading discussions with CAC.  Relatedly, the Agency would have found decreased merit in CSI's quotation (and decreased CSI's evaluation scores) under Factors 1 and 4, and would have found CSI's quoted price to be both unreasonably high and non-compliant with the terms of the RFQ, had it rationally evaluated CSI's quotation against the RFQ criteria.

342. Thus, but for the Agency's evaluation errors, there exists a substantial likelihood that CAC's quotation would have been deemed superior to CSI's under the non-price evaluation factors and, with its half-billion-dollar price advantage, that CAC would have been selected as the best-value offeror. *See, e.g.*, *BayFirst*, 102 Fed. Cl. at 695.

343. CAC has suffered undeniable prejudice as a result of the Agency's arbitrary, irrational, and otherwise unlawful acts described herein, and the Court should grant judgment in its favor.

## Count IX

## <u>CAC is Entitled to Permanent Injunctive Relief.</u>

344. CAC respectfully requests that the Court issue a permanent injunction barring the Agency from proceeding with performance of the awarded contract to CSI because, as described herein, that contract award arose from a prejudicially arbitrary and irrational evaluation of quotations and source selection decision.

345. To obtain injunctive relief, a protester must generally demonstrate (1) success on the merits; (2) irreparable harm if the injunction is not granted; (3) that the balance of hardships weighs in the protester's favor; and (4) that an injunction is in the public interest. *Superior Optical Labs, Inc. v. U.S.*, 152 Fed. Cl. 319, 323 (2021) (citing *PGBA, LLC v. U.S.*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)).

346. Based on the foregoing, CAC has established success on the merits.

347. As shown *supra* in Sections I-VII, the Agency conducted an entirely arbitrary and irrational corrective action reevaluation, in contravention of the terms of the RFQ, which resulted in an erroneous best-value tradeoff determination and the improper selection of CSI, rather than

CAC, as the best-value awardee.  In short, the Agency lacked a rational basis for its evaluation findings or source selection decision.

348.    Absent a grant of permanent injunctive relief, CAC will suffer irreparable harm because, *inter alia*, "[t]he loss of potential work and profits from a government contract constitutes irreparable harm." *Springfield Parcel C, LLC v. U.S.*, 124 Fed. Cl. 163, 195 (2015) ("Competitive detriment to plaintiffs stemming from a denial of a fair opportunity to participate in a lawful procurement process 'also engenders irreparable harm.'") (citations omitted); *see also* Decl. of D. Carson, ¶¶ 4-6.

349.    Irreparable harm to CAC is not, however, limited to the loss of an opportunity to perform, and profit from, this multi-billion-dollar opportunity.  CAC will also be deprived of the opportunity to earn valuable experience and past performance that, in turn, can be used to obtain future contract awards.  *See* Decl. of D. Carson, ¶¶ 4-6.

350.    The balance of hardships also weighs in favor of a grant of permanent injunctive relief to CAC.  Neither the Government nor CSI suffer harm if barred from proceeding with an arbitrarily and unlawfully issued contract award.

351.    Nor will a grant of injunctive relief unduly delay this procurement, which has already been prolonged by repeated evaluation errors by the Agency, multiple meritorious protests, and multiple rounds of voluntary corrective action undertaken by the Agency.  *See, e.g.*, *Fed. Acquisition Servs. Team, LLC v. U.S.*, 124 Fed. Cl. 690, 708 (2016); *Reilly's Wholesale Produce v. U.S.*, 73 Fed. Cl. 705, 716 (2006) (finding that no exceptional case exists in which delay alone would warrant a denial of injunctive relief, "particularly as it appears that some of the problems encountered here are, at least in part, of defendant's own making.").

352.    To the extent necessary services must still be performed, the Agency has continued to obtain such services through short-term bridge contracts.

353.    To the extent that the Agency claims some kind of economic harm arising from the need to conduct yet more corrective action, such harm is insufficient to tip the scales out of CAC's favor. *See, e.g.*, *Springfield Parcel C*, 124 Fed. Cl. at 195 ("Although the government may suffer economic harms, the 'burden of reprocurement costs occurs whenever an improper award of a contract is set aside,' and that alone does not affect the balance of harms.") (citations omitted).

354.    And, while CSI may claim to suffer harm from the loss of its contract award upon the issuance of an injunction and following a fair and rational evaluation of quotations, CSI had no rightful expectation of a contract award in the first instance, and only received such an award as the result of a defective evaluation process and award decision.

355.    Thus, any claim of such harm by CSI does not outweigh the harm to CAC. *Id.* ("Harm to [the awardee] does not alter this balance, because the process by which [the awardee] received the contract was itself flawed.").

356.    Not to mention, CSI has received, and continues to receive, windfalls—both financial, and in the form of past performance—from performance of the bridge contract work which undercut any claim of harm from CSI and more than counteract the loss of an award under the RFQ to which CSI was never entitled.

357.    Finally, a grant of permanent injunctive relief unquestionably serves the public interest.

358.    "[T]he public has an interest in the fair and lawful procurement of goods and services by the government." *Superior*, 152 Fed. Cl. at 326. "[T]he public interest in honest,

open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion." *CW Gov't Travel, Inc. v. U.S.*, 110 Fed. Cl. 462, 496 (2013).

359.   Thus, "[t]he public interest is, without doubt, served by ensuring that government officials follow applicable procurement statutes and regulations." *Magnum Opus Techs., Inc. v. U.S.*, 94 Fed. Cl. 512, 551 (2010) (citations omitted).

360.   Accordingly, the public interest is best served by a grant of permanent injunctive relief to prevent the Agency from proceeding with an arbitrarily and unlawfully issued contract award resulting from an irrational evaluation of quotations.

361.   This is particularly true where, as here, the Agency's arbitrary and irrational evaluation led to an erroneous award at a half-billion-dollar price premium. *See, e.g.*, *Cardinal Maint. Serv. v. U.S.*, 63 Fed. Cl. 98, 111 (2004).

362.   For these reasons, the Court should grant a permanent injunction barring the Agency from proceeding with performance of the unlawfully and arbitrarily issued contract award to CSI.

## **Request for Relief**

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and grant Plaintiff the following relief:

A.   A declaration from the Court that the Agency's corrective action reevaluation of quotations, and reselection of CSI as the contract awardee, was prejudicially arbitrary, capricious, an abuse of discretion, and otherwise unlawful;

B.   A permanent injunction barring the Agency from proceeding with performance of the arbitrarily and unlawfully issued contract award to CSI;

C.      An order directing the Agency to terminate CSI's contract award, conduct a rational reevaluation of offerors' quotations in accordance with the terms of the RFQ, and render a new award decision;

D.      The payment of CAC's bid preparation and proposal costs, the precise amount of which will be determined via a separate proceeding if the Agency and CAC are unable to resolve the matter informally;

E.      The payment of attorneys' fees pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504; and

F.      Such other relief as the Court may deem just and proper.


March 27, 2025                                      Respectfully submitted,

                                                   /s/Aron C. Beezley
                                                   Aron C. Beezley
                                                   Bradley Arant Boult Cummings LLP
                                                   1615 L Street, N.W., Suite 1350
*Of Counsel:*                                      Washington, D.C. 20036
                                                   Email: abeezley@bradley.com
Nathaniel J. Greeson                               Tel.: (202) 719-8254
Gabrielle A. Sprio                                 *Attorney of Record for*
Bradley Arant Boult Cummings LLP                   *Classic Air Charter, Inc.*