# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
**Bid Protest**

(Electronically Filed on March 27, 2025)

| | | |
|---|---|---|
| CLASSIC AIR CHARTER, INC., | ) | <span style="color:red">**Final Redacted Version**</span> |
| | ) | |
| Plaintiff, | ) | ▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| | ) | |
| v. | ) | Case No. 25-286C |
| | ) | |
| THE UNITED STATES, | ) | Judge Richard A. Hertling |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CSI AVIATION, INC. | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

March 27, 2025

*Of Counsel:*

Nathaniel J. Greeson
Gabrielle A. Sprio
Bradley Arant Boult Cummings LLP

Aron C. Beezley
Bradley Arant Boult Cummings LLP
1615 L Street, N.W.
Suite 1350
Washington, D.C. 20036
Email: abeezley@bradley.com
Tel.: (202) 719-8254
*Attorney of Record for*
*Classic Air Charter, Inc.*

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ................................................................................................ ii

**I.    INTRODUCTION** ......................................................................................................... 1

**II.   QUESTIONS PRESENTED** ......................................................................................... 2

**III.  STATEMENT OF THE CASE** ..................................................................................... 2

**IV.   STANDARD OF REVIEW** ........................................................................................... 3

**V.    ARGUMENT** ................................................................................................................ 4

**A.**    The Agency Irrationally Failed to Conduct an Acceptability Review as Required by the RFQ and Thus Failed to Disqualify CSI as Ineligible. ............................. 4

**B.**    The Agency Arbitrarily and Irrationally Evaluated Quotes under Factor 1—Corporate Experience. .................................................................................... 9

**C.**    The Agency's Evaluation of Factor 5—Price was Prejudicially Arbitrary. .............. 14

**D.**    The Agency Conducted Misleading, Unfair, and Non-Meaningful Discussions. ........ 19

**E.**    The Agency Arbitrarily and Irrationally Evaluated Quotes under Factor 4—Past Performance. ...................................................................................... 24

     **i.**    The Agency Irrationally Evaluated CSI's Past Performance. .......................... 24

     **ii.**   The Agency Arbitrarily Evaluated CAC's Past Performance. ......................... 27

     **iii.**  The Agency Subjected CAC to Unlawful Disparate Treatment. ....................... 31

**F.**    The Agency's Best-Value Tradeoff was Arbitrary, Irrational, and Otherwise Not in Accordance with Law. ................................................................................. 34

**G.**    The Agency Breached its Implied Duty to Fairly and Honestly Consider CAC's Quote. ........................................................................................................... 35

**H.**    The Agency's Arbitrary and Irrational Actions Prejudiced CAC. ............................. 36

**I.**    CAC is Entitled to Permanent Injunctive Relief. .................................................... 38

**VI.   CONCLUSION** ............................................................................................................ 39

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Allied Tech. Grp. Inc. v. U.S.*, 94 Fed. Cl. 16 (2010) ................................................................. 17

*AshBritt, Inc. v. U.S.*, 87 Fed. Cl. 344 (2009) .......................................................................... 19

*BayFirst Sols, LLC*, 102 Fed. Cl. 677, 695 (2012) ................................................ 14, 32, 34, 38

*Carahsoft Tech. Corp. v. U.S.*, 86 Fed. Cl. 325 (2009) ............................................................ 35

*Cardinal Maint. Serv. v. U.S.*, 63 Fed. Cl. 98 (2004) .............................................................. 39

*Castle-Rose, Inc. v. U.S.*, 99 Fed. Cl. 517 (2011) .................................................................... 35

*Centech Grp., Inc. v. U.S.*, 79 Fed. Cl. 562 (2007) .................................................................... 7

*Centerra Grp., LLC v. U.S.*, 138 Fed. Cl. 407 (2018) .............................................................. 19

*CW Gov't Travel, Inc. v. U.S.*, 110 Fed. Cl. 462 (2013) .......................................................... 39

*DigiFlight, Inc. v. U.S.*, 165 Fed. Cl. 588 (2023) ...................................................................... 5

*DMS All-Star JV v. U.S.*, 90 Fed. Cl. 653 (2010) .................................................................... 20

*East West, Inc. v. U.S.*, 2012 WL 4465228 (Fed. Cl. 2012) .................................................... 20

*EMTA Isaat, A.S. v. U.S.*, 123 Fed. Cl. 330 (2015) ................................................................. 17

*Gentex Corp. v. U.S.*, 58 Fed. Cl. 634 (2003) ......................................................................... 20

*Hanford Tank Disposition Alliance, LLC v. U.S.*, 173 Fed. Cl. 269 (2024) ............................... 7

*HP Enter. Servs., LLC*, B-413382.2, 2016 CPD ¶ 343 ............................................................... 7

*Impresa Construzioni Geom. Domenico Garnfi v. U.S.*, 238 F.3d 1324 (Fed. Cir. 2001) ............. 4

*J.C.N. Constr., Inc. v. U.S.*, 107 Fed. Cl. 503 (2012) ......................................................... 35, 36

*Magnum Opus Techs., Inc. v. U.S.*, 94 Fed. Cl. 512 (2010) ..................................................... 39

*Medline Indus., Inc. v. U.S.*, 155 Fed. Cl. 522 (2021) ........................................................ 35, 36

*Mortgage Contracting Servs. LLC v. U.S.*, 153 Fed. Cl. 89 (2021) ........................................... 17

*Peraton Inc. v. U.S.*, 146 Fed. Cl. 94 (2019) ............................................................................ 7

*Raytheon Co. v. U.S.*, 121 Fed. Cl. 135 (2015) ....................................................................... 20

*Reilly's Wholesale Produce v. U.S.*, 73 Fed. Cl. 705 (2006) .................................................... 39

*Serco, Inc. v. U.S.*, 81 Fed. Cl. 463 (2008) ........................................................................ 18, 35

*Springfield Parcel C, LLC v. U.S.*, 124 Fed. Cl. 163 (2015) ............................................... 38, 39

*Superior Optical Labs, Inc. v. U.S.*, 152 Fed. Cl. 319 (2021) ............................................... 4, 39

*T Square Logistics Servs. Corp. v. U.S.*, 134 Fed. Cl. 550 (2017) ............................................. 4

**<u>Statutes</u>**

5 U.S.C. § 706 ............................................................................................................................ 4

**<u>Regulations</u>**

FAR 42.1501 ............................................................................................................................ 28

FAR 52.233-3 ............................................................................................................................ 8

FAR 8.405-3 .......................................................................................................................... 5, 6

# I.   __INTRODUCTION__

Pursuant to Rule 52.1(c) of the Rules of the U.S. Court of Federal Claims ("RCFC"),

Plaintiff, Classic Air Charter, Inc. ("CAC"), submits this Motion for Judgment on the

Administrative Record ("MJAR") and supporting brief.  The Court should grant CAC's MJAR

because the Agency conducted an evaluation—and rendered an award decision—riddled with

prejudicial defects, arbitrary findings, and irrational conclusions.  Indeed:

- The Agency failed to conduct an Acceptability Review of CSI Aviation, Inc.'s ("CSI") quote in accordance with the Request for Quotations ("RFQ"), and thus failed to recognize that CSI's quote was ineligible for award under the RFQ and the FAR due to the expiration date of CSI's GSA Schedule.
- The Agency also conducted a facially defective evaluation of CSI's quote under Factor 1—Corporate Experience, whereby, among other things, the Agency credited CSI with experience of its teaming partners—including ███████████████—notwithstanding that (1) CSI failed to submit teaming agreements post-dating Round 4 Discussions with either entity; and (2) the RFQ criteria and Round 4 Discussions letter expressly precluded the consideration of a teaming partner's experience absent an updated teaming agreement.
- The Agency further failed to rationally evaluate price in accordance with the RFQ criteria.  CSI's price submission failed to include all required information—a fact which the Agency raised during discussions, which CSI repeatedly failed to correct, and which the Agency blatantly ignored in its final evaluation and award decision.
- The Agency also conducted a completely arbitrary, irrational, and unlawful evaluation of quotes under Factor 4—Past Performance, whereby it (1) ignored "███████" ratings and ████████████████ in CSI's CPARS and reference checks; (2) credited CSI with past performance which was not relevant to this requirement and for which the Agency had no CPARS or reference checks to evaluate; (3) made plainly irrational findings with respect to CAC's past performance which were belied by the weight of contemporaneous evidence; and (4) assessed CAC's past performance against a completely different—and substantially more punitive—standard that that against which CSI's past performance was assessed.
- Moreover, the Agency misled and misinformed CAC during discussions by claiming to have found a technical deficiency in CAC's quote—which did not exist—after a purported reevaluation of quotes during corrective action—which was never conducted—and directed CAC to remedy this non-existent issue while failing to inform CAC of material changes in the information previously shared by the Agency with respect to its understandings, intentions, and assumptions for this procurement and expressly relied upon by CAC in preparing its revised quote.

The litany of prejudicial Agency errors described herein culminated in a defective best-

value determination and the issuance of an unlawful award to CSI at a ***half-billion-dollar price premium***. Had the Agency rationally evaluated quotes in accordance with the RFQ, the selection of CAC—a highly qualified, highly capable incumbent presenting the greatest non-price merit ***and*** the lowest price in this two-offeror competition—as the best-value awardee would have been a foregone conclusion. Accordingly, the Court should grant judgment in CAC's favor.

## II.   QUESTIONS PRESENTED

1.       Whether the Agency's corrective action reevaluation and reissuance of an award to CSI is arbitrary, irrational, unlawful, or otherwise abusive of Agency discretion?

2.       Whether the Agency breached its implied duty to fairly consider CAC's quote?

3.       Whether CAC is entitled to injunctive relief?

## III.   STATEMENT OF THE CASE

The Agency issued the RFQ on January 23, 2023, seeking to award a multi-billion-dollar BPA for Daily Schedule Large Aircraft and Special High-Risk Charter Flight Services in support of ICE Air Operations, with a 12-month base period and four, 12-month option periods. Tab 17, AR 410. The Agency was to evaluate quotes through a "two-phase, advisory down-select process," whereby the Agency would first conduct an Acceptability Review of quotes, followed by a phased evaluation of quotes using five evaluation factors: Factor 1—Corporate Experience; Factor 2—Aircraft Availability and Commitment; Factor 3—Technical Capability; Factor 4— Past Performance; and Factor 5—Price. Tab 17, AR 421.

As relevant here, the Acceptability Review was to include an evaluation of each offeror's GSA Schedule to ensure it would remain in "effect for at least 60 months beyond the award date of the BPA." Tab 17, AR 414; FAR 8.405-3(d)(3). "[Q]uotes that do not pass the acceptability review will not be evaluated for the remaining phases/parts or factors." Tab 17, AR 417. For Factor 1—Corporate Experience, the Agency was to evaluate the experience of each offeror—

and, if a valid teaming agreement was provided, the experience of its teammates—by assessing "recent (active within the last three years) and relevant projects (similar in scope and complexity)." Tab 17, AR 421. The same experience was to be evaluated under Factor 4—Past Performance. Tab 17, AR 424. Prices were to be evaluated for reasonableness, and could be evaluated for realism. Tab 17, AR 425. In their price submissions, offerors were required to "input their (1) GSA rate, (2) discount percentage, and (3) proposed rates." Tab 17, AR 420.

CAC timely submitted its Phase 1 and Phase 2 quotes, as well as several revised quotes in response to four rounds of discussions held by the Agency over the course of this multi-year procurement and interspersed among several rounds of evaluations and multiple bid protests and corrective actions. Most recently, offerors submitted final revised quotes on October 30, 2024 in response to the Agency's fourth round of discussions. *See* Tabs 93-94. This fourth round of discussions and revised quote submissions followed a successful GAO protest by CAC of the Agency's March 2024 award to CSI, in response to which the Agency promised to reevaluate portions of CSI's quote and render a new award decision. Tab 84a, AR 5187; Tab 91, AR 5323-28; Tab 92a; Tab 92b. The Agency prepared new evaluation reports based on the revised quotes, conducted a new best-value tradeoff determination and source selection decision, and confirmed its $3.6 billion award to CSI—at a roughly ***half-billion-dollar price premium*** over CAC's quote—by lifting the stop-work order on CSI's March 2024 contract without adjusting the start date or period of performance. *See* Tabs 95-99; 110-112. CAC was informed that it received the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ under Factors 1-3, a ▮▮▮▮▮▮▮▮▮▮ score under Factor 4, and that its quoted price of ▮▮▮▮▮▮▮▮▮ and evaluated price of ▮▮▮▮▮▮▮▮ were less than CSI's quoted price of $3,219,226,171.80. Tab 113, AR 6003-04.

## IV.    <u>STANDARD OF REVIEW</u>

RCFC 52.1(c) allows for judgment on the administrative record ("AR") based on a

determination as to "whether, given all the disputed and undisputed facts, a party has met its

burden of proof based on the evidence in the record." *T Square Logistics Servs. Corp. v. U.S.*,

134 Fed. Cl. 550, 554 (2017).  In reviewing bid protests, the Court applies the standard of review

set forth in Section 706 of the Administrative Procedure Act, pursuant to which the Court must

set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with the law."  5 U.S.C. § 706(2)(A).  Stated differently, an agency's action must be

set aside as arbitrary and capricious if it lacks a rational basis or involves a violation of a statute

or regulation.  *Impresa Construzioni Geom. Domenico Garnfi v. U.S.*, 238 F.3d 1324, 1332 (Fed.

Cir. 2001).  "This inquiry is unchanged in the corrective action context."  *Superior Optical Labs,*

*Inc. v. U.S.*, 152 Fed. Cl. 319, 322-23 (2021).

## V.     ARGUMENT

### A.     The Agency Irrationally Failed to Conduct an Acceptability Review as Required by the RFQ and Thus Failed to Disqualify CSI as Ineligible.

As part of the RFQ evaluation scheme, the Agency was to conduct an Acceptability

Review to ensure that offerors submitted complete and compliant quotes.  *See, e.g.*, Tab 17, AR

417, 420; Tab 40, AR 1489; Tab 101, AR 5715-21; Tab 104.  The RFQ was clear that "[q]uotes

that do not pass the acceptability review ***will not*** be evaluated for the remaining phases/parts or

factors."  *Id*. (emphasis added); Tab 101, AR 5720.  Following CAC's successful GAO protest in

May 2024, the Agency specifically noted the need to conduct another Acceptability Review as

part of its corrective action reevaluation.  Tab 91, AR 5327.  During Round 4 Discussions

conducted in October 2024, CSI submitted new Letters of Commitment, new Airworthiness

Certificates, new OpSpecs, and new Teaming Agreements—all of which should have been

evaluated in the Acceptability Review conducted as part of the Agency's reevaluation.

Inexplicably, however, the Agency ***never*** conducted an Acceptability Review as part of its

corrective action reevaluation predating the January 2025 award—in violation of the RFQ criteria and the Agency's own determination that such an Acceptability Review was necessary. *See, e.g.*, Tab 17, AR 417, 420-21; Tab 91, AR 5327; *see also, e.g.*, *DigiFlight, Inc. v. U.S.*, 165 Fed. Cl. 588 (2023).

The Agency's failure to conduct an Acceptability Review as part of its latest corrective action reevaluation was not only violative of the RFQ, but was clearly arbitrary and irrational. As previously noted, CSI submitted new documentation during discussions and as part of its final revised quote which was within the scope of the Acceptability Review. By failing to conduct an Acceptability Review, the Agency never even evaluated these aspects of CSI's final revised quote before it re-awarded the contract to CSI. And, because the Agency never even bothered to evaluate substantial portions of CSI's final revised quote before making its award decision, the Agency failed to recognize that CSI's quote was unawardable under the terms of the RFQ and the FAR.

The Acceptability Review required an evaluation of each offeror's GSA Certification and GSA Schedule—which, among other things, set forth the expiration date of the offeror's GSA Schedule. Tab 17, AR 417, 420-21; Tab 17c, AR 511. This expiration date was to be validated against the RFQ (and FAR) requirement that, "to be eligible to compete, the total period of performance under the contractor's GSA FSS contract must be in full force and effect for at least 60 months beyond the award date of the BPA via the exercise of available, unexercised options." Tab 17, AR 414; *see also* FAR 8.405-3(d)(3); Tab 108, AR 5964.

As shown in CSI's GSA Certification, the last option period of CSI's GSA Schedule is set to expire on March 9, 2029. *See, e.g.*, Tab 19-23, AR 840. Had the Agency conducted an Acceptability Review of CSI's proposal as part of its reevaluation preceding the January 2025

award decision, as required by the RFQ, the Agency would have recognized that CSI lacked the necessary remaining period of performance on its GSA Schedule to be eligible for award under the RFQ or the FAR, and would have had no choice but to disqualify CSI from the competition. The date of CSI's BPA award was January 31, 2025. *See, e.g.*, Tab 111, AR 5989 (Jan. 31, 2025 email, "notify[ing] CSI Aviation, Inc. of the award of [the BPA]."). CSI's GSA Schedule expires on March 9, 2029—49 months and 9 days beyond the award date of the BPA. Thus, CSI's GSA Schedule will expire *prior* to the end of the 60-month period of performance of the BPA, and CSI is ineligible to compete under the terms of the RFQ and the FAR. Tab 17, AR 414; FAR 8.405-3(d)(3); Tab 41b, AR 1546 (showing a 60-month period of performance, with precise dates "[t]o be added upon award.").

To be sure, the January 2025 award to CSI is a new award following new quote submissions, new evaluations, and a new award decision—and thus has a new "award date" from which the 60-month period beyond the award date must be measured. But, in its December 5, 2024 response to CAC's Agency-level protest, the Agency previously took the position that:

> CAC misunderstands the relevance of CSI's GSA Schedule expiring on March 9, 2029. If the current award stands as awarded, March 8, 2024, 60 months beyond the award date would be March 7, 2029, which is two days prior to the expiration of CSI's GSA Schedule. Furthermore, the period of performance on [the BPA] with CSI is March 8, 2024, through March 7, 2029. The Government has no intention of extending the period of performance once the stop work order is lifted.

Tab 109, AR 5972. It is the Agency, not CAC, who misunderstands the implications of the corrective action undertaken and the expiration of CSI's GSA Schedule. The Agency's prior evaluation and award to CSI were legally unsound. Thus, the Agency solicited—and CSI submitted—substantially revised quotes as part of its corrective action, which included new corporate experience, new past performance, new subcontractors and teaming partners, new aircraft commitments, new OpSpecs documentation, and new technical approaches. *See* Tab

92b; Tab 94.  The Agency, in turn, reevaluated CSI's new quote under every evaluation factor, and arrived at a new award decision.  *See* Tabs 95, 96, 98a, 98b, 99.  The *new* quote submissions, *new* evaluation, and *new* award decision superseded and nullified the Agency's prior award to CSI.  Thus, the Agency could not merely reinstate its prior award—with the prior period of performance[1]—to CSI, because the quote upon which that award was based was substantially different from the new quote submitted by CSI and upon which the January 2025 award decision was based.  *See, e.g.*, *Hanford Tank Disposition Alliance, LLC v. U.S.*, 173 Fed. Cl. 269, 312-14, 316, 318 (2024) ("[T]he [agency] took corrective action, opened discussions, and … both offerors were asked to, and submitted, revised proposals…. At that point, the agency needed to evaluate the [revised proposals] and the Source Selection Authority needed to conduct a best value trade-off analysis on the revised proposals before the agency could accept an offer and award a contract. … [B]y extension, the original offers to a solicitation, are moot after an agency takes corrective action. … [A]fter the [agency] issued the corrective action and received new proposals, the agency could no longer evaluate the earlier submitted proposals, make a best value determination or award a contract based on those earlier submitted proposals submitted before the corrective action."); *Centech Grp., Inc. v. U.S.*, 79 Fed. Cl. 562, 575-77 (2007); *Peraton Inc. v. U.S.*, 146 Fed. Cl. 94, 101 (2019) (quoting *HP Enter. Servs., LLC*, B-413382.2, 2016 CPD ¶ 343 at 3 n.3).  The Agency also purports to have acted under the authority of FAR 52.233-3 in

---

[1] The Agency's apparent position—that it made a new award decision on January 31, 2025, based on a new quote submission from CSI, and that the period of performance of the award resulting therefrom began on March 8, 2024, *see* Tab 99; Tab 109 AR 5972—is facially irrational.  CSI submitted its new quote on October 30, 2024.  Tab 94.  The Agency conducted its evaluation of that new quote and made its new award decision on January 31, 2025.  Tab 99, AR 5615.  Yet, the Agency purports to have made an award whose period of performance commenced on March 8, 2024.  An agency cannot issue an award with a period of performance **predating** the existence of the quote and award decision upon which the award was based.

lifting the stop-work order on CSI's prior (nullified and superseded) award issued in March 2024. Tab 111, AR 5989-90. This award cannot be reinstated because CSI has replaced the quote which formed the basis of that award with a substantially different quote which formed the basis of the Agency's January 2025 award decision, as described above. Moreover, FAR 52.233-3 does not authorize the Agency to lift the stop-work order and proceed with the prior award under these circumstances.

FAR 52.233-3(a) provides that "[u]pon receipt of the final decision in the protest, the Contracting Officer shall either— (1) Cancel the stop-work order; or (2) Terminate the work covered by the order." The Agency is not acting in response to a "final decision in the protest," but rather is acting on the basis of a corrective action reevaluation undertaken with respect to completely new quote submissions. Further, FAR 52.233-3 contemplates an "either/or" scenario, whereby the agency must either cancel the stop-work order (if it receives a favorable final protest decision which sustains the award), or terminate the award (if it receives an unfavorable final protest decision which sustains the protest challenging the award). FAR 52.233-3 does not contemplate a third alternative whereby an agency may cancel a stop-work order and proceed with a previously-awarded contract following a new evaluation and award decision based on substantially revised quotes. Thus, while the Agency purports to have relied upon FAR 52.233-3 to cancel the stop-work order and resume with the prior award to CSI under the prior period of performance—an apparent attempt to avoid having to disqualify CSI for the untimely expiration of its GSA Schedule—the cited FAR provision does not give the Agency such authority.

In sum, the Agency failed to conduct an Acceptability Review as required by the RFQ in its corrective action reevaluation. Had it conducted such an Acceptability Review, the Agency would have been forced to disqualify CSI from the competition because its GSA Schedule is set

to expire less than 60 months from the award date of the BPA.  No amount of mental gymnastics with respect to the award date or period of performance can save the Agency from this inevitable conclusion.  The RFQ required, as an eligibility criterion, that the offeror's GSA Schedule "be in full force and effect for at least 60 months beyond the award date of the BPA."  Tab 17, AR 414.  The Agency issued an award to CSI—based on *new* quotes, *new* evaluations, and a *new* award decision—with a *new* award date of January 31, 2025.  CSI's GSA Schedule expires on March 9, 2029—49 months and 9 days after the January 31, 2025 award date of the BPA.  CSI was, therefore, ineligible under the express terms of the RFQ and the FAR.

The Agency's arbitrary and irrational failure to conduct an Acceptability Review, and failure to disqualify CSI from the competition, was undeniably prejudicial to CAC.  CAC is a highly qualified, deeply experienced prior incumbent who received ████████ evaluation marks under virtually every factor and quoted a fair and reasonable price.  But for the Agency's irrational failure to conduct an Acceptability Review pursuant to the RFQ and disqualify CSI's ineligible quote, CAC—the only other offeror remaining in the competition—undoubtedly would have received the contract award.

For this reason, alone, the Court should grant judgment in CAC's favor.

**B.**   **The Agency Arbitrarily and Irrationally Evaluated Quotes under Factor 1— Corporate Experience.**

Factor 1—Corporate Experience was one of the most important evaluation factors.  Tab 17, AR 425.  Under Factor 1, the Agency was to "evaluate recent (active within the last three years) and relevant projects (similar in scope and complexity)" to "determine its level of confidence that the contractors' corporate experience will aid in successfully performing the SOW requirements."  Tab 17, AR 421.  "Projects that are more similar to the proposed work, in scope and complexity, may be seen as more relevant than efforts that are less similar in these

areas." *Id*. The RFQ permitted consideration of a teaming partner's experience ***only*** "if there is a fully executed copy of the teaming agreement that clearly delineates what each company is doing." Tab 17, AR 418; Tab 92b, AR 5331. As part of the Round 4 Discussions in October 2024, each offeror was warned that "[t]eaming agreements dated prior to the issuance of this letter ***will not*** be accepted by the Government." Tab 92b, AR 5331 (emphasis added).

In its final quote revision, submitted on October 30, 2024 in response to Round 4 Discussions, CSI submitted an updated Corporate Experience Questionnaire in which CSI

███████████████████████████████████████████████████████

██████████████████ Tab 94-18, AR 5472-77, 5482. However, CSI ***did not submit updated teaming agreements*** with ███████████████████. *See* Tab 94. Because CSI did not submit teaming agreements with ███████████████ dated after October 23, 2024—the date of the Round 4 discussions letter—CSI could not utilize the experience of these teaming partners under the terms of the RFQ. The RFQ required a fully executed teaming agreement clearly delineating the scope of work to be performed by each company as a prerequisite to utilizing a teaming partner's corporate experience, and the Round 4 Discussions letter further clarified that "[t]eaming agreements dated prior to [October 23, 2024] ***will not*** be accepted by the Government." Tab 17, AR 418 (emphasis added); Tab 92b, AR 5331. CSI's Factor 1 submissions did not comply with these express criteria.

The Agency's evaluation of CSI's quote under Factor 1 was inarguably arbitrary and irrational because the Agency ████████████████████████████ as part of CSI's Corporate Experience evaluation notwithstanding (1) CSI's failure to submit updated teaming agreements; and (2) the express RFQ criteria which precluded such consideration in the absence of a valid teaming agreement. CSI was credited with ████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████ Tab 98a, AR 5582-83.  The Agency's attribution of ████████████████

████████████████ to CSI under Factor 1 based, in part, on the ████████████████████

████████—even though no valid teaming agreement was provided—was irrational and violative

of the RFQ.  These findings—which were irrationally based and assessed in contravention of the

RFQ criteria—formed a material part of the Agency's decision to award CSI a ████████

████████ rating under Factor 1.  *See, e.g.*, Tab 98a, AR 5586.

CSI was similarly—and wrongfully—credited with ████████████████████████████

████████████████ under Factor 1, even though no updated teaming agreement[2] with ████████

was provided.  Specifically, the Agency found that ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ Tab

98a, AR 5583.  The Agency also found, ████████████████████████████████

████████████████████████████ Tab 94-18, AR 5482, that ████████████████

████████████████████████████████████████████████

████████████████████████████████████████ Tab 98a,

AR 5585.  These arbitrary and irrational findings also played a material role in the Agency's

decision to assess CSI a ████████████████ rating under Factor 1.  Tab 98a, AR 5586.

The Agency further erred in evaluating the recency and relevancy of CSI's corporate

---

[2] The Agency required submission of new teaming agreements "due to the time lapse and the changes to subcontractor availability," as well as because CSI's prior teaming agreements ████████ ██████████████████████████████████████████ Tab 92b, AR 5331. Without new teaming agreements, it is unclear whether these teammates even remain committed to perform for CSI, or what the scope of that commitment might be.

██████████████████████████████████████████████████

experience.  *See also infra* Section V.E.i.  Recency was defined in the RFQ as the three-year period preceding the closing date of the RFQ.  Tab 17, AR 417, 421, 424.  Even with the numerous rounds of corrective action and revised quote submissions, the Agency made clear that the evaluation criteria remained unchanged from the initial RFQ.  *See, e.g.*, Tab 49, AR 2734; Tab 92b, AR 5331-32.  The closing date of the RFQ was January 28, 2023.  Tab 17, AR 408. Thus, the recency period for Factor 1 (and Factor 4) projects was the three-year period preceding January 28, 2023.  The AR is devoid of any indication that this three-year recency period has been adjusted during corrective action.  In fact, the Agency **declined** to provide an updated Corporate Experience Questionnaire, choosing instead to proceed with revised submissions and a reevaluation under the same long-standing time periods established in the RFQ and attachments for all aspects of the Factor 1 evaluation.  *See, e.g.*, Tab 92b, AR 5331.

However, CSI submitted—and the Agency evaluated—corporate experience which and thus was not within the RFQ-established period for recency.  For example, CSI submitted Tab 94-18, AR 5477-78; Tab 98a, AR 5584.  The Agency's findings that the contract was clearly contravened the RFQ because the subject contract did not fall within the established three-year period for recency.[3]

As for relevancy, the Agency was to consider the extent of similarity in scope and

---

[3] CAC prepared its revised quote submission in response to Round 4 Discussions based on the reasonable understanding, stated in its cover letter, that the RFQ-established time period for corporate experience remained unchanged.  *See* Tab 93-1, AR 5334.  Had CAC been aware that the Agency would consider corporate experience outside of the original timeframe, CAC could have submitted additional experience performed by itself and its teammates after the closing date of the RFQ, including, for example,

complexity between an offeror's submitted projects and the requirement being procured on a sliding scale of sorts, where more similar efforts were viewed as more relevant than less similar efforts.  *See* Tab 17, AR 421.  Again, however, the Agency failed to rationally apply this RFQ criterion in its Factor 1 evaluation of CSI's quote.  For example, the Agency found CSI's ███

███████████████████████████████████████████████████████

██████████████████████████ Tab 98a, AR 5584.  However, the contract in question was ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████ Tab 94-18, AR 5478.  CSI's ████

████ was not at all similar in scope and complexity to the subject requirement and should not have been found relevant under the RFQ criteria.  As another example, the Agency found ███

███████████████████████████████████████████████████████

█████████████████████████████ Tab 98a, AR 5584.  ██████ comprises only a small fraction of this requirement, which is primarily for provision of Daily Schedule Large Aircraft and Special High-Risk Charter Flight Services.  *See, e.g.*, Tab 41b, AR 1545-46.  Again, the Agency irrationally evaluated relevancy, failing to consider the lack of similarity in scope and complexity to the subject requirement.  If a rational evaluation had been conducted under the RFQ criteria, this contract could not have been found relevant.

These irrational evaluation findings had a material impact on the Agency's Factor 1 evaluation of CSI, as well as the best-value tradeoff and source selection decision.  Tab 98a, AR 5582-86; Tab 99, AR 5613.  The Agency irrationally credited CSI for corporate experience which was unquestionably outside of the recency period established in the RFQ.  And, the Agency

███████████████████████████████████████████████████████

similarly assigned undue credit to CSI for experience which bore no similarity in scope or complexity to the subject requirement. But for these arbitrary and irrational findings, the Agency almost certainly would have found CAC's exceptional quote to be superior in merit to CSI's quote under Factor 1—the most important evaluation factor—and would not have determined that CSI's quote warranted a half-billion-dollar price premium. *See, e.g.*, *BayFirst Sols, LLC*, 102 Fed. Cl. 677, 695 (2012). For these reasons, the Court should grant judgment for CAC.

### C.    The Agency's Evaluation of Factor 5—Price was Prejudicially Arbitrary.

For purposes of the Factor 5—Price evaluation, the RFQ instructed that offerors "must input their (1) GSA rate, (2) discount percentage, and (3) proposed rates" in the pricing submissions. Tab 17, AR 420. The inclusion of a stated discount percentage was important because the RFQ Terms & Conditions mandated that "[t]he relationship between the current price in the GSA schedule and the price offered in the contractors' quotation shall remain constant, i.e., the discount rate shall remain the same throughout the term of the BPA," even while GSA pricing is adjusted. Tab 41b, AR 1545. The RFQ notified offerors that the Agency would "ensure that the quotes contain all the information required by the RFQ," would evaluate for reasonableness, and could evaluate for realism. Tab 17, AR 424-25.

As part of its most recent corrective action, the Agency noted that "CSI's price will need to be reevaluated" because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Tab 91, AR 5328. The Agency ***never actually conducted*** such a reevaluation, but instead proceeded immediately to discussions with CSI and CAC, citing the impacts of the iAero bankruptcy, "the time lapse[,] and changes to subcontractor availability" as its bases for soliciting revised quotes. *See, e.g.*, Tab 92b, AR 5331-32. As part of these Round 4 Discussions in October 2024, the Agency invited revised pricing submissions under Factor 5. *Id.*

Although CAC ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████ CAC submitted an updated price quote as part of its October 30, 2024

submission in which it ██████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████ Tab 93-1, AR 5335.  CAC's updated pricing was

based on an entirely reasonable and rational understanding[4] that (1) the RFQ connected the

precise dates of performance for the base and option periods to the contract award, not to a fixed

date or period, *see* Tab 41b, AR 1546; Tab 49a; and (2) any award resulting from the Agency's

corrective action reevaluation would be made with an FY 2025 start date, considering that

revised quotes were submitted in October 2024 and that a contract award date cannot precede the

date of submission of the quotes upon which the award is based.  On the other hand, CSI

██████████████████████████████████████████████████████████████

██████████████████████████████—in response to Round 4

Discussions.  *Compare, e.g.*, Tab 51-20 *with* Tab 94-17.  Despite the ████████████████

████████████ the significant passage of time, and the fiscal year shift in base and option

periods to accommodate a new award in FY 2025, ████████████████████████

██████████████ Tab 96, AR 5572.  The Agency never critically evaluated the implications of

CSI's reliance on outdated pricing which no longer reflected its proposed approach, but the

impacts of elapsed time and a changed approach are significant.  For example, CSI's ████████

████ pricing narrative states that it ██████████████████████████ Tab 61.3, AR

---

[4] This understanding was consistent with the history of this procurement, because the Agency
previously adjusted the contract period of performance to account for the passage of time
between the now-terminated contract award to Chapman Freeborn made in May 2023 and the
award made to CSI in March 2024.  *See* Tab 41b, AR 1546; *Compare* Tab 65, AR 3310 *with* Tab
44a-13, AR 1940.  Notably, the Agency **did not** reopen discussions with CAC or otherwise
correct this basis for CAC's revised pricing.

3171.  But, because CSI █████████████████████████████████████████

███  the pricing evaluated by the Agency from ████████████  is no longer accurately or

appropriately escalated over the base and option periods pursuant to CSI's own price narrative.

CSI also claims that it had ██████████████████████████ *id.*, and ██████████████████████

████████████████████  Tab 61.3, AR 3169, but its ████████████████  does not—and

cannot—██████████████████████████████████████████

█████  Simply put, the Agency did not have adequate or accurate information upon which to

evaluate the completeness, fairness, reasonableness, or realism of CSI's price in light of the

████████████████  to CSI's quote.  The Agency, itself, even recognized that the ████████████

██  CSI's quote necessitated a reassessment of CSI's price.  *See, e.g.*, Tab 91, AR 5328 ██████

███████████████████████████████████████████████████████████

██████████████████████████  Yet, its actual evaluation completely ignored the risk

and uncertainty associated with CSI's ████████████████████████████████████

This, alone, renders the Agency's evaluation arbitrary and irrational—but was far from the only

error in the Agency's Factor 5 evaluation.

The Agency also turned a blind eye to clear defects in CSI's quoted pricing which

rendered CSI's quote non-compliant with the RFQ.  Indeed, CSI's price quote failed to contain

all information required by the RFQ—a material deficiency which the Agency raised during

discussions, which CSI repeatedly failed to correct, and which the Agency ignored in its final

evaluation and award decision.  Similarly, the Agency found CSI's ████████████████  and

notified CSI of this issue—only to ignore this in its final evaluation and award decision.

To repeat, the RFQ stated that "Contractors must input their (1) GSA rate, (2) discount

percentage, and (3) proposed rates" in their pricing submissions.  Tab 17, AR 420; Tab 96, AR

5570.  CSI **repeatedly failed** to comply with this material[5] RFQ requirement.  Indeed, the AR

shows that:



- In its ▓▓▓▓▓▓ evaluation of CSI's revised pricing[6] submitted on ▓▓▓▓▓▓, the Agency noted that CSI's price submittals ▓▓▓▓▓▓ Tab 59, AR 3150.
- In its ▓▓▓▓▓▓ discussions, the Agency informed CSI that ▓▓▓▓▓▓ Accordingly, ICE asks that CSI ▓▓▓▓▓▓ Tab 60b, AR 3155.  The Agency specifically directed CSI to ▓▓▓▓▓▓ *Id.*
- In its ▓▓▓▓▓▓ evaluation of CSI's post-discussions revised pricing—which remained ▓▓▓▓▓▓, *see* Tab 61.5, AR 3185—the Agency noted, again, that ▓▓▓▓▓▓ Tab 105, AR 5770.  Thus, CSI did not ▓▓▓▓▓▓ and did not ▓▓▓▓▓▓ in accordance with the RFQ requirements.
- Although CSI had the opportunity to do so, *see* Tab 92b, AR 5332, CSI ▓▓▓▓▓▓ after October 2024 discussions, either.  This led the Agency to find, again, in its ▓▓▓▓▓▓ price evaluation that ▓▓▓▓▓▓ in CSI's quoted pricing. Tab 96, AR 5572.
- In its January 31, 2025 award decision, the Agency repeated that ▓▓▓▓▓▓ in CSI's price submissions. Tab 99, AR 5611.
- Yet, despite unresolved determinations that CSI's quoted pricing ▓▓▓▓▓▓ and that CSI's quoted pricing ▓▓▓▓▓▓ the Agency inexplicably concluded that "CSI's price quote[]" ▓▓▓▓▓▓ *Id.*

To summarize, then, the Agency ▓▓▓▓▓▓

▓▓▓▓▓▓  *See also, e.g.*, *EMTA Isaat, A.S. v. U.S.*, 123 Fed. Cl. 330, 338 n.9

(2015); *Mortgage Contracting Servs. LLC v. U.S.*, 153 Fed. Cl. 89, 134 (2021) ("[A] price

reasonableness analysis considers whether an offeror's price is too high.").  The Agency also

---

[5] This RFQ requirement is material because it has a significant impact on price of the RFQ. *Allied Tech. Grp. Inc. v. U.S.*, 94 Fed. Cl. 16, 39 (2010); *see also, e.g.*, Tab 41b, AR 1514 (explaining the materiality of a stated, fixed discount rate).
[6] In its ▓▓▓▓▓▓ submission, CSI submitted a quoted price of ▓▓▓▓▓▓ and had a total evaluated price of ▓▓▓▓▓▓ Tab 59, AR 3150.  CSI has not adjusted its quoted or total evaluated price since that submission.  *See, e.g.*, Tab 113, AR 6003.

███████████████████████████████████████████████████████████

████████████ *See also, e.g.*, Tab 17, AR 420.  Even though CSI was put on notice of these

████████████████████ during discussions, and even though CSI was afforded ample

opportunity to correct these issues in its price quote, **CSI chose not to do so**.  Inexplicably,

however, the Agency ████████████████████████████████████████

███████████████████████████████████████████████.  The

Agency does not—and, indeed, cannot—explain why these documented ████████████

████████████████ simply disappeared, even though they were never resolved in CSI's revised

submissions.  To be clear, CSI's quoted price was found to be ████████████████—and

CSI never subsequently ██████ its price.  Because this issue was never resolved, CSI's quoted

price should have been deemed unreasonable.[7]  CSI's quote also ████████████████████

████████████████████ which rendered CSI's quote ██████████ with the material

RFQ requirements.  This issue was never fixed by CSI, and CSI's quote thus remained deficient.

The Agency's Factor 5 evaluation was not only arbitrary, irrational, and violative of the

RFQ, but was highly prejudicial to CAC.  CAC submitted a fair and reasonable price which

comported with all RFQ requirements—and which was roughly a **half billion dollars lower** than

CSI's quoted price.  Had the Agency not ████████████████████████████████████

████████████ in CSI's price quote, the Agency would have had no choice but to conclude that

---

[7] Here, the Agency has opted to obligate itself to conduct a new price reasonableness analysis in
the terms of the RFQ, which states that quoted prices "will be evaluated to determine fair and
reasonableness" and that this evaluation will be in addition to the Agency's evaluation
obligations under FAR 8.405-3(b)(2)(iv).  Tab 17, AR 425.  Where the agency has obligated
itself, in the plain terms of the RFQ, to conduct a new price reasonableness analysis in
establishing a BPA, it must do so—and the analysis must be rational and reasoned.  The mere
existence of more than one quote is not, however, sufficient to find an offeror's price to be fair
and reasonable.  *See, e.g.*, *Serco, Inc. v. U.S.*, 81 Fed. Cl. 463, 494 (2008).

███████████████████████████████████████████████████████████

CSI's quote was unawardable.  But for this material Agency error, issuance of the award to

CAC—a highly qualified and highly capable offeror, and the only eligible offeror in the

competition—would have been a virtual certainty.  And even if the Agency did not deem CSI's

quote to be unawardable, a rational evaluation of CSI's quote would have resulted in findings of

substantial risk and uncertainty arising from CSI's ████████████████████████████████

████████████████ following Round 4 Discussions, as well as a finding that CSI's

price—if appropriately escalated for a FY 2025 award date pursuant to CSI's price narrative—

will be **even higher** than quoted in its outdated price submissions.  Thus, but for the Agency's

arbitrary and irrational evaluation, the Agency would have recognized that CAC's price was not

only hundreds of millions of dollars lower than CSI's, but that it presented significantly greater

certainty and lower risk because it was ████████████████████████████████

████████████████████████████  Considering these price disparities, and CAC's

otherwise stellar evaluation scores, it is substantially likely that the Agency would have selected

CAC's highly-rated, lower-priced quote following a rational Factor 5 evaluation and best-value

tradeoff.  Accordingly, the Court should grant judgment in favor of CAC.

> **D.    The Agency Conducted Misleading, Unfair, and Non-Meaningful Discussions.**

Where, as here, an Agency elects to engage in discussions in a procurement conducted

under FAR Subpart 8.4, this Court generally "test[s] discussions undertaken … by the fairness

principles enshrined in FAR Part 15."  *Centerra Grp., LLC v. U.S.*, 138 Fed. Cl. 407, 414-15

(2018).  Whether viewed against the fairness principles comprising the FAR Part 15 framework

or the broader standards of fundamental fairness set forth in FAR 1.108-2(c)(3), discussions must

be fair and meaningful, and must not mislead offerors.  *See, e.g.*, *AshBritt, Inc. v. U.S.*, 87 Fed.

Cl. 344, 372 (2009).  "Discussions are misleading when a procuring agency issues 'incorrect,

confusing or ambiguous' communications that misdirect an offeror attempting to revise its

proposal." *Raytheon Co. v. U.S.*, 121 Fed. Cl. 135, 164 (2015); *see also, e.g.*, *DMS All-Star JV v. U.S.*, 90 Fed. Cl. 653, 670 (2010); *East West, Inc. v. U.S.*, 2012 WL 4465228, at *1 (Fed. Cl. 2012); *Gentex Corp. v. U.S.*, 58 Fed. Cl. 634, 653 (2003).  Here, the Agency's discussions were misleading, unfair, and non-meaningful—and the Court should grant judgment in CAC's favor.

  ***First***, the Agency's discussions with CAC were misleading with respect to the Agency's stated position on a ████████████████████ solution.  In Round 1 Discussions in October 2023, the Agency informed CAC that its proposed █████████████████████ ████████████████████ and that its proposed approach ████████████████ ████████ in CAC's solution. Tab 42a, AR 1712; *see also* Tab 42b, AR 1717.  In reliance on the information provided by the Agency during Round 1 Discussions, CAC ██████████████ ███████████████—an approach which CAC ███████████████████████ ████████████████████████████████ on the Agency's statements in these earlier rounds of discussions. Tab 93-3, AR 5344; *compare with* Tab 94-17, AR 5469-70 ████████ ██████████████████████ However, after misleading CAC through discussions into changing its proposed approach—and without notice to CAC—the Agency reversed course and penalized CAC for the very approach it induced CAC to adopt through discussions, even going to far as to cite CSI's ██████████████████ as a key distinguishing feature warranting payment of a half-billion-dollar price premium over CAC's ██████████████████. Tab 99, AR 5613.  The Agency induced CAC to adopt its allegedly preferred ██████████████████ through discussions which notified CAC that the Agency found a ██████████████████████████ ████████████ Tab 42a, AR 1712.  After CAC adopted the Agency's allegedly preferred approach (with stated reliance on the Agency's feedback as the reason for this change), the Agency changed tactics, found CAC's ██████████████████████████, and justified the

payment of a half-billion-dollar price premium to CSI on the basis that the Agency preferred ███████████████████████ This is a textbook example of prejudicially misleading discussions which render the Agency's evaluation arbitrary and irrational.

Had the Agency not misled CAC in the first instance, or had the Agency conducted meaningful Round 4 Discussions with CAC in which the Agency corrected its prior misdirection after reviewing CAC's revised quote submission and its stated reliance on the Agency's previously provided information, CAC would have ██████████████████████████ ████████████████████████████████ ██████████ As the ██████████████ was CAC's initial proposed approach—from which it departed only in reliance upon the Agency's misleading discussions—CAC was more than capable of reinstituting ██████████████████ had it not been misdirected to a ██████ ████████████ by the Agency.

The Agency's discussions were also prejudicially misleading because the Agency failed to correct CAC's stated assumption that any award following the October 2024 revised quote submittals and reevaluations would have an FY 2025 award date from which the base and option periods of performance would proceed.[8]  In its October 30, 2024 revised quote submission, CAC explained that its revised price ████████████████████████████████ ████████ Tab 93-1, AR 5335.  Had the Agency conducted meaningful discussions in which it informed CAC of its intentions regarding the start date and period of performance for any subsequent award and offered CAC the opportunity to revise its submission, CAC could have

---

[8] CAC disputes that the Agency had the ability to backdate the January 2025 award by 10 months without changing the period of performance to commence after the source selection decision was made.  However, assuming, *arguendo*, that the Agency could backdate the award in the manner it did, the Agency was required to correct the clearly mistaken understanding upon which CAC relied to prepare its revised price quote.

███████████████████████ the Agency's intention not to shift the award date or period of performance—irrational though they might be. Rather than conduct meaningful, fair, and non-misleading discussions with CAC, however, the Agency proceeded under Round 4 Discussions which were non-meaningful, misleading, and violative of fundamental fairness.

As part of its latest round of corrective action, the Agency created the memo to file set forth at Tab 91, in which the Agency purported to "review the impact of the iAero Group bankruptcy proceedings on CSI Aviation INC.'s (CSI) proposal evaluation and determine what actions, if any, the Agency should take after review." Tab 91, AR 5323. The Agency made no substantive evaluation findings with respect to either offeror's quote, but rather simply documented that CSI's quote would "need to be re-evaluated." Tab 91, AR 5328. In its Round 4 Discussions letter, issued in October 2024, the Agency claimed to have "performed a post-corrective action review and evaluation of [CAC's] quote in accordance with the RFQ evaluation criteria." Tab 92a, AR 5329. However, the record is devoid of any documentation reflecting that the Agency actually conducted a reevaluation of CAC's quote, or the reevaluation of CSI's quote it deemed necessary.[9] *See* Tab 91, AR 5328. The Agency's Round 4 Discussions also claim that this reevaluation of CAC's quote—which, to be clear, ***never occurred***—revealed that CAC's quote was "technical[ly] deficient [] due to iAero Airways bankruptcy," and directed CAC to address that purported deficiency in its final quote submission. Tab 92a, AR 5329. This was a non-existent deficiency, based on a purported reevaluation of CAC's quote which was never conducted, and was belied by the Agency's prior evaluation record which acknowledged that

---

[9] The Agency failed to actually reevaluate CSI's quote and, instead, proceeded directly to soliciting revised quotes to allow CSI to simply remove from its quote all reference to iAero. In this regard, the Agency completely failed to implement the corrective action promised to CAC and the GAO in exchange for dismissal of CAC's meritorious protest. Tab 79, AR 5148.

███████████████████████████████████   *See, e.g.*, Tab 50-3; Tab 52a, AR 3008;

Tab 52b, AR 3031.  So, to summarize:

- The Agency's Round 4 Discussions with CAC purported to find a technical deficiency in CAC's quote following a reevaluation of CAC's quote, and directed CAC to remedy that purported technical deficiency.  Tab 92a, AR 5329.
- But, the purported reevaluation was never conducted, and the purported technical deficiency cited in those discussions was fictitious.
- All the while, the Agency failed to actually raise other issues in its discussions with CAC—such as the Agency's changed understanding of a ████████████████, or intentions with respect to the award start date and period of performance— which would have rendered CAC's discussions fair and meaningful and would have given CAC an opportunity to meaningfully revise its quote without being misled by the Agency.
- The Agency's misdirection of CAC's attention to non-issues in its quote based on evaluations that never took place, while simultaneously failing to correct stated assumptions in CAC's quote which the Agency apparently perceived to be incorrect, clearly violates the fundamental fairness principles which govern the conduct of discussions in a FAR Subpart 8.4 procurement.

To be clear, the Agency could—and should—have proceeded with the reevaluation promised to CAC and the GAO in exchange for dismissal of CAC's meritorious protest, reevaluated the relevant portions of CSI's quote, and issued an award to CAC as the technically superior, lower-priced offeror who did not elect to proceed with a defunct air carrier as a teaming partner—and the only offeror without serious risk in its quote.  However, even assuming, *arguendo*, that the Agency's decision to reopen discussions in lieu of performing the promised corrective action reevaluation was not, itself, an arbitrary and irrational act,[10] the Agency's conduct of discussions with CAC was not meaningful or fair, and was misleading.  Had the Agency not misled CAC and otherwise subjected CAC to unfair and non-meaningful

---

[10] The record is devoid of any explanation as to why the Agency did not reevaluate quotes as promised in its corrective action, or why the Agency felt it necessary or appropriate to give CSI yet another opportunity to correct its error in business strategy and judgment—*i.e.*, its decision to team with a bankrupt air carrier.  CSI had ample opportunity to adjust its teaming strategy once it became aware of iAero's bankruptcy but ██████████, CSI chose not to do so.

discussions, CAC would have been able to adjust its revised quote to align with the Agency's changed intentions, understandings, and assumptions by, for example, ██████████████████ ████████████████████████████████████████████████████████████████████████████████ ██████████████████████ But for these arbitrary and irrational Agency acts, CAC would have had an even more meritorious technical solution and an even lower price, and CAC, the only other offeror, likely would have received the contract award as the best-value offeror.  Therefore, the Court should grant judgment in favor of CAC.

**E.** **The Agency Arbitrarily and Irrationally Evaluated Quotes under Factor 4—Past Performance.**

**i.** **The Agency Irrationally Evaluated CSI's Past Performance.**

The Agency's most recent past performance evaluation attributed ██ contracts to CSI—5 ████████ were performed by CSI, and ████████████████████████████████.  Tab 95, AR 5539-67.  The Agency received █████████████████████████ of those contracts ████████ ████████████████ *Id.*  The Agency thus could not evaluate past performance for any of those contracts, and should not have given CSI any credit for these contracts in the Factor 4 evaluation. This left ██ contracts for the Agency to evaluate, for which CPARS, reference checks, or both were obtained.  Tab 95, AR 5565-66.  However, the Agency's Factor 4 evaluation of CSI's quote was prejudicially arbitrary for several reasons.

*First*, the Agency completely ignored ██████████████████████████████████ ██████████████████████████████████████████████. Take, for example, ████████████████████████████████████████████████ Tab 95, AR 5549.  For a 2023 performance period, CSI received ████████████ CPARS scores in the areas of ████████████████████████ █████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████  Tab 95, AR 5551-52.  Inexplicably, the Agency did not assign CSI ████████

████████████████████████████  AR 5566, and justified its decision on the basis

that ████████████████████████████████████  AR 5567.

The Agency's determination was not only irrational—given the ████████████████

████████████████████████████████████████

████████████████  —but reflects clear disparate treatment as discussed *infra* in

Section V.E.iii.  The Agency made a similar material error with respect to ████████

████████████████████████  Tab 95, AR 5556.  The relevant

████████████████████████████████████

AR 5557.  Yet, the Agency completely ignored this ████████████████████

████████████████████  AR 5566-67.  This, too, was irrational.  Had the

Agency rationally evaluated ████████████████████████████████

the Agency would have assessed CSI findings of ████████████████  Factor 4

rating.

**Second**, the Agency failed to rationally evaluate the relevancy of CSI's past performance

projects.  The RFQ called for an evaluation of relevancy based on the similarity in scope and

complexity between a past performance project and the subject requirement.  ████████████

████████  should not have been found to be even marginally relevant, because ████████

████████████████████  Tab 95, AR 5539-67.  Such ████████

contracts are not even remotely similar in scope or complexity to this multi-billion dollar

requirement.  CSI's capability to perform a contract of ████████████  does not serve as a

rational indicator of CSI's capability to perform this significantly more complex, $3.6 billion

requirement.  Nor are ████████████████  relevant in scope or complexity to this work.

███████████████████████████████████████████████

████████ Tab 94-18, AR 5478.  It did not ███████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ *Id*.  The Agency's assessment of █████████████

for such a completely irrelevant past performance project, *see* Tab 95, AR 5565, was neither

rational nor reasoned.  ███████████████████████████████

███████████████████████████████████████

████████████ Tab 94-18, AR 5479—was similarly irrelevant, and the Agency's finding

of ██████████ for this contract was similarly arbitrary and irrational.  Tab 95, AR 5565.

███████████████████████████████████  Tab 94-

18, AR 5480.  ████████ thus fails to bear similarity to the vast majority of the scope and

services of the subject RFQ—and does not support a rational finding of ████████████ in

CSI's ability to successfully perform repatriation flight services.  ████████████████

████████████████████████████████████████

████████ Tab 94-18, AR 5481.  This is not similar in scope or complexity to the subject five-

year requirement for daily services, and thus cannot serve as the basis for ██████████

████████████ in CSI's ability to perform the subject requirement.  And, ██████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████ Tab 94-18, AR 5483.  Such an irrelevant

contract could not rationally ████████████████ in CSI's ability to perform.  Thus,

the Agency's assessment of ████████████ to CSI under Factor 4 was far from rational.

████████████████████████████████████████████

***Third***, the Agency's irrational evaluation findings carried through to its best-value tradeoff assessment and source selection decision.  In justifying award to CSI notwithstanding a half-billion-dollar price premium, the Agency purported to rely on the merit in CSI's past performance, stating that in addition to ████████████████████████████████

████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

Tab 99, AR 5612.  This is a blatantly inaccurate assessment of CSI's past performance.  As previously explained, ████ of the projects submitted by ████████████████ were irrelevant in scope and complexity to the subject requirement, and ████ more of the projects ████ ████████████████████████████████████████████████████████████████████In reality, CSI submitted ████ relevant past performance projects that the Agency could evaluate under the RFQ criteria—and ████████████ relevant past performance projects had ████████████████ past performance in the form of ████████ CPARS ratings and ████████ ████████████████  So, the Agency's statement that ████████████████████████████████ ████████████ *id.*, is, respectfully, categorically ***false***.  These irrational evaluation findings were precisely the bases upon which the Agency distinguished between CAC's and CSI's quotes to determine that the half-billion-dollar price premium associated with CSI's quote was warranted.  *See, e.g.*, *id*.  But for the Agency's arbitrary and capricious evaluation, CAC—a highly qualified offeror with exceptional evaluation marks and a substantially lower price— almost certainly would have received the contract award instead.

### ii.  The Agency Arbitrarily Evaluated CAC's Past Performance.

In its reevaluation of CAC's past performance under Factor 4, the Agency recognized

██████████████ in CAC's quote because the CPARS covering ████████████████

███████████████████████████████████████

███████████████████████████████

██████████████████████ Tab 95, AR 5537-38.  Stated differently, CPARS—

recognized by the FAR as "the official source for past performance information," FAR

42.1501(b)—reflected ███████████ past performance ratings for CAC.

    Notwithstanding the Agency's recognition of such ██████ past performance, CAC was

also assessed █████████████ under Factor 4 based on ███████████████████

████████████████████████████████████

██████████████████████ Tab 95, AR 5538.  In particular, the

Agency latched onto commentary in CAC's reference check as a basis for ████████████

████████ to CAC under Factor 4.  Tab 95, AR 5529; *see also* AR 5535.  Based on[11] these

narratives—which notably ███████████████████████████████

████████████████████████████████—the Agency found

reason to ██████████████████████████████████████

████████████████████████ notwithstanding the █████████████

█████████████████████ Tab 95, AR 5538.

    The Agency's evaluation findings, and decision to award CAC ██████████████

███████ rating under Factor 4, were arbitrary, irrational, and contrary to the weight of

---

[11] The Agency's finding of ████████████████████ for CAC under Factor 4 also referenced ██████████████████████ Tab 95, AR 5538.  This finding was not carried through to either the explanation of CAC's Factor 4 rating or the Source Selection Decision.  *Id*.; Tab 99, AR 5609-10.  This is likely because the Contracting Officer ████████████████████████████

████████████████████████████████████

contemporaneous evidence regarding CAC's past performance.[12]  The events of ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████  Indeed, ███████████████████████████

████████████████████████████████.  The events of ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

 CAC's CPARS and references reflect that CAC successfully performed ████████████

████████████████████████████████████████████████

████████████████████████████████  The Agency's reliance on ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████  was arbitrary,

irrational, and contrary to the weight of CAC's ██████████████  CPARS and past performance

references.  The Agency painted an ████████████████████  of what was clearly ████████████

████████████████████████████  But then again, the Agency's evaluation of

CAC's past performance under Factor 4 was hardly fair, neutral, or objective.  As described *infra*

in Section V.E.iii, the Agency disparately evaluated CAC's and CSI's past performance

information by ████████████████████████████████████████████████

---

[12] As discussed *infra* in Section V.E.iii, the Agency's evaluation findings also resulted from clear disparate treatment of CAC in its Factor 4 evaluation.

████████████████████████████████████████████████████



It also bears note that the Agency created past performance information for CAC as part of the evaluation process for this procurement and used that same past performance information to [REDACTED] CAC's Factor 4 rating. CAC's C[REDACTED] [REDACTED]—notably, the same CPARS report [REDACTED] [REDACTED], *see* Tab 95, AR 5538—was prepared by [REDACTED]. Tab 32.3, AR 1292. CAC s[REDACTED] [REDACTED] Tab 32.3, AR 1292-95. The AR shows, however, that evaluators and source selection officials for the subject procurement gathered on September 12, 2023 to ascertain [REDACTED] [REDACTED] [REDACTED] [REDACTED] Tab 35, AR 1354. It practically goes without saying that, in the midst of an ongoing procurement, Agency evaluators and source selection authorities have no business creating the past performance source materials that they are to review as part of that ongoing evaluation, and then relying on details in those self-created materials as the basis for justifying a multi-billion-dollar contract award to a

---

[13] [REDACTED] fulfillment of the role of [REDACTED] for this CPARS period appears to have been out of the ordinary course. In CAC's [REDACTED] the Contracting Officer served as the Assessing Official for CPARS. *See* Tab 32.2. For this CPARS, prepared during this procurement, [REDACTED] [REDACTED] Tab 99, AR 5615—served as the [REDACTED] instead.

company at a half-billion-dollar price premium.  *See* Tab 99, AR 5609-14.

The Agency's erroneous evaluation of CAC's quote under Factor 4 was undeniably prejudicial because, but for these errors, CAC would have been both the lower-priced offeror by a significant measure and superior (or, at worst, equal) to CSI under the non-price factors.  In this best-value procurement, and with ███████████ evaluation marks under every evaluation factor and a significantly lower price, CAC would have been virtually certain to receive the contract award but for the arbitrary evaluation conducted by the Agency.

### iii.   The Agency Subjected CAC to Unlawful Disparate Treatment.

In addition to the numerous evaluation errors described *supra* in Sections V.E.i-ii, the Agency irrationally subjected CAC to unlawful disparate treatment in the Factor 4 evaluation which led to prejudicially arbitrary evaluation conclusions and tainted the ultimate source selection decision.  This disparate treatment is most clearly seen in how the Agency accounted for what it perceived to be ███████████ past performance information for each offeror.  As described *supra* in Section V.E.i, CSI submitted ████████████████ under which it had received ██████████ CPARS ratings for the ████████████████ ██████████████████ Tab 95, AR 5551-52.  The Agency did not assess a finding of ██████████ to CSI, or re████████████████████ ████████████ because the Agency found that ██████████████████████ ██████████ Tab 95, AR 5566-67.  CSI was also attributed with ██████████████ ██████████████████, in which the ██████████████████ ████████████████████████████ Tab 95, AR 5557.  This did not even receive a mention among the Agency's evaluation findings for CSI, and did not serve as a basis for finding ██████████ in CSI under Factor 4 or otherwise ██████████████.  Tab 95, AR 5566-67.

████████████████████████████████████████████████

By contrast, as discussed *supra* in Section V.E.ii, the Agency assessed a finding of

████████████ to CAC for a ████████████████████████████████

████████████████████████ Tab 95, AR 5529.  CAC's CPARS for the same period

contained ████████████████████████████████

████████████████  Over the entire ████████████████████████

████████████████████████████████████████

████████████████████████

The record is devoid of any explanation as to why the Agency took a far more punitive

view of perceived ████████████████████████ in CAC's ████████████████

than it did of CSI's ████████████████████████████.  The Agency

offers no explanation as to why CAC's ████████████████████████

████████████████████ and similarly does not explain why ████████████

████████████████████████████████

████████████████████████████████████████

████████████████████████  The Agency engaged in clear

disparate treatment in evaluating quotes under Factor 4, and this rendered its evaluation highly

arbitrary and capricious.  *See, e.g.*, *BayFirst*, 102 Fed. Cl. at 691.

Such disparate treatment continued throughout and materially impacted the Agency's

best-value determination and, thus, undeniably prejudiced CAC.  The inequality and inaccuracy

of the Agency's relative best-value assessment of Factor 4 quotes is plainly apparent.  *See* Tab

99, AR 5612.  As shown by CAC's CPARS, CAC was found to have ████████████ratings in

████ CPARS report for ████████████████ and ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████ *See* Tab 95, AR 5530-35.  The real

"difference," such as it is, between CAC and CSI is that the Agency ████████████████

██████████████████████████████████████████ This is prejudicially

unlawful disparate treatment.  Similarly, and as already discussed herein, the Agency did not

evaluate perceived ██████████████ past performance ratings in CAC's and CSI's quotes

evenhandedly, but rather took a significantly more punitive view of CAC's ████████████

██████████████████████████ than it did of CSI's ████████████████████████

██████████████████████████ To be sure, there is **no truth** to the statement that ████████

████████████████████████████ Tab 99, AR 5612.

Nor is the Agency's claim that CSI's ████████████████████████████████

██████████████████████████████████████ and that ████████████████████████

███████████████████████████████████████████████ factually based or

accurate.  *Id*.  To be clear, CSI's CPARS confirm that CSI ████████████████████████

██████████████████████████████ *See, e.g.*, Tab 95, AR 5540 ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ AR 5535

██████████████████████ Further, CAC received countless "████████ ratings on its CPARS,

with ████████████████████████████████████████. Tab 95, AR 5530-35.

Again, this is clear disparate treatment which led to completely irrational (and factually

████████████████████████████████████████████████████████████

inaccurate) evaluation determinations.  CAC's past performance ███████████ CSI's, but rather simply did not receive the same ***consideration*** as the Agency gave to CSI. On this basis, too, the Court should grant judgment in CAC's favor.

### F.      The Agency's Best-Value Tradeoff was Arbitrary, Irrational, and Otherwise Not in Accordance with Law.

The RFQ called for award on the best-value basis and explained that "[a]s quotes approach equality (does not mean 'equal' because all quotes are different), price may become a determining factor."  Tab 17, AR 425-26.  In its irrational best-value tradeoff determination, the Agency listed █████████████████████ in CSI's quote as compared to CAC's quote as warranting the payment of ***a half-billion-dollar price premium***, including, for example, that:



However, as detailed *supra* in Sections V.A-E, the evaluation findings upon which the Agency relied in its best-value tradeoff determination were, themselves, arbitrary, irrational, and unsupported by the record evidence.  The Agency's arbitrary and irrational underlying evaluations thus tainted the Agency's best-value tradeoff and source selection decision.  *See, e.g.*, *BayFirst Sols., LLC*, 102 Fed. Cl. at 695.  Had the Agency rationally evaluated CAC's and CSI's quotes in accordance with the RFQ, the Agency would have found CAC to be both superior (or, at worst, equal to CSI) under the non-price evaluation factors, and lower-priced under Factor 5. In this RFQ, which mandated selection of the best-value offeror, the Agency would have had no choice but to select CAC for contract award following a rational evaluation of quotes in

accordance with stated criteria.  *Carahsoft Tech. Corp. v. U.S.*, 86 Fed. Cl. 325, 349-50 (2009).

Moreover, the ███████████████████ between CSI's and CAC's quotes, *see* Tab

99, AR 5612-13, even if rationally based, were plainly insufficient to justify an award to a quote

with an unreasonably high price at a ***half-billion-dollar price premium***.  ████████████ in

offerors' proposed approaches under the non-price factors, such as those cited to by the Agency

in its best-value tradeoff determination, are plainly insufficient to rationally justify the payment

of a half-billion-dollar price premium—particularly under an RFQ evaluation scheme which

mandated that price was to "become a determining factor" as quotes approached equality under

the non-price evaluation factors.  Tab 17, AR 425-26; *see, e.g.*, *Serco, Inc.*, 81 Fed. Cl. at 497.

For the reasons described herein, the Agency's best-value tradeoff determination defies

rationality, reason, and the terms of the RFQ, and the Court should grant judgment for CAC.

### G.    The Agency Breached its Implied Duty to Fairly and Honestly Consider CAC's Quote.

The Agency breached its implied duty to fairly and honestly consider CAC's quote by

refusing to rationally evaluate CAC's quote and refusing to consider CAC's highly meritorious

and significantly lower-priced quote for award in a non-arbitrary fashion.  *See, e.g.*, *J.C.N.*

*Constr., Inc. v. U.S.*, 107 Fed. Cl. 503, 517 (2012); *Medline Indus., Inc. v. U.S.*, 155 Fed. Cl. 522,

541 (2021); *Castle-Rose, Inc. v. U.S.*, 99 Fed. Cl. 517, 531 (2011).  By soliciting quotes under the

RFQ, the Agency was bound to give fair and honest consideration to CAC's quote.  However, the

Agency failed to do so.  The Agency's actions in conducting this procurement—and, as most

relevant here, the Agency's most recent round of reevaluations culminating in the January 2025

award decision—were prejudicially arbitrary and irrational, and otherwise unlawful.

To begin, the Agency stated in its Agency-level protest decision dated December 5, 2024

that it planned to lift the stop work order on CSI's prior award—indicating that the Agency had

already decided as of that date to confirm its prior award to CSI, rather than to terminate CSI's prior award and issue a new award to CAC.  Tab 109, AR 5972.  Yet, on that date, the Agency had not yet reevaluated offerors' revised quote submissions from October 2024.  *See* Tabs 95-99.  This, alone, indicates that the Agency never gave fair and honest consideration to CAC's revised quote submission in its corrective action reevaluation, and never rationally considered whether CAC's outstanding and significantly-lower priced quote presented the best value to the Agency.

Setting aside the above, the Agency also breached its implied duty to fairly and honestly consider CAC's quote because, as shown herein, the Agency's evaluation of CAC's quote was highly arbitrary and irrational.  *See supra* Sections V.A-F.  CAC has established arbitrary and capricious action by the Agency in its latest round of corrective action reevaluations, *id*., and is thus entitled to relief on the ground that the Agency breached its implied duty to fairly and honestly consider quotes.  *See, e.g.*, *JCN Constr.*, 107 Fed. Cl. at 517; *Medline*, 155 Fed. Cl. at 541.  Accordingly, CAC is entitled to relief on this basis, including but not limited to recovery of its bid preparation and proposal costs, the amount of which should be determined by a separate proceeding if the Agency and CAC are unable to reach an informal resolution.  *See, e.g.*, *Medline*, 155 Fed. Cl. at 533.  The Court should, therefore, grant judgment in CAC's favor and award CAC its bid preparation and proposal costs.

### H.    The Agency's Arbitrary and Irrational Actions Prejudiced CAC.

CAC suffered undeniable prejudice as a result of the Agency's arbitrary, capricious, and otherwise unlawful acts described herein because, but for such improper conduct, CAC would have had a more than substantial chance of receiving the contract award.  CAC is a highly qualified and highly capable offeror who successfully performed the incumbent requirement for five years.  CAC received outstanding evaluation marks under every RFQ criterion, and received ███████ evaluation ratings under nearly every non-price evaluation factor—including all of

the most important non-price evaluation factors.  Additionally, CAC submitted a fair, reasonable, and competitive proposed price which was approximately ***a half billion dollars lower*** than the price quoted by CSI.  CAC and CSI are the only two offerors remaining in the competition.

As described *supra* in Sections V.A-F, the Agency (1) failed to conduct an Acceptability Review as required by the RFQ, which would have resulted in a finding that CSI was ineligible for award due to the expiration of its GSA Schedule; (2) conducted an arbitrary and irrational evaluation of CSI's quote under Factor 1: Corporate Experience; (3) conducted an arbitrary evaluation of quotes under Factor 5: Price, which failed to comport with the terms of the RFQ; (4) arbitrarily, irrationally, and disparately evaluated CAC's and CSI's quotes under Factor 4: Past Performance; (5) failed to conduct meaningful discussions with CAC; and (6) failed to conduct a rational best-value tradeoff determination.  But for any or all of these Agency errors, the Agency would have rationally determined that CSI's quote was ineligible for award and CAC—the only eligible offeror remaining the competition, and a highly qualified and highly capable offeror in its own right—almost certainly would have received the contract award.  And, even if the Agency did not disqualify CSI from the competition (and it should have), the Agency would have found increased merit in CAC's quote (and increased CAC's evaluation score) under Factor 4, had it conducted a rational evaluation of CAC's quote and conducted meaningful, fair, and non-misleading discussions with CAC.  Relatedly, the Agency would have found decreased merit in CSI's quote (and decreased CSI's evaluation scores) under Factors 1 and 4, and would have found CSI's quoted price to be both unreasonably high and non-compliant with the terms of the RFQ, had it rationally evaluated CSI's quote against the RFQ criteria.  Thus, but for the Agency's evaluation errors, there exists a substantial likelihood that CAC's quote would have been deemed superior to CSI's under the non-price evaluation factors and, with its half-billion-

dollar price advantage, that CAC would have been selected as the best-value offeror. *See, e.g.*, *BayFirst*, 102 Fed. Cl. at 695. Quite simply, CAC has suffered undeniable prejudice as a result of the Agency's arbitrary and irrational acts described herein.

## I.    CAC is Entitled to Permanent Injunctive Relief.

CAC respectfully requests that the Court issue a permanent injunction barring the Agency from proceeding with performance of the awarded contract to CSI because, as described herein, that contract award arose from a prejudicially arbitrary and irrational evaluation of quotes and source selection decision. Based on the foregoing, CAC has established success on the merits. As shown *supra* in Sections V.A-F, the Agency conducted an entirely arbitrary and irrational corrective action reevaluation, in contravention of the terms of the RFQ, which resulted in an erroneous best-value tradeoff determination and the improper selection of CSI, rather than CAC, as the best-value awardee. In short, the Agency lacked a rational basis for its evaluation findings or source selection decision. Absent a grant of permanent injunctive relief, CAC will suffer irreparable harm because, *inter alia*, "[t]he loss of potential work and profits from a government contract constitutes irreparable harm." *Springfield Parcel C, LLC v. U.S.*, 124 Fed. Cl. 163, 195 (2015); *see* Decl. of D. Carson, ¶¶ 4-6. Irreparable harm to CAC is not, however, limited to the loss of an opportunity to perform, and profit from, this multi-billion-dollar opportunity. CAC will also be deprived of the opportunity to earn valuable experience and past performance that, in turn, can be used to obtain future contract awards. *See* Decl. of D. Carson, ¶¶ 4-6.

The balance of hardships also weighs in favor of a grant of permanent injunctive relief to CAC. Neither the Government nor CSI suffer harm if barred from proceeding with an arbitrarily and unlawfully issued contract award. Nor will a grant of injunctive relief unduly delay this procurement, which has already been prolonged by repeated evaluation errors by the Agency, multiple meritorious protests, and multiple rounds of voluntary corrective action undertaken by

the Agency.  *See, e.g.*, *Reilly's Wholesale Produce v. U.S.*, 73 Fed. Cl. 705, 716 (2006).  To the

extent necessary services must still be performed, the Agency has continued to obtain such

services through short-term bridge contracts.  To the extent that the Agency claims some kind of

economic harm arising from the need to conduct yet more corrective action, such harm is

insufficient to tip the scales out of CAC's favor.  *See, e.g.*, *Springfield Parcel C*, 124 Fed. Cl. at

195.  And, while CSI may claim to suffer harm from the loss of its contract award upon the

issuance of an injunction and following a fair and rational evaluation of quotes, CSI had no

rightful expectation of a contract award in the first instance, and only received such an award as

the result of a defective evaluation process and award decision.  Thus, any claim of such harm by

CSI does not outweigh the harm to CAC.  *Id*.  Not to mention, CSI has received, and continues to

receive, windfalls—both financial, and in the form of past performance—from performance of

the bridge contract work which undercut any claim of harm from CSI and more than counteract

the loss of an award under the RFQ to which CSI was never entitled.  Finally, the public interest

is best served by a grant of permanent injunctive relief to prevent the Agency from proceeding

with an arbitrarily and unlawfully issued contract award resulting from an irrational evaluation of

quotes.  *Superior*, 152 Fed. Cl. at 326; *CW Gov't Travel, Inc. v. U.S.*, 110 Fed. Cl. 462, 496

(2013); *Magnum Opus Techs., Inc. v. U.S.*, 94 Fed. Cl. 512, 551 (2010); *Cardinal Maint. Serv. v.*

*U.S.*, 63 Fed. Cl. 98, 111 (2004).  The Court should grant a permanent injunction barring the

Agency from proceeding with performance of the unlawfully and arbitrarily issued award to CSI.

## VI.    <u>CONCLUSION</u>

For the above-stated reasons, the Agency's actions were prejudicially arbitrary and

irrational, and the Court should (1) grant judgment in favor of CAC; (2) declare that the

Agency's corrective action reevaluation of quotes, and reselection of CSI as the contract

awardee, was prejudicially arbitrary, capricious, an abuse of discretion, and otherwise not in

accordance with law or the terms of the RFQ; (3) permanently enjoin the Agency from

proceeding with performance of the arbitrarily and unlawfully issued contract award to CSI; (4)

order the Agency to terminate CSI's contract award, conduct a rational reevaluation of quotes in

accordance with the terms of the RFQ, and render a new award decision; and (5) order the

Agency to pay CAC's bid preparation and proposal costs, the amount of which will be

determined in a separate proceeding if the parties are unable to resolve the matter informally.

March 27, 2025                                        Respectfully submitted,

                                                     /s/Aron C. Beezley
                                                     Aron C. Beezley
                                                     Bradley Arant Boult Cummings LLP
                                                     1615 L Street, N.W., Suite 1350
*Of Counsel:*                                        Washington, D.C. 20036
                                                     Email: abeezley@bradley.com
Nathaniel J. Greeson                                 Tel.: (202) 719-8254
Gabrielle A. Sprio                                   *Attorney of Record for*
Bradley Arant Boult Cummings LLP                     *Classic Air Charter, Inc.*